United States District Court

For the Northern District of California

1

2              UNITED STATES DISTRICT COURT

3              NORTHERN DISTRICT OF CALIFORNIA

4

5
TV INTERACTIVE DATA
6 CORPORATION,

7              Plaintiff,              No. C 10-0475 PJH

8        v.                           **ORDER RE MOTIONS FOR**
                                       **SUMMARY JUDGMENT**
9 SONY CORPORATION, et al.,

10             Defendants.
   _____/
11

12       The parties' motions for summary judgment came on for hearing before this court on

13 October 3, 2012.  Plaintiff TV Interactive Data Corporation ("TVI") appeared by its counsel

14 Richard M. Martinez, Patrick M. Arenz, Sarah Hudleston, and Victor C. Chan.  Defendants

15 Sony Corporation, Sony Corporation of America, Sony Electronics, Inc., Sony Computer

16 Entertainment, Inc. and Sony Computer Entertainment America LLC (collectively, "Sony")

17 appeared by their counsel Gregory S. Gewirtz, M. Elizabeth Holt, and Jonathan A. David.

18 Having read the parties' papers and carefully considered their arguments and the relevant

19 legal authority, the court hereby rules as follows.

20                              **BACKGROUND**

21       Plaintiff TVI was formed by Peter M. Redford in 1990 to develop new technologies in

22 the multimedia and interactive television markets.  Between 1997 and 2002, TVI (as

23 assignee from Mr. Redford and his co-inventor Donald S. Stern) obtained a family of

24 patents relating to the integration of interactive media with printed publications such as

25 children's books, magazines, and CD cases.

26       On July 1, 1994, Mr. Redford and Mr. Stern filed the initial patent application, which

27 subsequently issued as United States Patent No. 5,624,265 ("the '265 patent").  The initial

28 application was followed by additional divisional and continuation applications, which

eventually led to the issuance of the four patents-in-suit – United States Patent No. 5,597,307 ("the '307 patent"), United States Patent No. 5,795,156 ("the '156 patent"), United States Patent No. 6,249,863 ("the '863 patent), and United States Patent No. 6,418,532 ("the '532 patent").  The four patents-in-suit share a common specification,[1] and were issued in, respectively, January 1997, August 1998, June 2001, and July 2002.

Among other things, the patents disclose a method for automatically launching an application or other process upon the insertion of a disc into a peripheral of a computer system.  During prosecution, the inventors differentiated their invention and disclaimed so-called "boot" or "reboot" prior art.  This prior art had the limited capacity of starting an application only in association with a booting or rebooting of the device.

TVI asserts that over the course of prosecution, Microsoft eliminated the market for TVI – particularly for TVI's patented "autoplay" invention – by incorporating autoplay in every version of Microsoft Windows.  In 2002, TVI sued Microsoft for patent infringement. See TV Interactive Corp. v. Microsoft Corp., C-02-2385 JSW (N.D. Cal.) ("Microsoft").

Microsoft argued that it was not a direct infringer, and that it was the companies selling Windows-installed computers loaded with Windows that were infringing.  TVI then filed a parallel suit against various computer manufacturers.  See TV Interactive Corp. v. Fujitsu Ltd., C-04-3367 JSW (N.D. Cal.).  That litigation, which was filed in August 2004, was limited to the use of the autoplay invention in Windows computers.  In December 2004, the parties agreed to stay the case pending the outcome of the Microsoft litigation.

Meanwhile, Microsoft filed four motions for summary judgment – a motion for summary judgment of invalidity of the '156, '863, and '532 patents pursuant to 35 U.S.C. § 112 ¶ 2 (indefiniteness); a motion for summary judgment of invalidity under 35 U.S.C. § 102(b) (claims anticipated by prior art), based on Commodore CDTV; a motion for summary judgment of invalidity under 35 U.S.C. § 102(g) (priority of invention by Microsoft); and a motion for partial summary judgment of no willful infringement and limiting

---

[1] Where this order cites to the common specification, it is to the '532 patent.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

damages to post-suit inducement. In orders issued on October 13, 2004, the Hon. Jeffrey S. White denied all the motions.

Judge White denied the motion relating to the CDTV prior art on the ground that CDTV reboots, and TVI had made clear in prosecution and throughout the Microsoft litigation that rebooting was not TVI's invention. "Rebooting and re-initializing the entire system after every insertion of media is not simply an additional series of steps; it is more accurately a series of operations not contemplated by the construction of TVI's claims." Order Denying Microsoft's Motion for Summary Judgment of Invalidity Pursuant to 35 U.S.C. § 102(b) based on Commodore CDTV, at 2.

> Because the Commodore CDTV system reboots and re-initializes the system whenever a user ejects media and TVI's claimed invention[ ] is an advance over such reboot systems which can detect each insertion of media after the loading of initialization files without re-initializing the system, and because the proposed interpretation of the claims language would render superfluous its explicit language, the Court finds that Microsoft has failed to meet its high burden of demonstrating by clear and convincing evidence that the Commodore CDTV anticipates every single limitation of TVI's claimed invention.

Id. at 3.

Shortly before the commencement of trial, the parties reached a settlement, and Microsoft agreed to license the asserted patents.[2] Before Microsoft signed the deal, however, it filed petitions for reexamination of the validity of the asserted patents before the U.S. Patent and Trademark Office ("PTO"), in light of CDTV. The patent examiner agreed with Microsoft that the modules used by CDTV were covered under the patents' definition of "initialization file." '532 Reexamination, Office Action, at 33 (Nov. 21, 2005). TVI did not dispute that "initialization file" includes modules of code in ROM. '863 Reexamination, Patent Owner's Statement, at 4 (Aug. 7, 2006).

However, as in the Microsoft case, TVI distinguished its invention from CDTV on the basis of CDTV's rebooting requirement. '307 Reexamination, Examiner, Notice of Intent to Issue Ex Parte Reexam Certificate, at 3 (Oct. 24, 2008). TVI also narrowed several claims

---

[2] TVI also dismissed the parallel lawsuit against the computer manufacturers because the license covered their infringement for Windows-based computers as well.

United States District Court

For the Northern District of California

1 in the patents to clarify that the patented method requires that the application or other

2 process be initiated automatically upon insertion of the disk without rebooting or resetting

3 the system.

4       The PTO confirmed the patentability of the asserted independent claims of the '156

5 patent, the '863 patents, and claim 18 of the '307 patent as the claims were originally

6 drafted. The remaining asserted independent claims – claim 1 of the '307 patent and

7 claims 1, 9, and 17 of the '532 patent – were narrowed to confirm that the claims preclude

8 rebooting. Thus narrowed, the claims were determined to be patentable.

9       Once the reexaminations ended, TVI pursued other infringement claims. TVI filed

10 suit against a number of computer manufacturers on October 6, 2009, then dismissed the

11 complaint and refiled the present lawsuit on February 2, 2010 after a patent assignment

12 issue was clarified. TVI originally accused 11 defendant groups of infringement – all of

13 which manufactured or sold DVD or Blu-ray players, which TVI asserted incorporated its

14 patented autoplay technology. All defendants with the exception of the five Sony entities

15 have taken a license and/or been dismissed from the case.

16       With regard to Sony, TVI alleges, among other things, that the Sony defendants

17 have directly and/or indirectly infringed one or more claims of the patents-in-suit. The

18 accused products include Blu-rayDisc® and DVD VIDEO™ players – for example, the Sony

19 BDP-S550 and the Sony DVPNS700HB – as well as the Sony Playstation®3.

20       This case was previously assigned to the Hon. Jeremy Fogel. The court held a

21 claim construction hearing on February 22, 2011, and issued an order on April 15, 2011,

22 construing six disputed terms.[3] On August 19, 2011, Sony filed a motion for summary

23 ───────────────

24    [3] The disputed terms construed by the court were (1) "**file**" and "**initialization file**," found in all asserted independent claims, and in claims 1 and 17 of the '532 patent and

25 claim 1 of the '863 patent; (2) "**loading**," found in claim 17 of the '532 patent, claims 1 and 18 of the ''307 patent, and claim 1 of the '156 patent; and "**means for automatically loading an**

26 **initialization file**," found in claim 1 of the '156 patent and claim 1 of the ''863 patent; (3) "**first means for checking for a file of first predetermined name**" and "**second means for**

27 **checking for a file of second predetermined name**," found in claim 9 of the '863 patent; (4) "**said file other than said initialization file having a predetermined name that is**

28 **compatible with said initialization file**," found in claims 1 and 17 of the '532 patent and in claim 1 of the '863 patent; (5) "**returning to said step of automatically enabling**," found in

1   judgment of invalidity.  The hearing was subsequently vacated, the motion was

2   administratively stayed.  It was eventually re-noticed to be heard with the present cross-

3   motions for summary judgment.

4        On September 16, 2011, TVI filed a first amended complaint against the defendants

5   remaining in the case as of that date.  On September 28, 2011, following Judge Fogel's

6   departure from the court, the case was reassigned to the undersigned district judge.

7        On August 29, 2012, TVI filed a motion for summary judgment as to inequitable

8   conduct, laches, and equitable estoppel, and Sony filed a motion for summary judgment as

9   to inequitable conduct, laches, invalidity under 35 U.S.C. §§ 102 and 103, and non-

10  infringement.  Those two motions, plus Sony's earlier-filed motion for summary judgment of

11  invalidity, are now before the court.

**DISCUSSION**

13  A.   Legal Standard

14       A party may move for summary judgment on a "claim or defense" or "part of . . . a

15  claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is

16  no genuine dispute as to any material fact and the moving party is entitled to judgment as a

17  matter of law.  Id.

18       A party seeking summary judgment bears the initial burden of informing the court of

19  the basis for its motion, and of identifying those portions of the pleadings and discovery

20  responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

21  v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome

22  of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

23  material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

24  verdict for the nonmoving party.  Id.

25       Where the moving party will have the burden of proof at trial, it must affirmatively

26  demonstrate that no reasonable trier of fact could find other than for the moving party.

27  _____

28  claims 1 and 18 of the '307 patent; and (6) "**without rebooting the [host] device**," found in
claim 1 of the '307 patent and claims 1, 9, and 17 of the '532 patent.

United States District Court
For the Northern District of California

1  <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

2  the nonmoving party will bear the burden of proof at trial, the moving party can prevail

3  merely by pointing out to the district court that there is an absence of evidence to support

4  the nonmoving party's case.  <u>Celotex</u>, 477 U.S. at 324-25.  If the moving party meets its

5  initial burden, the opposing party must then set out specific facts showing a genuine issue

6  for trial in order to defeat the motion.  <u>Anderson</u>, 477 U.S. at 250; <u>see also</u> Fed. R. Civ. P.

7  56(c), (e).

8        When deciding a summary judgment motion, a court must view the evidence in the

9  light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

10  <u>Anderson</u>, 477 U.S. at 255; <u>Hunt v. City of Los Angeles</u>, 638 F.3d 703, 709 (9th Cir., 2011).

11  B.     Sony's Motions for Summary Judgment of Invalidity

12        Sony argues that certain asserted claims in the patents-in-suit are invalid under 35

13  U.S.C. § 112, and also under 35 U.S.C. §§ 102 and 103.  Once a patent has been issued,

14  its claims are presumed valid.  35 U.S.C. § 282.  A challenger that attacks the validity of

15  patent claims in civil litigation has a statutory burden to prove invalidity by clear and

16  convincing evidence.  <u>In re Baxter Int'l, Inc.</u>, 678 F.3d 1357, 1364 (Fed. Cir. 2012) (citing 35

17  U.S.C. § 282); <u>see also</u> <u>Microsoft Corp. v. i4i Ltd.</u>, __ U.S. __, 131 S.Ct. 2238, 2242 (2011).

18        Clear and convincing evidence is such evidence that produces "an abiding

19  conviction that the truth of [the] factual contentions are 'highly probable.'"  <u>Colorado v. New</u>

20  <u>Mexico</u>, 467 U.S. 310, 316 (1984).  Should the challenger fail to meet that burden, the court

21  will find not that the patent is valid (as it is already presumed valid), but simply that the

22  challenger did not carry its burden of establishing invalidity in the particular case before the

23  court.  <u>In re Baxter</u>, 678 F.3d at 1364 (citations and quotations omitted).

24        1.     Invalidity under § 112

25        Sony contends that certain asserted claims are invalid under 35 U.S.C. § 112, ¶ 1

26  (written description), ¶ 2 (definiteness), and ¶ 6 (structure for means plus function claims).

27        The "written description" requirement is as follows:

28

6

United States District Court

For the Northern District of California

1

2
3
4

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

5   35 U.S.C. § 112 ¶ 1.

6       "The purpose of the written description requirement is to ensure that the scope of

7   the right to exclude, as set forth in the claims, does not overreach the scope of the

8   inventor's contribution to the field of art as described in the patent specification." In re Katz

9   Interactive Call Processing Patent Litig., 639 F.3d 1303, 1319 (Fed. Cir. 2011) (quotations

10  omitted).  The specification does not need to use the same language as the claims in order

11  to satisfy the written description requirement. Yingbin-Nature (Guangdong) Wood Indus.

12  Co., Ltd. v. Int'l Trade Comm'n, 535 F.3d 1322, 1334 (Fed. Cir. 2008).  Nor does it demand

13  "either examples or an actual reduction to practice." Ariad Pharms., Inc. v. Eli Lilly & Co.,

14  598 F.3d 1336, 1352 (Fed. Cir. 2010) (en banc).

15      The test for sufficiency of the written description is "whether the disclosure of the

16  application relied upon reasonably conveys to those skilled in the art that the inventor had

17  possession of the claimed subject matter as of the filing date." Id. 1351; see also Crown

18  Packaging Tech., Inc. v. Ball Metal Bev. Container Corp., 635 F.3d 1373, 1380 (Fed. Cir.

19  2011).  This test requires an "objective inquiry into the four corners of the specification from

20  the perspective of a person of ordinary skill in the art." Ariad, 598 F.3d at 1351.

21      Whether a claim meets the written description requirement is a question of fact.

22  Crown Packaging Tech., 635 F.3d at 1380.  "[T]he level of detail required to satisfy the

23  written description requirement varies depending on the nature and scope of the claims and

24  on the complexity and predictability of the relevant technology." Id.  The question whether

25  the patent complies with the written description requirement "is amenable to summary

26  judgment in cases where no reasonable fact finder could return a verdict for the nonmoving

27  party." PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1307 (Fed. Cir. 2008); see

28  also Streck, Inc. v. Research & Diagnostic Sys., Inc., 665 F.3d 1269, 1285-86 (Fed. Cir.

1   2012).

2     The "definiteness" and "regards as his invention" requirement provides as follows:

3     The specification shall conclude with one or more claims particularly pointing
    out and distinctly claiming the subject matter which the applicant regards as
4   his invention.

5   35 U.S.C. § 112 ¶ 2.

6     "Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite."

7   Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1358 (Fed. Cir. 2010) (citations

8   omitted); see also Honeywell Int'l, Inc. v. Int'l Trade Comm'n, 341 F.3d 1332, 1338 (Fed.

9   Cir. 2003).  To prove indefiniteness, a party must "show[ ] by clear and convincing evidence

10  that a skilled artisan could not discern the boundaries of the claim" based on the intrinsic

11  evidence or knowledge of the relevant area of art.  Halliburton Energy Servs., Inc. v. M-I

12  LLC, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008); see also Invitrogen Corp. v. Clontech Labs,

13  Inc., 429 F.3d 1052, 1072 (Fed. Cir. 2005).  In addition, a finding of indefiniteness

14  invalidates the patent claims entirely, rather than gives meaning to them.  Exxon Research

15  & Eng'g Co. v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001).

16    With respect to the "regards as his invention" aspect of the definiteness requirement,

17  the Federal Circuit has held that when the plain language of the claims are clearly

18  inconsistent with the specification, the claims are invalid for not properly claiming what the

19  inventor regards as his invention.  Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336,

20  1349 (Fed. Cir. 2002).

21    Finally, the requirements applicable to means-plus-function claims are as follows:

22    An element in a claim for a combination may be expressed as a means or
    step for performing a specified function without the recital of structure,
23  material, or acts in support thereof, and such claim shall be construed to
    cover the corresponding structure, material, or acts described in the
24  specification and equivalents thereof.

25  35 U.S.C. § 112 ¶ 6.

26    Under this requirement, there must be some structure in the specification that

27  corresponds to the claimed function or the claim may be rendered indefinite under 35

28  U.S.C. § 112 ¶ 2.  The corresponding structure, furthermore, includes only the features

8

United States District Court

For the Northern District of California

1   necessary to perform the claimed functions.  See Northrup Grumman Corp. v. Intel Corp.,

2   325 F.3d 1346, 1352 (Fed. Cir. 2003) ("A court may not import into the claim features that

3   are unnecessary to perform the claimed function.") (citation omitted).

4        In its motion, Sony contends that the following terms render the claims invalid under

5   § 112:  (a) "automatically loading an initialization file;" (b) "compatible with said initialization

6   file;" (c) "returning to said step of automatically enabling [an interrupt];" and (d) "first [and

7   second] means for checking."  The court finds that the motion must be DENIED, based on

8   Sony's failure to establish invalidity by clear and convincing evidence.  In addition, it

9   appears that as to at least some of the terms, Sony is improperly arguing for

10  reconsideration of the prior order construing claims.

11             a.     "automatically loading an initialization file" (Claim 1 of '156 patent,

12                    Claims 1 and 9 of '863 patent, and Claims 1 and 17 of '532 patent)

13       The parties previously agreed that "automatically loading an initialization file" was

14  the claimed function in the means-plus-function term "means for automatically loading an

15  initialization file."  The court construed "loading" as "copying into memory," and construed

16  "initialization file" as "a file which, alone or in combination with other file(s), contains

17  information or data used or referenced to start up or configure software and/or hardware

18  and is not then used to perform a further process or used as a driver."  Claim Construction

19  Order at 8.  The term "automatically" was not construed.

20       Sony contends that there is no support in the specification for "automatically loading

21  an initialization file," and that the specification discloses only "automatically loading" an

22  autostart driver, which is used to look for certain files on inserted discs upon booting or

23  start-up of the host device (citing '532 patent, 21:59-62, 21:67-22:4, 22:23-26, 19:25-30,

24  26:11-17, 30:58-61, Fig. 5A).  Sony asserts that the specification says only that the

25  initialization files are "checked for" and "used" during booting – which it claims is not the

26  same thing as "loading" (citing id., 22:19-28).

27       Under the prior claim construction, and as agreed by the parties, an initialization file

28  cannot also be a driver such as an autostart driver.  See Claim Construction Order at 7-8,

United States District Court

For the Northern District of California

18.  For this reason, Sony argues, an initialization file cannot be automatically loaded to further perform a process, like an autostart driver, which is automatically copied into memory during booting and is used to perform the further process of starting an application (citing '532 patent, 4:34-37 – if file of first predetermined name exists, "autostart driver automatically executes the file which in turn starts the appropriate application").  Thus, Sony asserts, the term "automatically loading an initialization file" renders the asserted claims invalid for lack of a written description.

In opposition, TVI contends that "checking for" and "using" the initialization file necessarily involves "automatically loading" the file.  Based on the declaration of its expert Dr. Andrew Wolfe, TVI argues that the specification does in fact disclose automatically loading an initialization file.  See '532 patent, 22:19-23 ("[d]uring booting, host device 120 checks for initialization files such as startup files and configuration files.  On finding a valid initialization file, host device 120 uses the initialization file during booting.").  In addition, TVI contends, the specification discloses CONFIG.SYS as an example of an initialization file in the IBM PC (citing id. 21:66-22:6).  TVI asserts that one of ordinary skill in the art would understand that CONFIG.SYS is loaded (copied into memory) during start up of an IBM PC; and that the PTO examiner also adopted this view during reexamination, noting that installation files such as CDTV's ROM modules are "loaded into memory."

Dr. Wolfe explains that in 1994 the CONFIG.SYS initialization file was loaded into the memory of an IBM PC host device during the boot process of the Microsoft DOS operating system.  When powered on, the IBM PC began the boot process for Microsoft DOS, and during booting, as explained in the written description for the Redford patents, the computer system would "check for" and "use" the CONFIG.SYS file.  However, before the IBM PC used the CONFIG.SYS file, the boot process first copied ("loaded") the file into the system's memory.  Dr. Wolfe contends that this process was well-known in the field of computer science in 1994.  Thus, TVI argues, it follows that one of ordinary skill in the art in 1994 would have understood that "checking for" and "using" a CONFIG.SYS file during booting of an IBM PC host device necessarily involved copying the CONFIG.SYS file into

10

United States District Court

For the Northern District of California

1   the memory of the IBM PC.

2      TVI also notes that the PTO examiner during the original prosecution of the '156

3   patent concluded that "checking for" and "using" an initialization file is the corresponding

4   structure for the claim term "means for automatically loading an initialization file."  Finally,

5   TVI argues, during the technology tutorial before Judge White in the Microsoft case,

6   Microsoft (which created Microsoft DOS) explained that an initialization file is "checked for"

7   and "used" and also agreed that the initialization file is "loaded."

8      The court finds that Sony has not met its burden of showing by clear and convincing

9   evidence that this term renders the claims invalid.  Moreover, while there does not appear

10  to be any dispute regarding whether the loading is performed "automatically," there does

11  appear to be a dispute as to whether, e.g., one of ordinary skill in the art would interpret the

12  "checking for/using" process disclosed in the specification as "loading" a file.

13               b.     "compatible with said initialization file" (Claims 1 and 17

14                      of '532 patent, Claim 1 of '863 patent)

15     In construing the term "said file other than said initialization file having a

16  predetermined name that is compatible with said initialization file" as meaning "a file having

17  a predetermined name, which name is consistently used by the initialized host device to

18  seek a file," the court noted that the only dispute between the parties involved the meaning

19  of the words "compatible with."  Claim Construction Order at 17.

20     Sony's position was that "compatible with" meant "started up by," and that no file

21  could be considered "compatible with" the initialization file in the sense that files are

22  "compatible with" the autostart driver.  TVI argued that the specification supported the use

23  of "compatibility" in its ordinary meaning of "capable of existing or operating together in

24  harmony."  The court agreed with TVI, finding no indication that the inventors intended

25  "compatible with" in any other than its ordinary meaning.  Id. at 18.

26     The court found further that TVI's proposed construction of "a file having a

27  predetermined name, which name is consistently used by the initialized host device to seek

28  a file," captured the claim's requirement that the file be compatible with the initialization file,

11

United States District Court

For the Northern District of California

1    given that the embodiment described in the specification includes an initialization file,

2    autostart driver, and file on the storage medium, which are all designed to work in harmony

3    (even though the patent expressly contemplated embodiments that do not include an

4    autostart driver).  Id. at 19.

5         In the present motion, Sony argues that the court's construction renders the claim

6    invalid under § 112 ¶¶ 1 and 2, because the only support in the specification for

7    "compatibility" of a file name with a file is the compatibility of the predetermined file name

8    with the autostart driver file, not the initialization file as described in the claim language

9    (citing '532 patent, 22:35-50).  Similarly, Sony argues, the "consistently used" language that

10   TVI urged for its claim construction relates to consistent use by the autostart driver to

11   execute the file with the predetermined name (citing id., 22:34-42, 22:57-59, 4:30-38).

12   Sony claims that other uses of the word "compatible" in the specification refer to other

13   types of compatibility that is unrelated to file name compatibility, such as "compatible

14   applications," "IBM compatible personal computer," "algorithm compatible with MPEG/1

15   specification," "compatible peripheral," and "CD-ROM compatible write once optical disk."

16        Based on the specification, Sony asserts that the role of a file having a

17   predetermined name that is "compatible with" a file means it has to be compatible with the

18   file that will execute it – which is necessarily the autostart driver, and not the initialization

19   file.  Indeed, Sony contends, it makes no sense to have a predetermined name that is

20   "compatible with" the initialization file, where the purpose of the claimed invention is to have

21   a file with a predetermined name that is further used to perform a process.

22        In Sony's view, the court's construction is unworkable, because an initialized host

23   device alone does not consistently seek the file having a predetermined name, as any

24   booted up computer would be an "initialized host device."  According to Sony, it is only

25   when an autostart driver is installed that the host device consistently seeks the file with the

26   predetermined name upon insertion of a storage media.

27        In opposition, TVI argues that the term "compatible with" does not render the claims

28   in which it appears invalid, and that the fact that the exact language of the claim does not

United States District Court

For the Northern District of California

1    appear in the specification is not significant.  Relying on the declaration of its expert Dr.

2    Wolfe, TVI asserts that the specification provides ample description of a file having a

3    predetermined name, which name is consistently used by the initialized host device to seek

4    a file.

5          The court finds that Sony has not met its burden of showing by clear and convincing

6    evidence that this term renders the claims invalid.  The specification shows the host device

7    being configured with an autostart driver that is a separate executable image, but it also

8    discloses that "the instructions to a host device shown in Figs. 5A, 5B, and 5C can be

9    issued in other forms suitable for the host device (such as commands to the operating

10   system)."  See '532 patent, 22:7-25:41.  This shows that the claimed invention is not limited

11   to an autostart driver embodiment, and, at a minimum, raises a question of fact as to

12   whether one of ordinary skill in the art would have understood in 1994 that the inventors

13   possessed a system with "a file having a predetermined name, which name is consistently

14   used by the initialized host to seek a file."

15                    c.      "returning to said step of automatically enabling" (Claim 1 and

16                            dependent Claim 18 of '307 patent)

17   Claim 1 of the '307 patent recites

18   A method of automatically starting up a process in a host device based on
     insertion of a storage media into a peripheral, comprising:
19
20   booting an operating system of the host device, said step of booting including
     checking for an initialization file;

21   automatically enabling an interrupt;

22   automatically checking for a file other than said initialization file in at least one
     removable storage media associated with at least one peripheral on
23   occurrence of said interrupt, said removable storage media being encoded
     with electronic content including said file;
24
     automatically loading at least a portion of the electronic content from said
25   removable storage media in response to finding said file during said step of
     automatically checking;
26
     automatically executing an application identified by or associated with said
27   file; and

28   returning to said step of automatically enabling without rebooting the host

                                              13

United States District Court

For the Northern District of California

1    device.

2        The present dispute involves language in the last step in this claim – "returning to

3    said step of automatically enabling."  Sony's position is that the specification requires that

4    the interrupt must be disabled before it can be re-enabled, and also that the court's

5    construction renders the claims indefinite because the "said step" is the step of

6    automatically enabling an interrupt.

7        In the claim construction in the <u>Microsoft</u> case, Judge White construed "returning to

8    said step of automatically enabling" as meaning "returning to a state in which the host

9    device (e.g., computer) is prepared to process requests for attention to or from hardware

10   and/or software."  In the claim construction in the present case, TVI asked Judge Fogel to

11   adopt this construction.  However, Sony argued that the term should be construed as "re-

12   enabling a previously disabled interrupt to detect another removable storage media

13   associated with the peripheral."

14       Judge Fogel rejected Sony's proposed construction.  Judge Fogel noted that it

15   improperly added the limitations of disabling the interrupt, and re-enabling the interrupt, and

16   that Judge White had rejected similar language proposed by Microsoft, both because the

17   proposed construction imported limitations from the specification into the claim language,

18   and because the proposed construction reads a limitation found in a dependent claim into

19   an independent claim.  Claim Construction Order at 20.

20       Judge Fogel also noted that Sony argued that the specification teaches specifically

21   that the driver disables the interrupt before returning to the "step of automatically enabling

22   the interrupt," <u>see</u> '532 patent, Fig. 5B, step 527, and that it was standard practice at the

23   time of the invention to disable the interrupt before performance of the associated interrupt

24   service routine so that the interrupt would not re-fire and disrupt the routine's processing.

25   Judge Fogel agreed with Judge White, however, that limitations from the specification

26   cannot be read into the claims where the patentee has not demonstrated an intent to limit

27   the claim scope using words or expressions of exclusion or restriction.

28       Finally, Judge Fogel noted that dependent Claim 16 describes "the method of Claim

14

1 further comprising disabling said interrupt prior to said step of automatically executing

said file," and that TVI had argued that Sony's proposed construction would violate the

doctrine of claim differentiation.

Here, Sony again argues that the specification requires that the interrupt must be

disabled before it can be re-enabled.  Sony claims that the only embodiments disclosed in

the specification where there is a "returning" to a step of enabling the interrupt are those of

Figs 5B and 5C, which require returning to enable an interrupt that was disabled.

According to Sony, Fig. 5B discloses enabling and disabling a hardware interrupt, and Fig.

5C discloses enabling and disabling a software interrupt.  In both cases, an interrupt is

"enabled" (turned on) (Fig. 5B, step 513, Fig. 5C, step 545), and the host device "waits for"

the interrupt (Fig. 5B, step 515, Fig. 5C, step 547).

Sony contends that the specification further explains that after an interrupt occurs,

the autostart driver checks for a specific file on the media, and if the file is found, the device

looks for another file on the media; if either file is not found, the driver returns to the step

below the enabling step – "wait for interrupt;" if files with predetermined names are found,

the next step is that the driver "disables" the interrupt (citing Fig. 5B, step 527, Fig. 5C, step

566).  Sony notes that "[t]he disabling of interrupts allows [the] autostart driver . . . to

execute an application without being interrupted by user insertion of a removable storage

media" (citing 532 patent, 23:63-65).  Then, Sony asserts, after the application has

terminated, the driver returns to the step of enabling the interrupt (citing Fig. 5B, step 513,

Fig. 5C, step 545).  At this point, the autostart driver "goes via branch 530 back to step

513" ("enable interrupt") which allows the autostart driver to continue to be responsive to

the insertion of storage media (citing '532 patent, 24:10-15).

Sony argues that as construed, this term does not require the host device to again

disable the interrupt upon returning to "said step of automatically enabling [the interrupt]."

Rather, it permits the host device, after finding the file other than the initialization file and

executing the application, to skip the enabling step and merely return to a ready state,

where it is prepared to process requests for attention to or from hardware and/or software.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   Sony contends that a claim that is construed to omit a required step lacks written

2   description support because it is broader than what the applicants invented.

3         Sony also argues that Judge Fogel's construction renders the claims indefinite,

4   because the claims recite the step of "returning to the step of automatically enabling" the

5   interrupt; and since one cannot enable an interrupt unless it is disabled, a construction that

6   provides that the host device is enabling an already-enabled interrupt (or skipping the

7   required enabling step) renders the claims nonsensical and indefinite because it is

8   impossible to enable something that is not disabled.

9         In opposition, TVI argues that the written description reasonably discloses to one of

10   ordinary skill in the art the step of automatically returning to said step of automatically

11   enabling – that is, the system returns to a state in which the host device is prepared to

12   process requests to or from hardware and/or software.  TVI notes that the court specifically

13   found that the inventors chose not to state that it is necessary in every case to disable the

14   interrupts.  See Claim Construction Order at 22.  TVI contends that Sony has presented no

15   good reason to relitigate the construction of this claim term.

16         TVI also cites to Dr. Wolf's opinion that the specification reasonably conveys that the

17   inventors were in possession of a system that did not require a disabling and re-enabling

18   step, and that as of the time of filing in 1994, an interrupt could be disabled prior to

19   executing a program, or the interrupt could simply remain enabled during execution.

20         The court finds that Sony has not met its burden of showing by clear and convincing

21   evidence that this term renders the claims invalid.  As the court understands it, Sony's

22   position is that because this claim recites a series of steps, with the last one being

23   "returning to said step of automatically enabling," and because the third step listed in the

24   claim is "automatically enabling an interrupt," the phrase "automatically enabling" in the last

25   step must necessarily be interpreted to mean automatically enabling an interrupt.  And

26   since (according to Sony) the court's construction does not require enabling the interrupt, it

27   is broader than the specification and therefore renders the term indefinite.

28         However, Sony has not addressed the problem of claim differentiation.  Claim 16

**United States District Court**

For the Northern District of California

1    depends from Claim 1, and comprises the additional step of "disabling said interrupt prior to

2    said step of automatically executing said file.  The court agrees with Judge Fogel's analysis

3    in the Claim Construction Order – that it is reasonable to construe Claim 16 as

4    demonstrating that the patentees knew how to include a limitation of disabling the interrupt,

5    and to include that limitation in Claim 16, and chose not to include it in Claim 1.  See Claim

6    Construction Order at 21-22.

7              d.    "first [and second] means for checking" (Claim 9 of '863 patent)

8         This term, which includes "first means for checking for a file of a first predetermined

9    name" and "second means for checking for a file of a predetermined name" is a means-

10   plus-function limitation governed by § 112 ¶ 6.  During the claim construction, the parties

11   agreed as to the claimed function ("checking for a file of a first [or second] predetermined

12   name"), but disagreed as to the claimed structures in those terms.  Sony asserted that

13   unless the court added particular limitations to the construction, it would be so broad that

14   the claim would be invalid under 35 U.S.C. § 112 ¶ 2.

15        In a means-plus-function claim in which the disclosed structure is a computer or

16   microprocessor, which is programmed to carry out an algorithm, the disclosed structure is

17   not the general purpose computer, but rather the special purpose computer that is

18   programmed to perform the disclosed algorithm.  WMS Gaming, Inc. v. Int'l Game Tech.,

19   184 F.3d 1339, 1349 (Fed. Cir. 1999).  Here, both sides agreed that the corresponding

20   structure was a "host device (e.g. computer)" that was "programmed to perform the

21   disclosed algorithm," but disagreed as to exactly what the disclosed algorithm was.

22        TVI's position was that the disclosed algorithm is "using the first/second

23   predetermined name to determine if a file with that name is present in or accessible from

24   the storage media," while Sony contended that the disclosed algorithm is slightly different

25   for the two terms – with regard to "first predetermined name" it is "initially seeking, upon

26   detection of a storage media insertion into the peripheral, a security key file of a

27   predetermined name on the detected storage media;" and with regard to second

28   predetermined name, it is "seeking, upon confirming a valid security key in the file of the

17

United States District Court

For the Northern District of California

1   second predetermined name, a batch file of a predetermined name on the detected storage

2   media."

3        Judge Fogel's view was that the dispute essentially concerned "the degree of

4   specificity required in order for the structures to correspond to the functions asserted in the

5   claim."  Claim Construction Order at 14.  The court noted that Sony claimed that one skilled

6   in the art would understand from the specification that the "file of a first predetermined

7   name" is a certain kind of file – a security key file – and that the "file of a second

8   predetermined name" is another particular kind of file – an executable batch file, and that

9   without such limitations the terms would be so broad that the claim would be invalid under §

10  112 ¶ 2; while TVI argued that Sony's proposed structures improperly read limitations from

11  the specifications into the claims.  Id. at 14-15.

12       The parties agreed that the only recited function for "first means" was "checking for a

13  file of a first predetermined name, and the court found that the structure linked to the

14  function recited in the claim is "a host device (e.g. computer) programmed to perform the

15  disclosed algorithm of using the first predetermined name to determine if a file with the

16  name is presented in or accessible from the storage medium, and equivalents thereof."  Id.

17  at 15-16.

18       The court found that it was "clear from the specification that the process of checking

19  for a file of a first predetermined name is completed within decision box 517," and that

20  "Step 519 – checking to see if a security key is present in a file of a first predetermined

21  name – is not a part of the recited function and thus is not a claim limitation."  Id. at 15.[4]

22  The court also noted that where TVI intended to claim a structure related to the security

23  keys disclosed in the specification, it did so expressly, citing as an example, claim 5 of the

24  '156 patent, where TVI claimed a "means for comparing a key stored in said file of said first

25  predetermined name with a hard coded key" separately from the "first means for checking

26  _____

27       [4] The court noted Sony's argument that TVI's proposed construction rendered the claim
    invalid under § 112 ¶ 2, and commented that while the claims should be construed to preserve
28  their validity, the court was not permitted to redraft claims for that purpose.  Id. n.6.

United States District Court

For the Northern District of California

1    for a file of a first predetermined name."  Id. (citing '156 patent, claim 5).

2         Similarly, the court noted, the parties agreed that the only recited function for the

3    "second means" was "checking for a file of a second predetermined name," and found that

4    it was apparent that the process for checking for a file of second predetermined name was

5    completed within decision box 524.  See '532 patent, 22:46-54.  At the same time, the court

6    continued, both the claim language and the specification provide specific content for a "file

7    of a second predetermined name" – requiring "a means for starting up a process from said

8    file having said predetermined name," and that "said means for starting up" must "contain a

9    sequence of instructions to be executed to start up said process in response to said second

10   means of checking finding said file of said second predetermined name."  '863 patent, claim

11   9; see Claim Construction Order at 16.

12        The court noted further that the specification states that "[e]very file having a second

13   predetermined name . . . contains a sequence of application start-up instructions to be

14   executed to start an application" (citing '156 patent, 21:51-55), and that the specification

15   also states that "[a]t the very least, a file with second predetermined name . . . must be

16   present on a storage media to be compatible with an autostart driver which seeks a file of

17   the second predetermined name" (citing id., 21:46-50).  The court concluded that while the

18   claim language and specification require that "a file of a second predetermined name"

19   contain a sequence of instructions for starting a process, the construction of that phrase is

20   distinct from the means associated with performing the function of "checking for" a file of

21   that name.  Claim Construction Order at 16.

22        In means-plus-function terms, "[f]eatures that do not perform the recited function do

23   not constitute corresponding structures and thus do not serve as claim limitations."

24   Northrop Grumman, 325 F.3d at 1352.  For example, signals that are generated by "the

25   means for monitoring," are not part of the structure that performs the function of "generating

26   . . . control signals."  Id. at 1352-53.  Analogously, the content of the "file of a second

27   predetermined name," cannot be part of the structure of the "means for checking for a file

28   of a second predetermined name."  Claim Construction Order at 17.

1    Here, Sony argues that the specification discloses only one algorithm for performing

2 the function of "checking for a file of first [and second] predetermined name," which Sony

3 claims comprises initially checking for, upon detection of a storage media, a security key

4 file of a predetermined name on the storage media; and then checking for a batch file of a

5 second predetermined name after confirming that there is a valid security key.  Sony

6 contends that if the court's construction does not include the disclosed algorithm of

7 checking for a security key file and a batch file, these terms are invalid because they cover

8 structure broader than disclosed in the specification.

9    Specifically, Sony asserts that the only algorithm disclosed for checking for a file of a

10 first/second predetermined name is Fig. 5B, and its discussion in the specification ('523

11 patent, 23:1-5, 23:23-26, 23:45-48, 22:51-55, 23:1-24:3), which disclose checking for a

12 security key file (i.e., DISGOKEY.EXE) and then executing a batch file containing

13 application startup instructions (e.g., DISGO.BAT).  Sony argues that the only "file of a first

14 predetermined name" that is described in the specification is the file "DISGOKEY.EXE,"

15 which is a security key file, and that the only "file of a second predetermined name" that is

16 described in the specification is the file "DISGO.BAT.

17    During claim construction, the court commented that Step 519 – checking to see if a

18 security key is present in the file of a first predetermined name – is not part of the recited

19 function and thus is not a claim limitation.  Sony argues, however, that step 519 is not

20 actually checking to see if a security key is present, but rather is what Sony calls a

21 "separate comparison step" that may be used to verify if the security key file is valid once it

22 is found.  Thus, Sony asserts, the disclosed algorithm for "checking" still checks for the

23 security key and batch files, but stops there and does not require performing the next, extra

24 security algorithm of comparing bitmaps.

25    In opposition, TVI contends the court already considered and rejected Sony's

26 argument that unnecessary algorithms from the specification must be imported into the

27 structures corresponding to the functions "checking for a file of a first [second]

28 predetermined name."

United States District Court

For the Northern District of California

1    TVI asserts that the specification specifically discloses the algorithms of "using the

2   first [second] predetermined name to determine if a file with that name is present in or

3   accessible from the storage media, and equivalents thereof" through text and flow charts,

4   as decision boxes 517 and 524 in Fig. 5B both identify the process of checking for a file of

5   a predetermined name.  In addition, TVI argues, the specification describes the algorithm in

6   prose that uses and looks for a file with a unique name, such as DISGO, which has been

7   determined ahead of time and is present in storage media (citing 532 patent, 22:35-50).

8    A patentee can express an algorithm in any understandable terms – mathematical

9   formula, prose, flow chart, or any other manner that provides sufficient structure.  Finisar

10  Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1340 (Fed. Cir. 2008).  TVI asserts the

11  disclosures in the patent are sufficient under the law, and that Sony is improperly

12  attempting to add additional structure.  TVI contends that the court properly determined that

13  the corresponding structure need not include unnecessary features related to "security

14  keys" and "batch files" as Sony continues to argue.

15   The court finds that Sony has failed to meet its burden of showing by clear and

16  convincing evidence that this term renders the claims invalid.  The court is also persuaded

17  by the analysis in the Claim Construction Order.  Moreover, while it is true that the

18  specification mentions use of the types of files that Sony says are "required," it makes clear

19  that the files are being mentioned as examples, not as requirements of the structure.

20       2.   Invalidity under §§ 102 and 103

21   Sony argues that the patents-in-suit are invalid under 35 U.S.C. § 102(g) (priority of

22  invention) as against Microsoft Windows 95; are invalid under 35 U.S.C. § 103 for

23  obviousness, based on DO or CDTV, in combination with CD-I Designer's Overview; and

24  are invalid under 35 U.S.C. § 102(a) (priority of invention) and/or § 103 (obviousness)

25  based on JP '155 (a Japanese patent) alone or in view of UNIX Internals and/or articles.

26       a.   Invalidity under § 102(g)

27   Under 35 U.S.C. § 102(g),

28   a person shall not be entitled to a patent if before such person's invention

21

United States District Court

For the Northern District of California

1
2
3
4

thereof, the invention was made in this country by another inventor who has not abandoned, suppressed, or concealed it.  In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

5   35 U.S.C. § 102(g)(2).  Thus, a challenger claiming invalidity of a patent due to prior

6   invention can show either that another inventor reduced the invention to practice first, or

7   that another inventor was the first party to conceive of the invention and then exercised

8   reasonable diligence in reducing that invention to practice.  See Teva Pharm. Indus. Ltd. v.

9   Astrazeneca Pharms. LP, 661 F.3d 1378, 1383 (Fed. Cir. 2011).

10          Invalidity by prior invention under § 102(g) is a form of anticipation.  See Hybritech,

11   Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1379 (Fed. Cir. 1986); see also Net

12   MoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1369 (Fed. Cir. 2008).  For prior art to

13   anticipate under § 102, it must meet every element of the claimed invention.  See, e.g.,

14   Therasense, Inc. v. Becton, Dickinson and Co., 593 F.3d 1325, 1332 (Fed. Cir. 2010).

15   Moreover, "[t]he way in which the elements are arranged or combined in the claim must

16   itself be disclosed, either expressly or inherently, in an anticipatory reference."  Id.; see also

17   Net MoneyIN, 545 F.3d at 1369.

18          Thus, while priority of invention is a question of law, it must be determined based on

19   underlying factual determinations.  See, e.g., ActiveVideo Networks, Inc. v. Verizon

20   Commc'ns, Inc., 694 F.3d 1312, 1327 (Fed. Cir. 2012); Amkor Tech., Inc. v. Int'l Trade

21   Comm'n, 692 F.3d 1250, 1254 (Fed. Cir. 2012).

22          Here, Sony argues that the autoplay without rebooting feature of Windows 95 (sold

23   in August 1995) was developed by three Microsoft employees no later than January 31,

24   1994 (five months before the filing of the '492 patent application), and was fully operational

25   and checked into Microsoft's software management system by that date.  In support, Sony

26   attaches as Exhibits 92 and 93 to the Declaration of Fahd Majiduddin two "summary charts"

27   prepared by its attorneys.  Sony contends that these charts "confirm" TVI's prior allegations

28   from the Microsoft case that Windows 95 included each feature of the asserted patent

1   claims and that Microsoft reduced those features to practice by January 31, 1994.

2       Sony asserts that to swear behind the January 31, 1994 reduction-to-practice date

3   of Windows 95, TVI must show an earlier conception date of all claim elements, and must

4   show diligence from prior to January 31,1994 – neither of which TVI can do.

5       First, Sony contends that TVI has produced no corroborated evidence of prior

6   conception of "without rebooting."  Sony asserts that the claim element of "without

7   rebooting" does not appear in any TVI/Redford documents prior to the July 1, 1994 filing

8   date of the original application for the TVI patents.  And, Sony argues, even if TVI could

9   show that there was earlier conception of the "without rebooting" feature prior to January

10  31, 1994, Mr. Redford admitted that TVI's patent attorneys were not diligent until Omkar

11  Suryadevara (who drafted and filed the patent application and was the only attorney to

12  work on the DISGO application) "took over" on March 16, 1994 – which was after January

13  31, 1994.

14      Sony concedes that Judge White denied Microsoft's motion for summary judgment

15  of invalidity as to Windows 95, on the basis that there were facts in dispute regarding the

16  timing of TVI's reduction to practice, as well as conception and diligence.  However, Sony

17  argues, since that time, new facts have come to light and now, no reasonable dispute can

18  exist.  In particular, Sony contends that TVI is precluded from establishing an invention date

19  prior to March 16, 1994, as Mr. Redford admits it was not until that date that TVI's patent

20  counsel Mr. Suryadevara became involved.

21      In opposition, TVI argues that Sony failed to cite any real evidence in its two-page

22  attempt to prove Microsoft's prior invention, as the two summary exhibits (Sony's Exhibits

23  90 and 93) are simply compilations of attorney argument prepared for litigation, and are

24  therefore not evidence.

25      As a further basis for denying the motion, TVI argues that Sony has not established

26  anticipation by "prior invention" and has not offered the "prior invention" into evidence.  TVI

27  contends that Sony has no proof of any single prior art invention – it did not produce any

28  such reference during discovery, and did not attach any such reference to its motion.

United States District Court
For the Northern District of California

1  Rather, TVI asserts, Sony simply attached numerous exhibits which it attempted to "tape

2  together" as a prior invention, which does not satisfy the standard, and which in addition is

3  not sufficiently described as to date.  Moreover, TVI argues, its own expert testified that he

4  reviewed the native files produced by Sony and discovered no prior invention because

5  Sony has not produced sufficient information to teach one of ordinary skill in the art how the

6  produced files operate.

7       Finally, TVI contends that Sony has no evidence that the commercial version of

8  Windows 95 (which was commercially released on August 24, 1995) is what Sony claims

9  Microsoft reduced to practice in January 1994 – the undisclosed "build-up" version, which

10  Sony has in any event not even offered into evidence here.  In addition, TVI asserts it has

11  evidence that Microsoft modified the "autoplay" software files in October 1994 – more than

12  three months after TVI filed its initial patent application – and that it also modified other files

13  after that date.

14       In its second main argument TVI asserts that Sony's arguments about the dates of

15  conception and reduction to practice are not supported by any evidence, and that there is

16  at least a dispute of fact as to those dates.

17       The court finds that Sony has failed to meet its burden of showing by clear and

18  convincing evidence that the patents-in-suit are invalid under § 102(g).  As for the

19  "summary exhibits," they are attorney argument, not evidence.  The court finds further that

20  factual disputes exist with regard to, e.g., when Windows 95 was reduced to practice; and

21  that Sony has not established that all four corners of the Windows 95 invention describe

22  every element of TVI's claimed invention.

23            b.      Invalidity under § 103

24  Under 35 U.S.C. § 103,

25  a patent may not be obtained though the invention is not identically disclosed
    or described as set forth in section 102, if the differences between the subject
26  matter sought to be patented and the prior art are such that the subject matter
    as a whole would have been obvious at the time the invention was made to a
27  person having ordinary skill in the art to which subject matter pertains.

28  35 U.S.C. § 103(a).

United States District Court

For the Northern District of California

Obviousness is a question of law, to be determined based on underlying factual determinations.  Santarus, Inc. v. Par Pharm., Inc., 694 F.3d 1344, 1351 (Fed. Cir. 2012). A challenger claiming invalidity of a patent due to obviousness must prove by clear and convincing evidence that the claimed subject matter "as a whole would have been obvious at the time the invention was made" to those skilled in the art.  K-Tec, Inc. v. Vita-Mix Corp., 696 F.3d 1364, 1378 (Fed. Cir. 2012).

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007) (citation and quotation omitted). "While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls. If a court, or patent examiner, conducts this analysis and concludes the claimed subject matter was obvious, the claim is invalid under § 103."  Id. at 407.

The underlying factual inquiries that the court may consider are (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the field of the invention; and (4) objective considerations (also referred to as "secondary considerations") such as commercial success, long felt need, and the failure of others.  See Santarus, 694 F.3d at 1351.

Here, Sony argues that the asserted claims are invalid as obvious based on 3DO or CDTV, in combination with the "CD-I Designer's Overview."[5]  Sony claims that the 3DO and CD-I were both multimedia players that performed autoplay, and that the 3DO combined

---

[5]   Sony asserts that its expert Dr. Bruno "described the CD-I player and related publications in detail in his expert report," which Sony attaches as Exhibit 89 to the Majiduddin Declaration.  According to Sony, Dr. Bruno "led the CD-I development team at Philips in the 1980s and early 1990s, and published a book entitled 'Compact Disc-Interactive, A Designer's Overview' describing the CD-I player and its specification" (referred to here as the CD-I "Designer's Overview" or "DO").

with "CD-I Designer's Overview" or "CD-I DO" renders obvious all of the asserted claims.

Sony contends that the 3DO, the CD-I DO, and the host devices in the TVI patents all include a host device coupled to a CD drive; and also play video content from discs inserted into the CD drive, and automatically start applications upon insertion of the disc. Sony claims that the decision to reboot or not between autoplaying discs was at the time of the TVI invention, merely a "design choice," and that the CD-I DO expressly taught that either was possible.

Citing to particular pages from the CD-I DO (text and diagram), Sony argues that the DO teaches the obvious design choice of autoplaying with or without rebooting. Sony asserts that the DO shows that the CD-I device returns to the point indicated in the diagram, located just above the step "Load Boot file (if present on disc)," when a user inserts a new disc – that after booting up and executing an application on a disc, the system continues to detect insertions of newly inserted discs and the system will not reboot (unless there happens to be a boot file on the disc). According to Sony's interpretation, the CD-I DO discloses continuing to detect insertion without rebooting, and also continuing to detect insertion with rebooting the device (for a special case of the disc having a boot file), both of which Sony claims are available design choices to the producer of the CD-I disc.

Sony argues further that the CDTV in conjunction with the CD-I DO renders all asserted claims invalid as obvious under 35 U.S.C. § 103. Sony asserts that TVI claims that CDTV does not anticipate because it lacks a "file having a predetermined name" since the Disc Label file is always at a predetermined location on a CD-I disc. Sony disagrees with this contention, but asserts that the combined teachings of CDTV and the CD-I DO nevertheless render all TVI's claims obvious.

In the Microsoft case, Microsoft filed a motion for summary judgment of invalidity of all claims of TVI's patents as anticipated by CDTV. According to Sony, in its opposition, TVI argued that CDTV rebooted or re-initialized the CDTV player, and then, according to Sony, TVI "convinced Judge White" that "after the claimed invention initially loads the initialization files, it can then detect every ensuing insertion of media without re-initializing

1   the system." Sony claims that the "without rebooting" limitation was the only feature that

2   Judge White found to be missing from CDTV.

3   Sony also contends that in the reexamination that was initiated by Microsoft's

4   request following the settlement of the <u>Microsoft</u> case, the PTO initially rejected claims as

5   anticipated and/or obvious over the CDTV prior art, and that TVI then amended the claims

6   to include the "without rebooting" on disc insertion limitation, after which the PTO allowed

7   the claims based on TVI's amendments and arguments that CDTV rebooted upon each

8   disc insertion and ejection.

9   Sony claims that after the PTO received Microsoft's reexam request, the PTO

10  determined that there was a substantial question regarding the patentability of all "identified

11  claims." According to Sony, TVI then informed the '307 patent examiner that another

12  examiner on the '532 patent had allowed claims on the '532 patent after those claims were

13  amended to incorporate the "without rebooting" limitation, and stated that "the common

14  issue presented by all the reexamination requests and the art cited therein is whether the

15  claims on the reexamination are valid over 'boot art' disclosed by the CDTV manual."

16  Sony contends that in the subsequent Office Action letter, the examiner provided a

17  detailed claim chart demonstrating that every element of the '307 claims was present in the

18  CDTV Manual. According to Sony, TVI responded by adding the "without rebooting the

19  host device" limitation, and the examiner at that point allowed the claims. Sony claims that

20  in the other reexam proceedings, TVI conceded that the "normal functions" of CDTV

21  included "the steps of automatically enabling and interrupt, automatically checking for a file

22  other than the initialization file on occurrence of the interrupt, automatically loading,

23  automatically executing and returning to such step of automatically enabling." Sony asserts

24  that when the '307 Examiner subsequently allowed the claims of the '307 Patent, his

25  "reasons for patentability" relied on CDTV's alleged inability to perform the claimed steps

26  without rebooting.

27  According to Sony, at no time during the original or reexam prosecution did TVI or

28  the examiners ever consider prior art that was understood to disclose autoplay upon disc

United States District Court

For the Northern District of California

insertion without rebooting the device. However, Sony contends, the CD-I DO indisputably teaches this feature, and the CDTV and CD-I prior art references are in the same field (multimedia host devices) and when considered together provide a combination of familiar elements according to known methods that yield predictable results. For this reason, Sony argues, TVI's asserted patent claims are invalid as obvious over the combination of CDTV and CD-I DO because the only alleged missing feature from CDTV was "without rebooting" and CD-I DO clearly teaches that feature for use in the same device.

In opposition, TVI asserts that Sony has failed to meet its high burden of establishing obviousness. TVI argues that the court should deny Sony's motion because Sony has failed to properly support its argument with admissible evidence, and because there are fact questions as to whether the combinations identified by Sony render the asserted claims obvious.

The court finds that the motion must be DENIED. First, Sony has failed to meet its burden of showing invalidity by clear and convincing evidence, and in particular, has failed to support its arguments with admissible evidence. As with the portion of the motion regarding Microsoft's purported prior invention, Sony cites not to actual evidence, but rather to attorney-created cut-and-paste excerpts of documents and expert reports, along with attorney comments in various charts prepared by counsel.

More notably, Sony has failed to provide supporting expert opinion, leaving it to the court to try to interpret and evaluate technologically complex documents and arguments. While Sony argues that where the references and the invention are "easily understandable," there is no "need" for expert testimony for the court to find invalidity on summary judgment, the fact is that the court finds neither the references and the invention nor Sony's arguments to be easily understandable as presented.

The court also finds that summary judgment is not warranted based on the existence of factual questions as to whether the combinations identified by Sony render the asserted claims obvious. Sony failed to make even a prima facie showing that its purported 3DO and CD-I DO combination, or purported CDTV and CD-I DO combination, each has all the

28

United States District Court

For the Northern District of California

1   claim limitations of all the fifteen asserted claims.  Moreover, Sony has neither addressed

2   TVI's evidence of "secondary considerations" of non-obviousness, such as evidence of

3   commercial success and market acceptance, and failure of others; nor put forth any

4   contrary evidence regarding "secondary considerations" as required by the standard.

5                    c.      Invalidity under § 102(a) and/or § 103

6           Sony asserts the asserted claims are invalid either as anticipated under § 102(a)

7   (priority of invention) or as obvious under § 103, in light of certain prior art.  Both

8   anticipation and obviousness require the court to compare the properly construed claims to

9   the available prior art.  Genetics Inst. LLC v. Novartis Vaccines and Diagnostics, Inc., 655

10  F.3d 1291, 1302 (Fed. Cir. 2011).  However, obviousness can be proven by combining all

11  existing prior art references, while anticipation requires that all elements of a claim be

12  disclosed within a single reference.  Cohesive Techs., Inc. v. Waters Corp., 543 F.3d 1351,

13  1364 (Fed. Cir. 2008).

14          That is, if  each and every limitation is found either expressly or inherently in a single

15  prior art reference, the claim is invalid under § 102 for anticipation.  Genetics Inst., 655

16  F.3d at 1302.  If it is necessary to reach beyond the boundaries of a single reference to

17  provide missing disclosure of the claimed invention, the proper ground is not § 102

18  anticipation, but § 103 obviousness.  Cohesive Techs., 543 F.3d at 1364.  However, proof

19  of inherent anticipation is not the same as proof of obviousness, and it does not follow that

20  every technically anticipated invention would also have been obvious.  Id.  Moreover,

21  obviousness requires analysis of the underlying facts, including the scope and content of

22  the prior art, the level of ordinary skill in the art, the differences between the claimed

23  invention and the prior art, and the "secondary considerations," while secondary

24  considerations are not part of a claim of anticipation.  Id.

25          Sony argues that a Japanese patent application filed by NEC in 1992 ("JP '155") and

26  published in October 1993, invalidates the claims under § 102(a) and/or § 103 in view of

27  UNIX publications.  According to Sony, JP '155 proves that Redford was not the first to

28  invent autoplay from inserted media based on predetermined file names without rebooting.

United States District Court

For the Northern District of California

1   According to Sony, JP '155 discloses a system that checks for and executes a file

2   called "autoexec" on a disk to spare the user from typing commands.  It is the disk drive (JP

3   '155, Fig.2) and flowchart of operation (JP '155, Fig. 3) that Sony claims are shown with

4   English translations in its brief.  According to this English translation, the drive 10 has a slot

5   15 for floppy disks, button 17 to eject disks, and a light 16 to indicate whether a disk is in

6   the drive.  The drive has an auto-start mode to automatically start applications upon disk

7   insertion. Each press of button 18 toggles the auto-start mode, i.e., turning the mode on

8   (indicator light 19 lit up) or off (indicator light 19 turned off).

9   Sony claims that JP '155 solved the same problems that TVI purported to solve such

10  as avoiding the need to "learn . . . input commands to execute the application program" or

11  to be "proficient in UNIX command operations" (citing JP '155 at 5).  Sony asserts that

12  "[w]hen there is a design need or market pressure to solve a problem," the pursuit of known

13  options "is likely the product not of innovation but of ordinary skill and common sense."

14  KSR, 550 U.S. at 421.

15  Sony also attaches as Exhibit 105 to the Majiduddin Declaration a 31-page "JP '155

16  invalidity chart."  Based on this (attorney-prepared) chart, Sony asserts that there is no

17  genuine issue of material fact that JP '155 discloses the same obvious techniques claimed

18  in the TVI Patents.  Sony claims that JP '155 uses the example of a UNIX workstation, and

19  that when a floppy disc is inserted, the disk drive sends an interrupt signal to the operating

20  system (OS) which proceeds to "mount" the disc.

21  Sony asserts that the system will "check the content on the floppy disk 8" and use a

22  "find command" to check whether the disk includes "the predetermined file named

23  'autoexec.'"  Sony claims that TVI's expert Dr. Wolfe has admitted that "JP '155 describes

24  'autoexec as one exemplary name of a file on a disk," and argues that if the autoexec file is

25  found, the commands in the file are executed.  Sony asserts that this process of detecting

26  insertion and finding and executing the autoexec file occurs without rebooting – and that as

27  discs are ejected and new discs inserted, JP '155 executes one "automatic execution

28  command file 9 after another," and "[e]ven after the automatic start specific switch 18 is

1    pressed, the floppy disc 8 may be inserted and ejected as desired" (citing JP '155).

2          Sony claims that Fig. 3 of JP '155 shows that the system returns directly to the disc

3    insertion step (S2) after the program is run (S7), and that step S10 (shutdown) confirms

4    that JP '155 does not reboot through steps S7 to S2.  According to Sony, when JP '155

5    reboots or shuts down, it is shown at step S10.  Sony asserts that JP '155 also expressly

6    refers to continuously starting one autoexec file after another when each disk is replaced:

> In addition, if the content in a single floppy disk 8 is insufficient for the
> processing, a plurality of floppy disks 8 may be successively inserted to start
> one automatic execution command file 9 after another, resulting in continuous
> processing. In this case, the floppy disk 8 is replaced by another disk while
> the automatic program start mode indicator lamp 19 is in an on-state. The
> above procedure makes it possible to automatically perform the operation
> from the installation to execution of the application program 30 without
> performing an operation that requires the knowledge about the UNIX 20 such
> as command input through the keyboard.

12   JP '155 at 13.

13         Sony states that it expects that TVI will argue JP '155 does not include initialization

14   files – to which Sony's response is that such files are inherently disclosed since JP '155

15   teaches connecting the disk drive to a UNIX system, and UNIX computers prior to 1993

16   included initialization files used at boot-up to configure hardware and are not used

17   thereafter.  Sony contends that even TVI's expert Dr. Wolfe agrees that UNIX computers

18   had initialization files, and further, as indicated in "UNIX Internals – A System Operations

19   Handbook," there is "no question" that UNIX systems used such initialization files.

20         In opposition, TVI argues that the motion should be denied because Sony has not

21   established that any of the fifteen asserted claims is invalid based on JP '155.  As an initial

22   matter, TVI argues that Sony has again provided no evidence to support its argument, and

23   that it has provided its analysis regarding the fifteen claims in a separate attorney-created

24   document.  TVI asserts further that even if Sony had properly supported its arguments

25   regarding the JP '155 reference, it has not established that any asserted claim is invalid

26   based on that reference.

27         In addition, TVI contends that summary judgment of anticipation is inappropriate

28   here in light of JP '155 alone, or in combination with UNIX publications, because there are

United States District Court

For the Northern District of California

1  fact issues regarding whether every limitation of every claim of the asserted patents is

2  found in JP '155, and because Sony has not shown that the JP '155 reference describes

3  every limitation arranged or combined in the same way as the asserted claims, or that any

4  particular version of UNIX rendered TVI's patents obvious.

5       The court finds that the motion must be DENIED.  Sony has failed to meet its burden

6  of showing by clear and convincing evidence that the asserted claims are invalid as

7  anticipated or obvious based on the JP '155 prior art or on UNIX.  The claim charts and

8  other attorney-prepared exhibits are not evidence, and are therefore insufficient to support

9  a motion for summary judgment.  In addition, other materials cited by Sony – such as the

10  UNIX manual – are incomprehensible to the court without the assistance of expert

11  testimony.

12       Moreover, it appears that a genuine issue of material fact exists with regard to, e.g.,

13  the element requiring checking for a file of predetermined name, and whether JP '155

14  requires that the host check each disc for a "predetermined name;" and with regard to

15  whether JP '155 does or does not disclose an initialization file, or whether it discloses

16  "automatically displaying a selection encoded in the form of electronic content on said

17  removal storage media."

18  B.     The Cross-Motions for Summary Judgment

19       TVI and Sony each seek summary judgment as to Sony's counterclaim/affirmative

20  defense of inequitable conduct, and affirmative defense of laches.  In addition, TVI seeks

21  summary judgment as to Sony's affirmative defense of equitable estoppel, and Sony seeks

22  summary judgment as to its counterclaim/affirmative defense of noninfringement.

23       1.     Inequitable conduct

24       In its answer and counterclaim, Sony alleges that the patents-in-suit are

25  unenforceable based on inequitable conduct by TVI, Mr. Redford, Mr. Stern, "and others"

26  involved in the prosecution and reexamination of the patents.  "Applicants for patents are

27  required to prosecute patent applications in the PTO with candor, good faith, and honesty."

28  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).  "A breach of this duty

United States District Court

For the Northern District of California

1  constitutes inequitable conduct." Id.  If the conduct was sufficiently culpable, a court may

2  declare the patent to be unenforceable.  Id.; see also Massachusetts Eye and Ear Infirmary

3  v. QLT Phototherapeutics, Inc., 412 F.3d 215, 237 n.12 (Fed. Cir. 2005).

4       To establish unenforceability based on inequitable conduct in the PTO, the alleged

5  infringer must show that information material to patentability was withheld from the PTO, or

6  material misinformation was provided to the PTO, with the intent to deceive or mislead the

7  patent examiner into granting the patent.  Therasense, Inc. v. Becton, Dickinson & Co., 649

8  F.3d 1276, 1290-92 (Fed. Cir. 2011) (en banc); see also Outside the Box Innovations, LLC

9  v. Travel Caddy, Inc., 695 F.3d 1285, 1290 (Fed. Cir. 2012).  "[I]nequitable conduct hinges

10  on basic fairness," and should, as a general rule, be applied only in instances "where the

11  patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim."

12  Therasense, 649 F.3d at 1292 (citation omitted).

13       Intent and materiality are separate requirements, and both must be established.  Id.

14  at 1290.  A finding that the misrepresentation or omission amounted to negligence or even

15  gross negligence under a "should have known" standard does not satisfy the intent

16  requirement.  Id.; see also 1st Media, LLC v. Electronic Arts, Inc., 694 F.3d 1367, 1374-75

17  (Fed. Cir. 2012) (knowledge of the reference and knowledge of materiality alone are

18  insufficient to show an intent to deceive).  Anything else would "effectively eviscerate

19  Therasense's test for mens rea and reinflict the plague of patent unenforceability based on

20  the thinnest of speculation regarding the applicant's putative mental state."  1st Media, 694

21  F.3d at 1374.

22       Because direct evidence of deceptive intent is rare, the court "may infer intent from

23  indirect and circumstantial evidence."  Therasense, 649 F.3d at 1290.  "However, to meet

24  the clear and convincing evidence standard, the specific intent to deceive must be 'the

25  single most reasonable inference able to be drawn from the evidence[,]'" and "the evidence

26  'must be sufficient to require a finding of deceitful intent in the light of all the

27  circumstances.'"  Id. (citations omitted).  If multiple reasonable inferences can be drawn,

28  "intent to deceive cannot be found."  Id. at 1290-91.

United States District Court

For the Northern District of California

1       In addition, "[b]ecause neither mere nondisclosure of prior art references to the PTO

2   nor failure to mention prior art references in an affidavit constitutes affirmative egregious

3   misconduct, claims of inequitable conduct that are based on such omissions require proof

4   of but-for materiality." Id. at 1292-93.  An exception to this rule is that it is not necessary to

5   prove "but-for" materiality where the alleged inequitable conduct can be considered

6   "affirmative egregious misconduct." Id. at 1292.

7       Here, Sony argues that TVI's patents are unenforceable due to inequitable conduct,

8   claiming that the inventors, Mr. Redford and Mr. Stern, were fully aware of the 3DO, CDTV,

9   and CD-1 prior art products that implemented "autoplay" and that anticipated their

10  inventions, but withheld that information in order to mislead the PTO.[6]  For its part, TVI

11  contends that Sony cannot prove by clear and convincing evidence that 3DO or CDTV

12  provide a basis for affirmatively finding inequitable conduct, and that the motion must be

13  denied as to CD-1 because the court denied Sony's motion to amend the answer and

14  counterclaims to allege CD-1 as a basis for the inequitable conduct affirmative defense and

15  counterclaim.

16      Sony argues that Mr. Redford had extensive knowledge of 3DO and the 3DO game

17  console as early as 1993 and 1994; and that TVI business records confirm his knowledge

18  of 3DO and its materiality during the prosecution of the TVI patents.  Sony contends that

19  Mr. Redford made a deliberate decision to withhold the 3DO reference during prosecution

20  and to misrepresent its operation as excluding autoplay in the patents.  Sony also asserts

21  that Mr. Redford and his "prosecution team" continued to misrepresent 3DO to the PTO

22  during reexamination, by, for example, failing to submit certain documents from the

23  Microsoft litigation which Sony contends were necessary to correct statements in the

24  specification that 3DO did not implement autoplay, despite the fact that Mr. Redford had

25  been indisputably "told" during that lawsuit that the 3DO player did implement autoplay.

26

27          [6]  For the most part, Sony limits its argument in the present motion to the allegations
28  against Mr. Redford, asserting that it was unable to locate Mr. Stern during discovery in this
    case.

34

United States District Court

For the Northern District of California

1    Sony contends that Mr. Redford and Mr. Stern were "privy to intimate knowledge of

2  the operation of 3DO in 1993-94" when TVI entered a "business relationship" with 3DO and

3  tried to obtain certification for a remote control for the 3DO player.  Sony claims that

4  "numerous documents" involving Redford and authenticated by him discuss meetings

5  regarding the 3DO player, as well as TVI's "extensive business relationship" with 3DO.

6    Sony cites to evidence showing that Redford prepared several business plans in

7  1993 that "refer to" the 3DO player, and that he "described" the 3DO player to TVI's board

8  in June 1994, two weeks before filing the initial patent application on July 1, 1994.

9  Moreover, Sony asserts, in February 1996, while the first two patent applications were

10 pending, Redford compiled a book called "Video on Demand for Interactive Television

11 Featuring TVIQ Technology," which Sony claims discusses 3DO, CD-I, Sony's PlayStation,

12 and Sony's (at that time) new DVD standard, in the context of TVI's "TVIQ" product and its

13 core component "DISGO" (Redford's autoplay invention).  Sony argues that this book

14 "establishes" that Redford knew of the 3DO player, and that he knew it was "highly material

15 as regards autoplay," and that he "made a deliberate decision to withhold it and to

16 misrepresent its operation as excluding autoplay."

17    Sony also asserts that it has "learned" that TVI entered into an NDA with 3DO in

18 February 1994 to receive 3DO's "proprietary information" and asserts that 3DO's former

19 GC stated that 3DO would "typically have disclosed substantial amounts of information to

20 any business partner who executed an NDA."  However, Sony argues, because TVI no

21 longer has any of this information, and because 3DO went bankrupt and its former general

22 counsel allegedly no longer has access to 3DO's files, Sony has no proof of these claims.

23    With regard to CDTV, Sony first contends that the court should reject any argument

24 by TVI that is based on the premise that the original claims should be limited to autoplay

25 without rebooting.  Sony argues that such a "construction" is contrary to the express

26 language of the original claims; that the PTO rejected that construction during

27 reexamination when it rejected certain claims in TVI's patents as anticipated by CDTV; that

28 TVI consistently represented that its patents covered the broad concept of autoplay until

United States District Court

For the Northern District of California

1   late in the <u>Microsoft</u> litigation after Microsoft allegedly demonstrated how CDTV invalidated

2   all claims (and TVI then argued that its claims should be limited to systems that autoplay

3   without rebooting); and that admissions made by Mr. Redford and TVI's expert Dr. Wolfe

4   establish that autoplay "was believed" to be the most important aspect of the invention.

5          Sony contends that the evidence shows that Mr. Redford withheld the CDTV prior art

6   during the original prosecution, and during reexamination, with an intent to deceive the

7   PTO.  Sony notes that the CDTV player – which it claims implemented autoplay the same

8   way TVI did – was first sold in the United States in April 1991.  Sony asserts that Judge

9   White made an incorrect decision in holding that the CDTV did not anticipate claims in view

10  of TVI's allegation that the claims should be considered to include what Sony asserts was

11  an unclaimed "without booting" limitation.  Nevertheless, Sony argues, this "error" need not

12  be considered in view of the fact that the "high materiality" of CDTV was established during

13  the PTO reexam.

14         Sony asserts that in its request for reexamination of the patents, Microsoft relied on

15  the CDTV manual as prior art, and the PTO issued three office actions rejecting numerous

16  claims as invalid base on the CDTV manual.  Sony claims that in response, Mr. Redford's

17  counsel "repeatedly made false statements" regarding how CDTV operated – <u>e.g.</u>, that the

18  CDTV device rebooted upon insertion of a disc, and upon ejection, which Sony claims was

19  false because the CDTV does not reboot upon disk insertion.  Sony claims it is not

20  providing this information in order to prove Mr. Redford's inequitable conduct, but only to

21  show that CDTV was not properly considered by the PTO during the reexams.

22         Sony claims that because the examiner rejected claims in each of the four TVI

23  patents based on the CDTV Manual, "but-for" materiality has been established.  According

24  to Sony, the only issue that remains is whether Mr. Redford knew of CDTV, knew it was

25  material, and made a deliberate decision to withhold it.  Sony argues that because the

26  evidence shows that Mr. Redford was aware of CDTV, had seen it in operation, had

27  authored a business plan identifying CDTV as the main competing commercial technology

28  in 1991, and had documents disclosing its technical features – yet failed to disclose any of

United States District Court

For the Northern District of California

1  this information including the technical documents to the PTO – the "pattern of deception

2  and deceit is clear" and there are no disputed issues of material fact.

3        Sony claims that Mr. Redford was asked how he could have appreciated these

4  supposedly detailed distinctions from simply observing the CDTV in action, and that he

5  then "admitted that he had obtained and used documents about the CDTV product,

6  including a customer brochure and articles in computer magazines[,]" and that he never

7  provided copies of these documents to the PTO.  Sony argues that since Mr. Redford

8  "admitted" he did not disclose these documents, this shows that he "made a deliberate

9  decision" to withhold the information from the PTO, which demonstrates intent.

10       Sony also contends that because the PTO rejected certain claims in each patent

11 during the reexam over CDTV, "but-for" materiality is established.  And since, in Sony's

12 view, it has established that Mr. Redford knew of the CDTV technology, knew it was

13 material, and deliberately withheld it, this is all that is necessary to establish inequitable

14 conduct.

15       Finally, Sony argues that Judge White's denial of Microsoft's motion for summary

16 judgment based on CDTV is of no relevance because as of that time, the PTO had not yet

17 rejected any claims based on CDTV.  Nevertheless, Sony asserts, notwithstanding his

18 denial of Microsoft's motion, Judge White was "concerned with Redford's withholding of

19 CDTV," as he stated in the order granting Microsoft's motion for leave to amend the

20 pleadings and preliminary invalidity contentions that "Microsoft may be successful on its

21 defense/counterclaim of inequitable conduct based on the CDTV reference" in view of the

22 October 1991 business plan "which clearly shows that Redford was familiar with the CDTV

23 reference."  Sony also notes that Judge White denied TVI's motion for a finding of no

24 inequitable conduct on the basis that disputed facts existed regarding Redford's failure to

25 disclose the 3DO system comprehensively or to disclose Commodore's CDTV as prior art.

26       With regard to the CD-I player, Sony contends that this product was jointly

27 developed by Sony and Philips in the 1980s, and that Mr. Redford admitted that he owned

28 a CD-I player in 1991, and his October 1991 business plan referred to the CD-I player as

having a standard that "will likely carve out a significant segment of the multimedia market." Sony also claims that Mr. Stern "reached out to Philips" seeking to obtain a copy of the CD-I standard and other CD specs, to which he received a response advising him that the material he sought was available for purchase, and that he subsequently submitted this information to TVI.  Based on this, Sony asserts that the undisputed facts establish that Mr. Redford knew about the CD-I prior art, knew it was material, and made a deliberate decision to withhold it from the PTO.

TVI argues that Sony's allegations about 3DO pertain to TVI's disclosures to the PTO, and Sony's claim that TVI was wrong about 3DO and its toggling requirement.  TVI asserts that this is simply an allegation, not proof.  TVI also argues that the specification correctly described 3DO as Mr. Redford understood it during prosecution – or at least as Mr. Redford understood the developer's prototype – and there is no evidence to the contrary.

Nor, TVI asserts, can Sony prove that 3DO was "but-for" material to any asserted claim in the patents.  TVI contends that Sony's experts rely on information outside the 3DO player itself, including highly confidential information such as source code, which Mr. Redford did not and does not have access to.  TVI also contends that the PTO has disagreed with Sony's experts over the materiality of 3DO – as the PTO has already determined that 3DO is <u>not</u> but-for material.

TVI notes that Sony's position here is the materiality of 3DO and other products would be "clear to one of ordinary skill in the art and even to a lay person," based on such person's viewing of videos that show the operation of the products.  TVI argues, however, that arguments of counsel cannot meet the burden of proof on summary judgment.  Apart from this, TVI argues that Sony has not established that Mr. Redford knew about or appreciated the alleged materiality of 3DO, and that Sony has no evidence of deceptive intent.

With regard to CDTV, TVI asserts that Sony has offered no evidence of deceptive intent, in particular because it has failed to establish that Mr. Redford knew of, or

1   appreciated the alleged materiality of, CDTV's limited autoplay capacity.  TVI contends that

2   the only evidence in the record is that Mr. Redford saw a CDTV device running in an

3   electronics store, was intrigued by its unique remote control, and then saw other high-level

4   brochures and advertisements about CDTV (none of which identified autoplay as a

5   feature).  TVI contends that Sony appears to be arguing that Mr. Redford "should have

6   known" – which the Federal Circuit has unambiguously held is insufficient to establish the

7   "intent" requirement.

8        In addition, TVI contends that Sony cannot prove that CDTV is "but-for" material,

9   because the PTO has already confirmed the validity of the asserted patents over CDTV –

10   which means that Sony has no "clear and convincing" evidence that the issued patents

11   would not have been issued "but-for" the omission of the CDTV reference.

12        Finally, TVI notes that the CDTV manual was at issue during reexamination, while

13   Sony has alleged that it was the CDTV <u>device</u> that forms the basis of its inequitable

14   conduct allegations.  TVI argues that Sony's purported proof of materiality of a non-

15   accused reference is irrelevant to whether the CDTV device is material, and that even if

16   Sony's proof of materiality is based on the CDTV manual, there is no evidence or even

17   allegation that Mr. Redford knew of the CDTV manual.

18        Finally, with regard to CD-I, TVI asserts that Sony cannot prove its unpled

19   allegations regarding CD-I.  Sony previously sought leave to amend its answer and

20   counterclaims to assert an affirmative defense and counterclaim of inequitable conduct as

21   to the CD-I reference, but the court denied the motion as untimely.  Thus, there is no

22   inequitable conduct affirmative defense that relates to CD-I.

23        The court finds that both motions must be DENIED.  Sony has not met its burden of

24   proving inequitable conduct, because it has not proven that TVI or Redford made a

25   deliberate decision to withhold information from the PTO, and has also not proven that

26   either the 3DO player or the CDTV console is material, or that anyone at TVI appreciated

27   Sony's theory of materiality.  Nor has Sony identified any basis for the court to find an

28   egregious affirmative act.  Sony does not claim that TVI or Mr. Redford filed a false

1    affidavit, which is the sole type of "egregious affirmative act" identified by the Federal Circuit

2    as providing an exception to the requirement of "but-for" materiality.  See Therasense, 649

3    F.3d at 1292.  On the other hand, the evidence provided by Sony, while insufficient to prove

4    inequitable conduct, is arguably sufficient to raise disputed issues of fact as to this defense.

5         With regard to the 3DO device, Sony failed to provide admissible evidence that

6    clearly establishes that TVI withheld references that were material to patentability.

7    Primarily,  Sony relies on an exhibit that is an attorney-prepared chart or summary

8    combining numerous 3DO and CD-I references.  An attorney-prepared summary is not

9    admissible evidence, and in any event, this exhibit is a "collage" of at least 10 separate

10   references about 3DO.

11        Nor has Sony provided clear and convincing evidence showing that Mr. Redford or

12   Mr. Stern appreciated the alleged materiality of the 3DO device.  To sustain a charge of

13   inequitable conduct, "clear and convincing evidence must show that the applicant made a

14   deliberate decision to withhold a known material reference."  Molins, 48 F.3d at 1181.  Even

15   were the court to assume for the sake of argument that Mr. Redford or Mr. Stern

16   appreciated the materiality of the 3DO reference, an applicant's appreciation of the alleged

17   materiality of a reference is a separate and distinct element of proof from separate intent.

18   See 1st Media, 694 F.3d at 1374-75.  Here, however, it is unclear whether Mr. Redford or

19   Mr. Stern even saw the numerous references that are incorporated in Sony's theory of

20   materiality, let alone that they acted with the specific intent to deceive the PTO.

21        With regard to the CDTV device, Sony has provided no evidence showing that the

22   CDTV console is material, and that the PTO non-final rejection of claims cited by Sony was

23   based on the CDTV manual, not the device itself; or that Mr. Redford or Mr. Stern

24   appreciated the alleged materiality of the CDTV console.  The manual is a 480-page

25   document, and even if Mr. Redford was aware of the manual, it is not clearly established

26   that he knew of every single thing in the manual.  Moreover, even if the CDTV manual

27   could be considered a material reference, it does not necessarily follow that the CDTV

28   console is material.

United States District Court

For the Northern District of California

1    With regard to the CD-I reference, Sony concedes that this issue is moot, as there is

2  no inequitable conduct defense or counterclaim pled with respect to the CD-I prior art.

3    2.    Laches

4    In its answer and counterclaim, Sony alleges that the doctrine of laches bars TVI

5  from recovering any compensation or remedy for the alleged infringement of the patents-in-

6  suit by the Sony defendants.  Laches is cognizable under 35 U.S.C. § 282 as an equitable

7  defense to a claim for patent infringement.  A.C. Aukerman Co. v. R.L. Chaides Const. Co.,

8  960 F.2d 1020, 1028-30 (Fed. Cir. 1992).

9    The alleged infringer bears the burden of proving two elements by a preponderance

10  of evidence – that the patentee delayed filing suit for an unreasonable and inexcusable

11  length of time from the time the patentee knew or reasonably should have known of its

12  claim against the defendant, and that the alleged infringer was prejudiced or injured by the

13  delay.  Id. at 1032.  Prejudice may be either economic or evidentiary.  Id. at 1033; see also,

14  e.g., Hearing Components, Inc. v. Shure Inc., 600 F.3d 1357, 1375-76 (Fed. Cir. 2010).

15    Application of the laches defense is discretionary, and it "is not established by undue

16  delay and prejudice.  Those factors merely lay the foundation for the trial court's exercise of

17  discretion."  Aukerman, 960 F.2d at 1036 (emphasis in original).  The court "must weigh all

18  pertinent facts and equities in making a decision on the laches defense."  Id. at 1034.

19  Where the defense of laches is established, the patentee's claim for damages may be

20  barred.  Id. at 1028.

21    A rebuttable presumption of laches arises where a patentee delays bringing suit for

22  more than six years after the date the patentee knew or should have known of the

23  defendant's "potentially infringing activities."  Wanlass v. General Elec. Co., 148 F.3d 1334,

24  1337 (Fed. Cir. 1998) ("Wanlass II"); see also Serdarevic v. Advanced Med. Optics, Inc.,

25  532 F.3d 1352, 1358 (Fed. Cir. 2008); Aukerman, 960 F.2d at 1028, 1035.

26    "[A]bsent other equitable considerations, a prima facie defense of laches is made out

27  upon proof by the accused infringer that the patentee delayed filing suit for six years after

28  actual or constructive knowledge of the defendant's acts of alleged infringement."

United States District Court
For the Northern District of California

1    Aukerman, 960 F.2d at 1037; see also Wanlass v. Fedders Corp., 145 F.3d 1461, 1464

2    (Fed. Cir. 1998) ("Wanlass I").  Without the presumption, the facts of unreasonable delay

3    and prejudice "might reasonably be inferred from the length of the delay, but not

4    necessarily.  With the presumption, these facts must be inferred, absent rebuttal evidence."

5    Aukerman, 960 F.2d at 1037 (emphasis in original); Wanlass I, 145 F.3d at 1464.

6         The presumption has the effect of shifting the burden of going forward with evidence,

7    not the burden of persuasion.  Aukerman, 960 F.2d at 1028.  That is, once a defendant

8    establishes a presumption of laches on summary judgment, the burden shifts to the plaintiff

9    to rebut the presumption of laches by offering evidence to show an excuse for the delay or

10   that the delay was reasonable, or by offering evidence sufficient to place matters of

11   evidentiary and economic prejudice genuinely in issue.  Serdarevic, 532 F.3d at 1359-60

12   (citing Aukerman, 960 F.2d at 1038).  If the plaintiff presents a sufficiency of evidence

13   which, if believed, would preclude a direct finding in favor of the infringing defendant, the

14   presumption evaporates and the accused infringer will have to satisfy its burden of

15   persuasion with actual evidence.  Aukerman, 960 F.2d at 1037-38.

16        Here, Sony does not directly argue – though it appears to be suggesting – that a

17   presumption of laches arises in this case because TVI was aware of Sony's allegedly

18   infringing activities more than six years before filing the present lawsuit.[7]  To determine if

19   the presumption of laches applies, the court must determine whether the undisputed

20   evidence shows that TVI had actual or constructive knowledge of the alleged infringing

21   activities by Sony prior to February 2, 2004, six years before the date TVI filed the present

22   action.

23        Sony contends that TVI was well aware of Sony's DVD players for 12 years prior to

24   filing this lawsuit, noting that the '307 patent had already issued when Sony launched its

25   DVD players in the U.S. in the fall of 1997, and that TVI's three remaining patents issued

---

27        [7]  Sony does argue more directly in its opposition to TVI's motion that TVI's delay in
28   filing this lawsuit "by law has created presumption of laches," but its argument appears to be
     based purely on the amount of time that elapsed between Sony's introduction of its DVD
     players and TVI's filing of the lawsuit.

United States District Court

For the Northern District of California

1   within the four years following.  Sony argues that TVI could have sued Sony for infringing at

2   least one of the four patents from the day that Sony launched its DVD player, and also that

3   it could have sued Sony for patent infringement in 2002 when it filed the suit alleging that

4   Microsoft's "autoplay" feature infringed its patents, or in 2004 when it filed the suit alleging

5   that other computer manufacturers that used Windows also infringed its patents.  Instead,

6   TVI delayed until 2010 to file the present action.

7       Sony notes that TVI filed suit against Sony in August 2004, alleging that Sony's

8   VIAO computers that included Windows infringed the patents-in-suit, and claims that

9   documents produced in discovery show that TVI "was in fact fully aware of Sony's DVD

10  players and the DVD standard."  Sony also asserts that Mr. Redford "admitted" he was

11  "aware of" Sony's DVD players shortly after their release; and that "[n]umerous TVI

12  documents reveal that TVI considered Sony a potential licensing target since at least as

13  early as 1994," and that TVI was "developing technology that it sought to incorporate the

14  DVD standard and employ in DVD players, was aware of the technical aspects of DVD

15  technology, and sought to collaborate with DVD player manufacturers."

16      Sony also contends that TVI's constructive knowledge is established by documents

17  and testimony showing that TVI was aware of Sony's DVD players in 1997, and also by the

18  facts that it was "well known" that Sony first sold its DVD players in the fall of 1997 and was

19  among the best known brands of DVD players at that time, and that Sony's sales and

20  advertising and sales of its DVD players grew dramatically over the next seven years.

21  Similarly, Sony asserts, its introduction of the BD and PS3 products in 2006 was "well

22  known," as is the fact that it has been a "market leader of DVD and BD players in the U.S."

23      The court finds that the motions must be DENIED.  As an initial matter, the

24  presumption of laches does not arise as to the Blu-Ray and PlayStation products, because

25  those products were introduced prior to February 2, 2004.  Moreover, to the extent that

26  Sony argues that laches applies to bar TVI's infringement claims not only as to DVD

27  players but also as to "similar" products that "implement autoplay" (Sony's Blu-ray and

28  Playstation3 players), based on allegations in the first amended complaint regarding

United States District Court

For the Northern District of California

1   infringement, and also based on its expert John Byrd's opinions regarding various

2   similarities among the three types of devices, the court notes that TVI's expert Dr. Andrew

3   Wolfe has explained in his expert report that Blu-ray and Playstation3 players are distinct

4   because they accept different files of predetermined names than do DVD players, and

5   share other differences in the startup procedure.  Thus, at a minimum, the existence of

6   material disputed facts precludes a finding that the presumption applies to the Blu-ray and

7   PS3 players based on their "similarity" to the DVD players.

8        As for the DVD players, while it appears undisputed that Mr. Redford and others at

9   TVI were aware that Sony was selling its DVD players by late 1997 or perhaps 1998, Sony

10  has not provided evidence showing that Mr. Redford or TVI was aware of the alleged

11  "potentially infringing activities."  See Wanless II, 148 F.3d at 1337.  The mere fact that Mr.

12  Redford testified in his deposition that he "found out about [Sony's DVD players] about the

13  same time that they became available" is insufficient, without more, to establish that he

14  knew or reasonably should have known that the DVD players infringed TVI's patents.

15       In its argument, Sony cites to a variety of documents purporting to show TVI's

16  awareness or constructive knowledge, but many of the documents involve technical

17  discussions and references that have not been interpreted or explained for the court, and/or

18  contain no obvious references to DVD players.

19       For example, Sony cites to a memo apparently prepared by Mr. Stern in March 1994

20  regarding "Trip to Japan," which mentions Sony in connection with "demo Sega game" and

21  "MotionPad," among other rather cryptic references, but does not actually use the term

22  "DVD."  Similarly, Sony cites to a December 1993 TVI memo to Sony Computer

23  Entertainment regarding a "TVI MotionPad™ proposal," and certain "motion detection

24  technology," which again does not refer to DVD players.

25       An August 1997 memo purportedly from Mr. Stern asks the recipient to talk to

26  someone at Toshiba in Tokyo and "find out who I can speak to about the DVD data

27  structure," in particular the "VMGI, PCI, HLI, BTNIT data formats," which does indeed

28  reference DVDs, but in such a way as to be incomprehensible to the court.  Similarly, a

**United States District Court**

For the Northern District of California

1   November 1997 email from someone at TVI to a Mr. Takagawa at a Japanese company

2   thanks him for his email regarding his "strategy toward the February IrDA meeting" and his

3   "continuous support to TVI," and follows this with a summary of an earlier phone

4   conversation, the final point of which refers to an employee of "Philips" and the fact that

5   "[h]e requested a sample [of "SmartPaper Remote"] immediately for his internal demo to

6   Philips DVD and WebTV teams."

7          Also included are a number of excerpts of hand-written pages from notebooks kept

8   by Mr. Redford and Mr. Stern, in which Sony has highlighted various instances of the usage

9   of "DVD," but again, has provided no explanation or interpretation of these notes (which are

10   not comprehensible to the court) except insofar as it claims that such documents show that

11   TVI "was aware of the technical aspects of DVD technology and sought to collaborate with

12   DVD manufacturers."  None of this evidence is sufficient to establish that TVI delayed filing

13   suit for more than six years after actual or constructive knowledge of Sony's allegedly

14   infringing activities with regard to its DVD players.

15          As Sony has failed to establish a presumption of laches, it can prevail on this

16   defense only if it can affirmatively meet its burden of showing either evidentiary or

17   economic prejudice because of TVI's delay.  See Wanlass II, 148 F.3d at 1337.  Sony

18   asserts that it can show both evidentiary and economic prejudice, while TVI argues that

19   Sony lacks evidence sufficient to show either evidentiary or economic prejudice

20          "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to

21   present a full and fair defense on the merits due to the loss of records, the death of a

22   witness, or the unreliability of memories of long past events, thereby undermining the

23   court's ability to judge the facts."  Aukerman, 960 F.2d at 1033.  Persuasive evidence as to

24   evidentiary prejudice should show exactly what particular prejudice an alleged infringer will

25   suffer from the absence of witnesses or evidence.  See Meyers v. Asics Corp., 974 F.2d

26   1304, 1308 (Fed. Cir. 1992).

27          Sony contends that the passage of time has resulted in the disappearance of

28   extensive evidence that is highly relevant to its defense of this case – in particular,

United States District Court

For the Northern District of California

1   information and witness testimony relevant to prior art such as 3DO, CDTV, and CD-1,

2   dating back to the 1980s and early 1990s, which Sony requires to show that the TVI

3   patents are invalid.  Sony claims that due to TVI's delay, "a substantial amount of

4   information and witnesses relevant to those prior art devices" are no longer available.

5           Sony argues that the 3DO product has been off the market for 15 years, and that

6   certain 3DO "documents and witnesses" that would have been available in 1997-2003 can

7   no longer be found, including a presentation Redford made to the board regarding 3DO.

8   Sony contends that the unavailability of documents and witnesses is due in part to the fact

9   that the company involved in that product filed for bankruptcy and destroyed many files.

10          With regard to CDTV, Sony contends that TVI's business records show that Redford

11  and others at TVI understood "various technical features" of CDTV, but never disclosed any

12  CDTV documents to the PTO, and all such "critical documents" have allegedly been

13  discarded.  Sony claims that such lost documents are relevant to its inequitable conduct

14  and invalidity defenses.

15          As for CD-I, Redford testified that Phillip gave him a device in 1991, but he no longer

16  has it.  Sony claims that TVI's documents also indicate that Redford and TVI had

17  "significant information" about CD-I, but those documents were also discarded by TVI.

18          Sony also claims that TVI co-inventor Donald Stern has "disappeared," and that his

19  absence constitutes a critical loss of evidence because of his knowledge of prior art and

20  also because of his contributions to the development of TVI's patents.  Mr. Stern was

21  available during the Microsoft suits in the 2002-2005 time period, but now (according to

22  Sony) no one knows whether he is alive or dead.  Sony claims to have hired a private

23  investigator to search for him in the Philippines, to no avail.

24          Finally, Sony argues that TVI acknowledges it experienced "extensive" loss of

25  records through fire or computer crashes, within six years of the date it learned about

26  Sony's DVD products (e.g., in 1998 and in 2003).

27          TVI's position is that Sony cannot establish that any delay prevented it from

28  presenting a "full and fair defense," as Sony has fully and fairly defended itself in this

United States District Court

For the Northern District of California

1    litigation.  Moreover, TVI notes, Sony has represented to the court that it is entitled to

2    summary judgment on the claims of infringement, validity, and inequitable conduct.  TVI

3    contends that if it were really true that Sony had been prevented from defending itself, then

4    it could not simultaneously argue that it is entitled to summary judgment on all critical

5    issues in the case.

6        TVI also contends that it sought discovery from Sony on the issue of evidentiary

7    prejudice, but that Sony refused to offer a deposition witness, and responded to TVI's

8    interrogatories with a vague statement that failed to explain how it has been detrimentally

9    impacted by the lack of any specific evidence.  TVI also notes that none of Sony's experts

10   has provided any opinion regarding prejudice in connection with Sony's laches defense,

11   despite Sony's counsel's objection to discovery on that issue.

12       As for the alleged missing documents, TVI asserts that it has produced more than

13   320,000 pages of documents, among those the documents produced during the Microsoft

14   litigation (which included documents from TVI's initial design and development period); and

15   that it has also offered to make available prototype and software from the relevant inventive

16   time period – but Sony chose not to inspect any of this evidence.  TVI asserts further that

17   Sony has not explained what prior art – if any – or which related documents it is missing or

18   how such prior art or documents prejudice its invalidity defense.

19       Finally, with regard to witnesses, TVI contends that Sony has not identified any of

20   TVI's former employees, explained why he/she is relevant, identified any steps to contact

21   those employees, or demonstrated that no one in any of Sony's entities has comparable

22   knowledge.  With regard to Mr. Stern, TVI argues that Sony has misrepresented the facts.

23   TVI claims to have identified Mr. Stern's address in the Philippines in May 2010, but argues

24   that Sony never attempted to subpoena him, despite the fact that the Philippines allows for

25   letters rogatory and depositions at the U.S. Embassy.  Mr. Stern was also living in the

26   Philippines during the Microsoft litigation, and according to TVI, Microsoft managed to

27   depose him there.

28       The court finds that Sony has not met its burden of establishing evidentiary prejudice

United States District Court

For the Northern District of California

1  based on TVI's delay in filing suit.  In particular, disputed issues remain regarding whether

2  documents essential to Sony's defense are missing, or whether particular witnesses cannot

3  be located.  In particular, the question of Mr. Stern's ability to testify appears to be disputed.

4  "Economic prejudice may arise when a defendant and possibly others will suffer the

5  loss of monetary investments or incur damages which likely would have been prevented by

6  an earlier suit."  Aukerman, 960 F.2d at 1033 (citations omitted).  Such damages are not

7  those attributable to a finding of liability on the patent infringement claims, as economic

8  prejudice would then arise in every suit.  Id.  Instead, the court must look for a change in

9  the economic position of the alleged infringer during the period of the delay.  Id.  Economic

10  prejudice is "likely to be a slippery issue to resolve."  Id. (citation omitted).

11  The court must also "consider and weigh any justification offered by the plaintiff for

12  its delay[,]" such as other litigation, negotiations with the accused, poverty and/or illness

13  under limited circumstances, extent of infringement, and disputes over the ownership of the

14  patents.  Id. (citations omitted).  This list is not exhaustive, and the listed factors will not

15  constitute sufficient justification in every case.  Id.

16  Here, Sony asserts that the evidence shows it could have "cut off" any possible

17  damages claims years ago had it been sued or even charged with infringement on a timely

18  basis.  Relying on the opinions of its expert Mr. Byrd, Sony argues that it could readily have

19  disabled the "autoplay" feature of its DVD players, or simply reloaded its operating system

20  between disc insertions.

21  Sony also claims that a finding of infringement will cause it economic harm based on

22  the fact that it has introduced many models of DVD players over the years, and first sold

23  the accused Blu-ray players and PS3 (PlayStation 3) in 2006.  According to Sony, it could

24  easily have introduced other (non-infringing) products if it had been aware that TVI intended

25  to file suit, but that it didn't know, and the result, as explained by its damages expert

26  Michael J. Wagner, was that it spent over $20 billion on research and development

27

28

48

United States District Court

For the Northern District of California

1   between 2007 and 2011.[8]  Sony contends that all the associated research and

2   development expenses would have been avoided had it been placed on notice of TVI's

3   infringement claims.

4         As for the question whether Sony has established the ability or willingness to design

5   around the patents, Sony asserts that its Rule 30(b)(6) representative testified that Sony's

6   "technical expert" would provide such details, and that it has provided three non-infringing

7   alternatives through its expert Mr. Byrd.

8         For its part, TVI argues that Sony cannot prove any economic prejudice because it

9   cannot show that it would have done anything different if it had been sued earlier.

10  Economic prejudice requires an explicit nexus to the patentee's delay in filing suit.  See

11  Hemstreet v. Computer Entry Sys. Corp., 972 F.2d 1290, 1294 (Fed. Cir. 1992).  It is not

12  enough that the alleged infringer changed its position by, for example, investing in the

13  production of the allegedly infringing device.  Rather, "[t]he change must be because of and

14  as a result of the delay, not simply a business decision to capitalize on a market

15  opportunity."  Id. (citing Aukerman, 972 F.2d at 1033).  Thus, TVI asserts, the crucial

16  question is whether Sony would have acted differently if sued earlier.

17        Here, TVI argues, Sony has no evidence to offer at trial to support any assertion of

18  economic prejudice.  TVI contends that Sony's Rule 30(b)(6) representative refused to

19  answer questions at his deposition regarding designing around the asserted patents after

20  this litigation started, and refused to answer questions regarding whether Sony could have

21  redesigned around the patents after the Microsoft  case.

22        TVI also asserts that Sony has offered no evidence that it ever disabled and

23  removed autoplay from any of its accused players (even after this case was filed), and that

24  it is questionable whether Sony's other suggested non-infringing alternative is even

25  feasible, as it has not been reduced to practice.  As for Sony's claim that it has invested

26

27  ───────────────

28        [8]  Sony relies on Mr. Wagner's opinion to support this claim, although the court was unable to confirm that Mr. Wagner actually rendered this particular opinion, as Sony failed to point to the relevant portion of the report.

United States District Court

For the Northern District of California

1   more than $20 million in the accused products, TVI argues that this is not sufficient to show

2   economic prejudice, because there is no monetary nexus between this investment and the

3   timing of the lawsuit.

4          The court finds that Sony has not met its burden of showing that it has suffered or

5   will suffer economic prejudice as a result of TVI's delay in filing suit.  At a minimum,

6   disputed issues of material fact exist with regard to this issue.  Sony's argument regarding

7   research and development expenses is not clearly supported by evidence showing a nexus

8   with TVI's delay.  As for Sony's argument that its technical expert – which the court

9   interprets as a reference to Mr. Byrd – will provide details regarding which non-infringing

10  alternatives Sony would have implemented, the court notes that while Mr. Byrd did provide

11  extensive opinions regarding the costs of redesigning the accused Sony products in order

12  to avoid infringing the TVI patents-in-suit, this is not necessarily the same as providing

13  evidence as to which non-infringing alternatives Sony would have provided had it been

14  anticipating that TVI would file suit.

15         Finally, with regard to TVI's articulated justifications for the delay in filing suit, the

16  court finds no need to address the other factors applicable to the question of the

17  reasonableness of the delay, in light of its ruling that Sony has not met its burden with

18  regard to establishing prejudice.

19         3.     Equitable estoppel

20         In its answer and counterclaim, Sony alleges that TVI's infringement claims are

21  barred by the doctrine of equitable estoppel.  Equitable estoppel is cognizable under 35

22  U.S.C. § 282 as an equitable defense to a claim of patent infringement. Where an alleged

23  infringer establishes the defense of equitable estoppel, the patentee's claim may be entirely

24  barred.  Aukerman, 960 F.2d at 1028.

25         Three elements must be established to bar a patentee's suit by reason of equitable

26  estoppel.  The alleged infringer must show (1) misleading conduct, which may include not

27  only statements and actions but silence and inaction, leading the alleged infringer to

28  reasonably infer that rights will not be asserted against it; (2) the alleged infringer's reliance

United States District Court

For the Northern District of California

1   upon that conduct; and (3) that due to that reliance, the alleged infringer would be

2   materially prejudiced if the patentee were allowed to proceed with its claim.  Id.  No

3   presumption is applicable to the defense of equitable estoppel.  Id.

4        In its motion, TVI argues that Sony cannot prevail on this defense because it cannot

5   show any material prejudice (as argued above in connection with the laches defense) and

6   also has no proof of reliance on any misrepresentation by TVI that TVI did not intend to

7   assert its patents against Sony.

8        In opposition, Sony asserts that disputed issues of fact preclude summary judgment

9   on this defense.  Sony argues that TVI does not dispute that its failure to assert its patents

10  against Sony's DVD players when it sued Sony in 2004 was an action that prejudiced Sony,

11  but that it has only argued that Sony cannot show it relied on TVI's behavior.

12       Sony acknowledges that its Rule 30(b)(6) representative refused to answer certain

13  questions during his deposition, but argues that the problem was that counsel for TVI failed

14  to ask two crucial questions – whether Sony relied on TVI's failure to assert its patents

15  against Sony's DVD players in 2004, and what Sony would have done if TVI had filed suit

16  regarding Sony's DVD players in 2004.  Sony claims that if TVI's counsel had asked these

17  questions, TVI would have learned that Sony did rely on TVI's failure to assert its patents,

18  and that if sued, it would have vigorously defended itself.  In support of this argument, Sony

19  has provided a declaration from one of its attorneys – Jamie Siegel – who is also the

20  corporate representative who was deposed on the issue of reliance.

21       The court finds that TVI's motion must be DENIED.  While it is true that Sony has

22  provided no clear evidence of reliance, there are material facts in dispute regarding whether

23  communications between TVI and Sony during the pendency of the Microsoft case "lulled

24  Sony into a sense of security" in going ahead and "settling" with TVI in that case, but then

25  continuing with its own sales of DVD, BD, and PS3 products.

26       4.      Noninfringement

27       Sony argues that its products do not infringe TVI's '156 and '863 patents because

28  they do not "operatively couple" two host devices, and that its products do not directly or

51

United States District Court

For the Northern District of California

1  indirectly infringe the method claims of the '532 or '307 patents.

2       To establish infringement of a patent, every limitation set forth in a claim must be

3  found in an accused product or process exactly or by a substantial equivalent.  Jurgens v.

4  McKasy, 927 F.2d 1552, 1560 (Fed. Cir. 1991).  There can be no infringement as a matter

5  of law where a claim limitation is totally missing from the accused device.  Johnston v. IVAC

6  Corp., 885 F.2d 1574, 1577 (Fed. Cir. 1989).  The motion of an accused infringer for

7  judgment on the ground of noninfringement of a patent may be granted where the

8  patentee's proof is deficient in meeting an essential part of the legal standard for

9  infringement, and no material issue of fact exists.  Id.; see also TechSearch L.L.C. v. Intel

10  Corp., 286 F.3d 1360, 1369 (Fed. Cir. 2002).

11            a.      Noninfringement of '156 and '863 patents

12       Sony argues that its products do not infringe TVI's '156 and '863 patents because

13  they do not "operatively couple" two host devices.  Claim 1 of the '156 patent and Claims 1

14  and 9 of the '863 patent are means-plus-function claims.  Each claims "a host device

15  comprising . . ." and includes the limitation "operatively couple."

16       Claim 1 of both patents includes the limitations "said means for detecting being

17  operatively coupled to said output lead of said peripheral and to said means for

18  automatically loading" and "said means for checking being operatively coupled to said

19  means for detecting."  Claim 1 of the '156 patent also includes the limitation "said means for

20  starting up being operatively coupled to said means for checking," and Claim 9 of the '863

21  patent includes the limitations "said first means for checking being operatively coupled to

22  said means for detecting," "said second means for checking being operatively coupled to

23  said means for detecting," and "said means for starting up being operatively coupled to said

24  second means for checking."

25       In the Claim Construction Order, the court construed "means for automatically

26  loading an initialization file" which also appears in Claim 1 in both the '156 and '863 patents

27  as having a claimed function of "automatically loading an initialization file," and a

28  corresponding structure of "a host device programmed and/or configured to perform the

United States District Court

For the Northern District of California

1    disclosed algorithm of checking for and using an initialization file during booting from either

2    a removable storage media (such as floppy disk) or a permanent storage medium which is

3    an integral part of the host device, and equivalents thereof."  <u>See</u> Claim Construction Order

4    at 13.  Based on this, Sony argues that because the "means for checking" is part of the

5    same claim, the same structure "host device" corresponds, and that the corresponding

6    structure for "means for checking" is therefore a host device (<u>e.g.</u> computer) programmed

7    to perform the disclosed algorithm of detecting insertion of a storage media through polling

8    or use of an interrupt from a storage peripheral, and equivalents thereof.

9         As indicated above, the asserted claims require that the "means for checking" be

10   "operatively coupled" to another element, such as "said means for detecting."  Thus, Sony

11   argues, the literal construction of "said means for checking being operatively coupled to

12   said means for detecting" is "a host device . . . operatively coupled to a host device . . . ."

13   However, Sony asserts, that the same host device cannot be operatively coupled to itself; if

14   it could, the claim limitation would be meaningless.

15        Sony contends that TVI has changed its infringement contentions in an effort to

16   resolve this dilemma.  For example, Sony notes that TVI's original infringement contentions

17   for the PS3 referred to the relevant structure for both the means for checking and means

18   for detecting as a "host device," but that when Sony pointed out that the accused products

19   do not operatively couple two host products, TVI changed the structure from "host devices"

20   to "programs."  That is, TVI's infringement contentions identified the corresponding

21   structure as "a host device programmed to perform the disclosed algorithm of . . . ," and Dr.

22   Wolfe's reply expert report states that "in most cases, those claimed structures are

23   programs running on the same host processor."

24        Sony claims that Dr. Wolfe also now states that "in each of the disclosed

25   embodiments, the claimed means-plus-function elements are operatively coupled when

26   information flows from one structure to another."  Sony argues, however, that even if that is

27   what "operatively coupled" meant, the claims would still require information flowing from

28   one host device to another, not from one "program" to another "program."  Sony also notes

53

United States District Court
For the Northern District of California

1  that the specification mentions "operatively coupled" only once, to describe a physical

2  connection between separate components (citing '156 patent 19:31-33).  Claim 1 of the

3  '156 and '863 Patents further require operatively coupling the means/host to the output lead

4  of a peripheral, which Sony argues is another clear reference to a physical connection

5  between different devices.

6      In opposition, TVI argues that there is no basis for the court to consider and find a

7  replacement for two "host devices" in the '156 and '863 patents.  TVI notes that this new

8  theory – that the '156 and '863 patents require two host devices in order to be valid – was

9  never raised at claim construction, and is contradicted by Sony's invalidity theory

10  throughout this case.

11      In addition, TVI asserts, since claims must be construed the same for both validity

12  and infringement, Sony has waived any right to now assert that the claims require two host

13  devices; and that in any event, because Sony never asked to have the term "operatively

14  coupled" construed, the ordinary meaning should apply.  Finally, TVI contends that contrary

15  to Sony's representation, TVI has consistently asserted its infringement theory.

16      The court finds that Sony has not met its burden of establishing noninfringement by

17  showing that TVI's proof is deficient in meeting an essential part of its claim of infringement.

18  At a minimum, disputed issues of fact preclude summary judgment. Accordingly, the motion

19  for summary judgment of noninfringement of the '156 and '863 patents is DENIED.

20          b.      Noninfringement of '532 and '307 patents

21      Sony contends that the court should find that Sony's products do not directly or

22  indirectly infringe the method claims of the '532 and '307 patents because TVI has no

23  evidence that Sony directly performed all claimed steps, and because TVI has no evidence

24  that Sony had the intent or knowledge required to prove indirect infringement.

25      The '532 and '307 Patents expressly claim methods.  To prove direct infringement by

26  Sony, TVI must show that Sony performed each and every step of the claimed method in

27  the United States.  Meyer Intellectual Props. Ltd. v. Bodum, Inc., 690 F.3d 1354, 1371

28  (Fed. Cir. 2012).  Sony argues that TVI cannot survive summary judgment merely by

54

United States District Court

For the Northern District of California

1    showing Sony's products are <u>capable of</u> performing the claimed steps, or that an end user

2    <u>likely</u> performed the claimed steps – but must prove Sony itself actually performed each

3    step.  While that standard would apply if TVI had moved for summary judgment of

4    infringement, the court notes that the standard is somewhat different here.

5        When a party moving for summary judgment does not bear the ultimate burden of

6    proof on an issue, that party can satisfy its initial burden by showing that there is an

7    absence of evidence to support the moving party's case.  <u>See</u> <u>Celotex</u>, 477 U.S. at 325.

8    Thus, an accused infringer seeking summary judgment of noninfringement may meet its

9    initial burden by providing evidence that would preclude a finding of infringement, or by

10   showing that the evidence on file fails to establish a material issue of fact essential to the

11   patentee's case.  <u>Novartis Corp. v. Ben Venue Labs, Inc.</u>, 271 F.3d 1043, 1046 (Fed. Cir.

12   2001); <u>see also</u> <u>Exigent Tech., Inc. v. Atrana Solutions, Inc.</u>, 442 F.3d 1301, 1308-09 (Fed.

13   Cir. 2006).

14       Sony argues that TVI has no evidence that Sony infringes the claimed methods,

15   which require more than simply autoplaying content upon disc insertion.  The '532 claims

16   require "continuing to detect insertion without rebooting" (i.e., detection of at least a second

17   disc without rebooting).  The '307 claims, according to TVI, all require "returning to said

18   step of automatically enabling" without rebooting.

19       Thus, Sony argues, a second disc is required in order to detect insertion and begin

20   playback of content.  According to Sony, TVI's infringement contentions state this step

21   "occurs when the inserted BD-ROM is removed and the player is prepared to accept

22   another BD-ROM."  Sony contends that while TVI may argue its '307 claims could be met

23   merely by inserting one disc, this is contrary to TVI's "admissions" and in any case is a new

24   issue of claim construction by TVI.

25       Sony contends that TVI's only evidence that Sony performs the claimed methods in

26   the U.S. relates to certain testing of BD and DVD players in the U.S., and usage of PS3

27   consoles at U.S. tradeshows.  However, Sony asserts, TVI has not alleged that PS3

28   consoles are tested in the U.S. and its only allegation that the BD and DVD players are

tested in the U.S. is based upon the testimony of Sony's Rule 30(b)(6) witness that Sony

tests "general playback, power-on, basic usage as a customer would have of the product."

As to actual use by Sony of the PS3 and BD/DVD players, Sony claims that TVI relies

solely on testimony of Sony's 30(b)(6) witnesses stating generally that Sony demonstrated

those products at some U.S. tradeshows, but not how Sony demonstrated the products

(e.g., one disc could have been left in all day).

Thus, Sony argues, TVI has adduced no evidence that Sony performed the claim

steps of "returning" and "continuing" during those limited tests and tradeshows.  For

example, Sony claims there is no evidence that it used more than a single test disc in its

limited U.S. testing of DVD and BD players (which are made overseas), and no evidence

that the PS3 was ever tested by Sony in the U.S.

Sony contends that TVI cannot respond to its lack of evidence by speculating that

Sony must have inserted a second disc or ejected a disc to place the device in a state

where it can detect a new disc at some point during a trade show or testing, because

speculation is "clearly not the same as proof."  Thus, Sony argues, TVI has failed to adduce

sufficient evidence that Sony directly infringed the method claims of the '532 and '307

Patents.

Sony also argues that TVI has no evidence that Sony had the intent or knowledge

required for indirect infringement or contributory infringement.  Sony claims that TVI alleges

that Sony actively induced its customers to infringe the '532 and '307 Patents.  Sony

argues, however, that liability for inducement requires knowledge that the induced acts

constitute patent infringement.  See Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct.

2060, 2068 (2011).  Inducement requires that the alleged infringer knowingly induced

infringement and possessed a specific intent to encourage another's infringement.  In re Bill

of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d 1323, 1339 (Fed. Cir.

2012).  Thus, Sony argues, even if TVI had proof that third parties in the U.S. used the

accused products to perform all steps of the method claims, TVI has failed to identify any

facts that Sony knew the third parties' infringed.

1    According to Sony, Dr. Wolfe "suggested" that Sony may have gained such

2    knowledge of infringement during the <u>Microsoft</u> suit, but Sony notes that that suit related to

3    Windows and PCs, not DVD, BD or PS3 players, and that it did not involve any of the Sony

4    entities in this case responsible for PS3 consoles.  Sony contends that TVI also cannot

5    dispute that it never advised Sony at any time prior to filing this lawsuit that Sony's DVD,

6    BD and PS3 players allegedly infringe the patents.

7    Sony also claims that Dr. Wolfe "admitted" he is not aware of any evidence that TVI

8    ever put Sony on notice of alleged infringement by its DVD players prior to filing the present

9    case, and TVI has not submitted no evidence to the contrary.  Sony contends that as noted

10   in the argument regarding laches, TVI's actions during and since that suit gave Sony "every

11   reason to believe" that the currently accused products did not infringe the TVI patents.

12   Further, Sony argues, other than a reference to user manuals, Dr. Wolfe "admitted" he was

13   not aware of any evidence that Sony intended to encourage its customers to infringe any of

14   TVI's patents, and that Redford also "admitted" that TVI has no such evidence.

15   In opposition, TVI argues that it has substantial evidence that Sony directly

16   performed all steps of the asserted method claims, and also has substantial evidence with

17   which it intends to prove indirect infringement at trial.  First, TVI contends that it has

18   evidence that Sony tested its accused Blu-ray and DVD players in the U.S., and

19   demonstrated its Blu-ray, DVD, and PS3 players at trade shows in the U.S.  Dr. Wolfe

20   states in his reports that by testing and demonstrating the playback and power-on operation

21   of each of its DVD and Blu-ray models, Sony has performed all steps of the asserted

22   method claims.  TVI asserts that this evidence is sufficient to create at least a triable issue

23   of material fact as to whether Sony performed each step of the asserted method claims.

24   With regard to Sony's argument that TVI's evidence is insufficient because TVI must

25   show that a second disc was tested or demonstrated, TVI responds that this is attorney

26   argument unsupported by evidence, and this position also has no basis in the claim

27   language.

28   TVI also contends that it has substantial evidence with which it intends to prove

United States District Court
For the Northern District of California

57

1   indirect infringement at trial.  TVI asserts that the evidence shows that Sony has known

2   about TVI's patents for years – at least as far back as the <u>Microsoft</u> litigation; and that there

3   is clear evidence that Sony repeatedly came across TVI's patent portfolio while prosecuting

4   its own patent applications, as TVI's patents were cited during prosecution of at least 17 of

5   Sony's patents over the years.

6           Similarly, TVI claims that there is evidence sufficient to support a finding that Sony

7   intended to induce its customers to infringe the asserted patents.  Induced infringement

8   requires evidence of activities from which the jury may infer that the accused infringer acted

9   with a specific intent to encourage another's direct infringement.  <u>See</u>, <u>e.g.</u>, <u>Ricoh Co., Ltd.</u>

10  <u>v. Quanta Computer Inc.</u>, 550 F.3d 1325, 1342-43 (Fed. Cir. 2008).  Knowledge of the

11  patents coupled with control over the design and manufacture of the product that is used

12  for direct infringement may also support an inference of specific intent to cause

13  infringement.  <u>See</u> <u>id.</u>

14          TVI contends that it has ample evidence that Sony designed and manufactured the

15  accused devices and, as shown above, had detailed knowledge of the patents, and also

16  that it instructed its customers on how to use the accused products in an infringing way –

17  and that in any event, the normal use of the accused products to play movies infringes the

18  asserted method claims, as autoplay is the default setting for Sony's products.  Moreover,

19  TVI argues, in the face of knowledge of the patents and its products' practice of the claimed

20  methods, Sony changed nothing but instead continued to market, produce and sell the

21  accused devices, providing additional compelling evidence of intent.  <u>See</u> <u>Mentor H/S, Inc.</u>

22  <u>v. Medical Device Alliance, Inc.</u>, 244 F.3d 1365, 1379 (Fed. Cir. 2001).

23          Alternatively, TVI argues that the evidence at least establishes Sony's willful

24  blindness to infringement by the accused products.  An infringer cannot avoid

25  indirect infringement "by deliberately shielding themselves from clear evidence of critical

26  facts that are strongly suggested by the circumstances."  <u>Global-Tech</u>, 131 S. Ct. at 2068.

27  TVI argues that based on the record above, Sony cannot avoid this conclusion on summary

28  judgment, as it cannot deny that it knew of the asserted patents and a charge of

1  infringement in 2004, along with TVI's patent family throughout Sony's effort to seek patent

2  protection on its products.  TVI contends that any claim of deniability by Sony is a dispute

3  for the jury.

4       The court finds that Sony has not met its burden of establishing noninfringement by

5  showing that TVI's proof is deficient in meeting an essential part of its claim of infringement.

6  Moreover, disputed factual issues exist with regard to, e.g., whether Sony performed each

7  step of the asserted method claims.  Accordingly, the motion for summary judgment of

8  noninfringement of the '532 and '307 patents is DENIED.

9                                    **CONCLUSION**

10      In accordance with the foregoing, Sony's motions for summary judgment of invalidity

11 are DENIED; TVI's motion for summary judgment as to inequitable conduct, laches, and

12 equitable estoppel is DENIED; and Sony's motion for summary judgment as to inequitable

13 conduct, laches, and non-infringement is DENIED.

14

15 **IT IS SO ORDERED.**

16 Dated: December 3, 2012

17 _____

18 PHYLLIS J. HAMILTON
   United States District Judge

19

20

21

22

23

24

25

26

27

28