DUANE M. GECK (State Bar No. 114823)
dmg@severson.com
PHILIP BARILOVITS (State Bar No. 199944)
pb@severson.com
M. ELIZABETH HOLT (State Bar No. 263206)
meh@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Gregory S. Gewirtz (*Pro Hac Vice*)
ggewirtz@ldlkm.com
Jonathan A. David (*Pro Hac Vice*)
jdavid@ldlkm.com
Charles P. Kennedy (*Pro Hac Vice*)
ckennedy@ldlkm.com
Fahd K. Majiduddin (*Pro Hac Vice*)
fmajiduddin@ldlkm.com
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090
Telephone: (908) 654-5000
Facsimile: (908) 654-7866

Attorneys for Defendants Sony Corporation,
Sony Corporation; Sony Computer Entertainment Inc.;
Sony Computer Entertainment America LLC;
Sony Corporation of America; and Sony Electronics Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA — SAN FRANCISCO DIVISION

| | |
|---|---|
| TV INTERACTIVE CORPORATION,<br><br>  Plaintiff,<br><br>  v.<br><br>SONY CORPORATION et al.,<br><br>  Defendants. | Case No. 3:10-CV-00475-JCS<br><br>**DEFENDANTS' NOTICE OF MOTION AND MEMORANDUM ON *DAUBERT* MOTIONS FOR PLAINTIFF'S EXPERTS DR. V. SRINIVASAN, MICHAEL WAGNER, AND DR. ANDREW WOLFE**<br><br>Date:  February 22, 2013<br>Time: 9:30AM<br>Judge:  Joseph C. Spero |

FINAL REDACTED Def Daubert_s motion re_ testimony of TVI Experts.DOCX

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................ii,iii

NOTICE OF MOTION ............................................................................................................ 1

MEMORANDUM AND POINTS OF AUTHORITY............................................................ 1

I.     INTRODUCTION......................................................................................................... 1

II.    THE LAW REGARDING ADMISSIBILITY OF EXPERT TESTIMONY............................ 3

III.   MOTION TO PRECLUDE TESTIMONY ON SRINIVASAN SURVEYS
       AS BASED ON AN UNRELIABLE METHODOLOGY ........................................... 4

   A.    The Surveys .......................................................................................................... 4

   B.    Dr. Srinivasan's "Price Discount" Methodology Has Not Been
         Accepted In The Scientific Community ............................................................ 6

   C.    Dr. Srinivasan's Own "Price Discount" Conjoint Analysis Should
         Be Excluded As Unreliable Under Daubert ...................................................... 7

   D.    The Survey Results Are Demonstrably Unreliable ......................................... 9

   E.    Strong Recent Precedent Rejects As Unreliable Conjoint Survey
         Results Containing Comparable Illogical Responses...................................... 12

   F.    The Survey Methodology Is Rendered Unreliable By Overvaluing
         The Few Tested Features................................................................................... 13

   G.    The Survey Results Should Be Excluded Because Dr. Srinivasan
         Failed To Test The Closest Alternatives To AutoPlay.................................... 15

IV.    MOTION TO PRECLUDE OR LIMIT TESTIMONY BY
       MICHAEL WAGNER, TVI'S DAMAGES EXPERT......................................... 17

   A.    Mr. Wagner's Opinion Should Be Excluded Along With The
         Srinivasan Surveys ........................................................................................... 17

   B.    Mr. Wagner Failed To Consider The Effect Of Increasing Sony's
         Prices On Decreasing The Volume Of Sales.................................................... 18

   C.    Mr. Wagner's Methodology Using Retail Prices Conflicts With
         The Patent Law.................................................................................................. 19

   D.    Mr. Wagner's Royalty Values From 2011/2012 Conflict With
         The Hypothetical Negotiation Date.................................................................. 20

   E.    Mr. Wagner's Testimony Is Not The Product Of A Reliable
         Method Because He Could Not Articulate The Method He Used .................... 21

V.     MOTION TO PRECLUDE OR LIMIT TESTIMONY BY
       ANDREW WOLFE, TVI'S LIABILITY EXPERT ............................................ 23

   A.    Dr. Wolfe's Testing of Reboot Times ............................................................... 23

   B.    Dr. Wolfe's Testing Was Unreliable and Unscientific ................................... 24

VI.    CONCLUSION ........................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Honda Corp. Inc. v. Allen*,
    600 F.3d 813 (7th Cir. 2010) .................................................................................................. 8

*Apple, Inc. v. Samsung Electronics Co.*,
    No. 11-cv-01846, 2012 WL 2571332 (N.D. Cal. June 30, 2011) .......................................... 19

*Atlantic Richfield Co. v. Farm Credit Bank*,
    226 F.3d 1138 (10th Cir. 2000) ............................................................................................ 16

*Braun v. Lorillard Inc.*,
    84 F.3d 230 (7th Cir. 1996) ............................................................................................... 8, 9

*Community Technologies, Inc. v. Fujitsu Ltd.*,
    333 F.Supp.2d 858 (N.D.Cal. 2004) ...................................................................................... 8

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ............................................................................................. 16

*Crystal Semiconductor Corp. v. Tritech Microelectronics International, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001) ........................................................................................... 18

*Daubert v. Merrell Dow Pharmaceutical., Inc.*,
    509 U.S. 579 (1993) ..................................................................................................... passim

*Daubert v. Merrell Dow Pharms, Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ............................................................................................... 23

*Domingo v. T.K.*,
    289 F.3d 600 (9th Cir. 2002) ............................................................................................... 23

*Fresenius Med.l Care Holdings, Inc. v. Baxter Int'l, Inc.*
    No. C03-0431, 2006 WL 1646113 (N.D. Cal. June 12, 2006) ............................................. 15

*General Electric v. Joiner*,
    522 U.S. 136 (1997) ............................................................................................................ 22

*Grain Processing Corp. v. American Maize-Products, Co.*
    185 F.3d 1341 (Fed. Cir. 1999) ........................................................................................... 15

*Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc.*
    588 F.3d 908 (6th Cir. 2009) ................................................................................................. 7

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .............................................................................................................. 4

*Laser Dynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ................................................................ 19, 20, 21

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F.Supp.2d 558 (S.D. N.Y. 2007) ................................................................ 8

*Oracle America, Inc. v. Google Inc.*,
    No. C10-03561, 2012 WL 850705 (N.D. Cal. Mar. 13, 2010) .................. 12

*Riles v. Shell Exploration & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002) ................................................................ 15

*Simple Air v. AWS Convergence Technology*,
    No. 09-289 (E.D.Tex.) ................................................................................ 6

*Sumner v. Biomet, Inc.*,
    No. 7:08–CV–98 2010 WL 4736320 (M.D. Ga. Nov. 16, 2010) .................. 8, 9

*United States v. Finley*,
    301 F.3d 1000 (9th Cir. 2002) ................................................................ 4

*United States v. H&R Block, Inc.*,
    833 F.Supp.2d 36 (D.D.C. 2011) ............................................................ 9

*Wells v. SmithKline Beecham Corp.*,
    601 F.3d 375 (5th Cir. 2010) ................................................................ 8

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ................................................................ 22

*Zygo Corp. v. Wyko Corp.*,
    79 F.3d 1563 (Fed. Cir. 1996) ................................................................ 15

STATUTES AND OTHER AUTHORITIES

35 U.S.C. § 284 ............................................................................................ 3, 19

Fed. R. Evid. 702 .................................................................................... 3, 9, 17, 21

1

<u>**NOTICE OF MOTION**</u>

2     PLEASE TAKE NOTICE that Defendants Sony Corporation, Sony Computer

3  Entertainment Inc., Sony Computer Entertainment America LLC, Sony Corporation of America,

4  and Sony Electronics Inc. (collectively "Sony") hereby move to exclude portions of the opinions

5  and testimony of TV Interactive Data Corp.'s ("TVI") damages experts, Dr. V. "Seenu" Srinivasan

6  and Mr. Michael Wagner, and TVI's technical expert Dr. Andrew Wolfe. This Motion is based on

7  the following memorandum of points and authorities in support, the Declaration of Robert Klein

8  ("Klein Decl.") with Exhibits 1-7 and the Declaration of Charles P. Kennedy ("Kennedy Decl.")

9  with Exhibits 8-18.

10

<u>**MEMORANDUM AND POINTS OF AUTHORITY**</u>

11 **I.     INTRODUCTION**

12     TVI's patents in this case cover one minor feature — autoplay without

13  rebooting — allegedly found in Sony's DVD players, BD players, and PS3 game systems.

14  Autoplay allows a disc inserted into the player to automatically play content without any user

15  interaction such as pushing a play button.  In view of the prior art, TVI does not contend  that its

16  patent claims  cover autoplay *per se*, but only autoplay without rebooting, such as reloading the

17  operating system, resetting the device or restarting the operating system.  An alternative to

18  autoplay is use of a conventional play button to start the play of an inserted disc.

19     Autoplay is merely one of numerous technologies and features found in these products.

20  The parties' experts have identified from 40 to 69 such features in a single product.  Survey data

21  has established that autoplay does not drive consumer demand for these products, and it is

22  unimportant in comparison to Sony's brand, ease of set up, built-in WiFi, high definition, picture

23  quality, and numerous other features.  In the case of Sony's PlayStation3 (PS3) console, the most

24  significant features are its primary use as a video game machine, the versatility and quality of

25  available video games, the PlayStation brand, its interactive nature and other play related features.

26  Thus, damages in this case for use of the autoplay without rebooting feature, assuming that TVI

27  establishes infringement and validity of its patents, should be very small.

28     Despite the above, TVI now astonishingly contends that its damages for the alleged

FINAL REDACTED Def Daubert_s motion re_ testimony of TVI Experts.DOCX

infringement exceed *$70 million*.  TVI arrived at this outlandish figure by ignoring any real-world evidence of a reasonable royalty (such as the royalty rate at which TVI intended to license its technology at the time of the hypothetical negotiation) and instead concocting a brand-new methodology which defies common sense and economic reality.  In particular, TVI retained Dr. V. Srinivasan to employ an untested survey method requiring that respondents compare "price discounts" for combinations of hypothetical product features.  The nonsensical results fully demonstrated why this method is fatally flawed and had never been used before by any reputable expert.  Indeed, an analysis of the answers shows that nearly 30% of the respondents who chose between two identical products having only different price discounts *selected the lower discount*. These answers show that respondents did not understand the price discount method and violated the very premise of the survey that a higher price discount should be preferable to a lower one.

TVI's expert also limited his survey to only 6 out of at least 40 features of the products and did not inform respondents of the other features that the products had, including some of the most important features such as using a PS3 game console for playing the video games.  This inappropriate method caused the respondents to drastically overvalue autoplay and the six other features surveyed to such an extent that the survey "values" for only the six tested features would nearly total *the entire retail price of the product*.  And the survey overstated the autoplay feature by comparing it to a full system restart (shutting the power off and turning it back on), rather than the more appropriate noninfringing alternatives available to Sony by which a user would only wait a few extra seconds while the operating system reloads for the disc to play.  Because of these significant flaws, the Srinivasan surveys are clearly unreliable and do not come remotely close to passing the *Daubert* test.

Michael Wagner, TVI's damages expert, relied almost entirely on the unreliable Srinivasan survey to manufacture TVI's exaggerated damages claim.  Mr. Wagner ignored a joint license agreement between TVI and ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████.  Using the Srinivasan surveys instead, Mr. Wagner came to the

conclusion that a reasonable royalty would be $0.85 per DVD unit; $2.75 per BD unit; and $1.30 per PS3 unit, translating to a total damages recovery in excess of $70 million.

Even beyond his use of the unreliable Srinivasan surveys, Mr. Wagner's methodology was unreliable and contrary to law.  In computing royalties that would require that Sony increase the wholesale prices of its products, Mr. Wagner did not consider the reduction in unit sales that would result from such increases in price and that would reduce his damages calculation. Moreover, he incorrectly based his analysis on additional revenue from the *retail* prices of the products, but 35 U.S.C. § 284 requires a reasonable royalty for the use made of the invention by the infringer, and Sony would enjoy only an increase in *wholesale* prices.  He also used amounts consumers would supposedly pay in 2011/2012 for autoplay, instead of additional revenue to Sony for the patented feature as of the date of the hypothetical negotiation in 1997.  Because of these critical flaws, his opinion is entirely unreliable and must be excluded under *Daubert*.

Mr. Wagner's opinions also depend on unreliable measurements of time delays in testing by Dr. Wolfe, TVI's technical expert.  At his deposition, Dr. Wolfe could not recall important aspects of his testing methodology. He testified that he had to videotape his tests in order to record the time required to do a "cold reboot" of the system, but he was not aware whether the videotapes were produced to Sony.  Although Sony and the Court would need those videotapes to evaluate the reliability of Dr. Wolfe's tests, TVI never produced them.  Demonstrated by Dr. Wolfe's inability to recall how he conducted the tests, the timing tests for the accused Sony products, on which Mr. Wagner relies, are unscientific and unreliable.  His subjective tests fail the *Daubert* requirements of being subject to peer review, having a determined rate of error, having standards or controls that can be evaluated, and having acceptance in the scientific community.  Thus, Dr. Wolfe's testing should be excluded as unreliable.

## II.     THE LAW REGARDING ADMISSIBILITY OF EXPERT TESTIMONY

Under Fed. R. Evid. 702, an expert qualified by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or

1  to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony

2  is the product of reliable principles and methods; and (d) the expert has reliably applied the

3  principles and methods to the facts of the case. To determine the admissibility of expert testimony,

4  courts follow the framework set out in *Daubert v. Merrell Dow Pharmaceutical., Inc.*, 509 U.S.

5  579, 589-90 (1993).

6        *Daubert* requires the district court to ensure that any scientific testimony "is not only

7  relevant, but reliable." *Id.* at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42

8  (1999).   A trial court has broad discretion in assessing the relevance and reliability of expert

9  testimony. *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002).

10  **III.   MOTION TO PRECLUDE TESTIMONY ON SRINIVASAN**
     **SURVEYS AS BASED ON AN UNRELIABLE METHODOLOGY**

11        **A.   The Surveys**

12        Dr. Srinivasan ran three surveys to assess the "value" of certain selected features of DVD

13  players, BD players, and PS3 systems, and the results have become the linchpin of TVI's damages

14  case.   These surveys and Dr. Srinivasan's testimony should be excluded because they are based

15  entirely on an untested and unreliable "price discount" method.

16        Dr. Srinivasan had an outside group collect information on the attributes of DVD, BD and

17  PS3 products from the manufacturers' websites.   From these lists, Dr. Srinivasan selected 18

18  features for each product (DVD, BD, PS3) to be used for Phase 1 of the surveys.   In Phase 1

19  respondents ranked the "importance" of the 18 selected features together with certain autoplay

20  rebooting delays, and two price discounts (*e.g.*, $5, $10).   (Kennedy Decl. Exh. 8, Srinivasan

21  Reports 11-12.)   For Phase 2 of each study, Dr. Srinivasan selected the six features and the

22  discount amount that had been ranked closest to the autoplay feature assessed in Phase 1.   In

23  Phase 2, each respondent was shown 15 "choice tasks" through which the respondent would

24  indicate his preference for one of four permutations of four product features (including autoplay)

25  and "price discounts." (*Id.* at 13.)   One such choice task is shown below:

26

27

28

1

2

3
### Blu-ray Player

4

5
| Adjustable picture settings | Yes | No | No | Yes |
|---|---|---|---|---|
| Price Discount | $0 | $5 | $10 | $5 |
| Camera memory slot | Yes | No | No | No |
| Ability to play video/photo/audio from computer (DLNA certified) | Yes | No | No | No |
| Next Disc Playback | Playback after 40 seconds | Playback after 15 seconds | Playback after 90 seconds | Playback after 90 seconds |
| | ○ | ○ | ○ | ○ |

< | Back     Next | >

10

11  Each respondent selected one of the four options from each choice task reflecting the most

12  desirable combination of features and price discount.   Dr. Srinivasan did not supervise the

13  collection of the data or the conduct of the survey. (*Id.,* Exh. 9, Srinivasan Dep. 19:7-23:15)

14          Once the Phase 2 data had been collected, it was analyzed according to a complex

15  algorithm:

16      The CBC data were analyzed by the CBC software using Hierarchical Bayes (HB)
        methods.  Because the amount of data at the individual level are small (only 15 choices),
17      it is better to constrain the value parameters to provide more accurate results.  The
        MWTP [Market's Willingness To Pay] determination requires that the respondent does
18      not place negative values on price discounts.  (The instructions for price discount are
        clear that the product remains the same so there is no quality reduction along with the
19      price discount.)

20  (Kennedy Decl. Exh. 8, Srinivasan Reports 15 (emphasis added).)  Critically, Dr. Srinivasan did

21  not determine the extent to which any respondents in the survey *had* placed negative values on

22  price discounts — contrary to the requirement of his method.    (*Id.* Exh. 9, Srinivasan

23  Dep. 273-74.).  Dr. Srinivasan used the data to create a "dashboard" that was used by Mr. Wagner to

24  determine the MWTP of autoplay without reboot using the "fully constrained" results from his

25  surveys.  (*Id.*, Ex. 8., Srinivasan Report 18.)

26

27

28

**B.  Dr. Srinivasan's "Price Discount" Methodology
Has Not Been Accepted In The Scientific Community**

Under the accepted approach for conjoint analyses, respondents make choices between options *at different prices*.   Dr. Srinivasan's method of using *price discounts*, however, is unprecedented and resulted in massive respondent confusion, which led to unreliable data.

Dr. Srinivasan himself has previously employed the traditional approach of conjoint analyses using price, not price discount.   (*See* Kennedy Decl. Exh. 10, O. Netzer and V. Srinivasan, "Adaptive Self-Explication of Multiattribute Preferences," *Journal of Marketing Research* 144, 148, 153 (Feb. 2011); Exh. 9, Srinivasan Dep. 255:16-257:8, 245:22-246:6.)   Indeed, Dr. Srinivasan testified that his practice is to use differences in product prices:

> Q. Now, I want to talk about this price discount that you put in there. In other conjoint analysis you have used the actual prices of the products and not the discount for the choices; is that correct?
> . . . .
> THE WITNESS:  Yes.

(Exh. 9, Srinivasan Dep. 243:1-8 (emphasis added).)

Moreover, in his only other conjoint analysis for litigation, Dr. Srinivasan used differences in price.  In *Simple Air v. AWS Convergence Technology*, No. 09-289 (E.D.Tex.), Dr. Srinivasan used the "total price of the product, not price discount in that conjoint analysis." (*Id.* at 360:7-10.) And, he tested "all the attributes" of the products, as opposed to focusing on a mere six attributes. (*Id.* at 360:3-6)   Importantly, Dr. Srinivasan has never submitted a conjoint analysis with price discounts in a court case.  (*Id.* at 244:5-22.)   Moreover, he is aware of *no court case* where a conjoint analysis has been accepted using his price discount method.  (*Id.* at 247.)

Critically, peer reviewed literature, including the academic literature cited in his report, only supports conjoint analysis surveys that use different prices, not price discounts.   (*Id.*. 257-258; Exh. 11, Srinivasan Dep. Exh. 291.)

When asked whether he was aware of any peer-reviewed articles recommending the use of price discounts in a conjoint analysis, Dr. Srinivasan at first tried to confuse the point by contending that studies to determine the impact of a price discount for a product could use price

discounts.  (Kennedy Decl. Exh. 9, Srinivasan Dep. 247-48.)  But when asked pointedly to identify "any peer-reviewed article in which for a conjoint analysis the concept of price discounts was used instead of price and it was recommended as being the valid approach," Dr. Srinivasan was unable to identify a single article or author.  (*Id.* at 248-251.)  He admitted that his reports in this case do not set forth any scholarly peer-reviewed article that "supports the use of a price discount," as was done in the conjoint analysis here.  (*Id.* at 254:12-25.)

### C.  Dr. Srinivasan's Own "Price Discount" Conjoint Analysis <u>Should Be Excluded As Unreliable Under *Daubert*</u>

Even assuming that the use of traditional conjoint analysis would be appropriate in this case, Dr. Srinivasan's untested methodology is fatally flawed and unacceptable.  His opinion fails the *Daubert* requirement that the evidence must rest "on a reliable foundation" and "the reasoning or methodology underlying the testimony [must be] scientifically valid." *Daubert*, 509 U.S. at 592-93, 597.

Particularly on point for excluding Dr. Srinivasan's own creative version of conjoint analysis is the decision in *Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing*, *Inc.* 588 F.3d 908 (6th Cir. 2009), in which the court considered a motion to exclude an expert witness's variation of an otherwise acceptable SSNIP ("Small But Significant Non-Transitory Increase in Price") test.  There, the district court found that the expert "did not properly perform the SSNIP test":

> By his own admission, Zimbalist did not perform the standard SSNIP test.  Rather than analyzing whether a price increase at a particular point in time would result in consumer substitution of an alternative product, Zimbalist looked at average Sprint Cup ticket prices and attendance figures over an eight-year span and concluded that both price and demand increased in this time period.  The district court properly characterized this analysis as Zimbalist's "own version" of the SSNIP test and noted that "<u>[i]t has not been tested; has not been subjected to peer review and publication; there are no standards controlling it; and there is no showing that it enjoys general acceptance within the scientific community.  Further, it was produced solely for this litigation.</u>"  We find this analysis persuasive.  The district court therefore did not abuse its discretion in discrediting Zimbalist's SSNIP test.

*Id.* at 918 (emphasis added).  Based on these deficiencies, the appeals court upheld the district court's exclusion of both the expert report and testimony as unreliable under *Daubert*.  *Id.* at 919.

1    Exclusion is also supported by cases rejecting techniques that have not been subjected to

2    peer review and publication and are not generally accepted in the relevant scientific community.

3    The four guiding factors from the *Daubert* case in assessing the reliability of expert testimony are:

4    (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the

5    technique has been subjected to peer review and publication; (3) the known and potential error rate

6    of the methodology; and (4) whether the technique has been generally accepted in the proper

7    scientific community.   *Daubert*, 509 U.S. at 595.   Applying these *Daubert* factors, courts have

8    rejected tests for which an expert cannot establish reliability through testing of the methodology,

9    peer review, or general acceptance in the proper scientific community.

10    As this Court found in *Community Technologies, Inc. v. Fujitsu Ltd.*, 333 F.Supp.2d 858

11    N.D. Cal. 2004), in rejecting an expert opinion:

12    In particular, UI offers no explanation for its expert's reliance on a modeling technique
      that is used mainly to simulate circuits in the early stages of designing the circuit in order
13    to obtain currents and voltages in *existing* circuits.   UI cites no evidence suggesting that
      Dr. Inan's methodology has been subject to peer review or would be accepted in the
14    relevant scientific community.   To the contrary, UI's expert concedes that he is unaware
      of any scientist using PSPICE to obtain currents and voltages in actual circuits instead of
15    simply measuring to obtain these values.

16    *Id.* at 881 (citation omitted); s*ee also Am. Honda Corp. Inc. v. Allen*, 600 F.3d 813, 818 (7th Cir.

17    2010) (rejection of expert testimony where there was no indication that analysis had been

18    generally accepted by anyone other than the expert); *Wells v. SmithKline Beecham Corp.*, 601 F.3d

19    375, 380 (5th Cir. 2010) (expert's opinion that medication caused gambling problem was not

20    generally accepted); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558,

21    636-37 (S.D. N.Y. 2007) (survey to establish trademark dilution excluded under *Daubert* because

22    of absence of support); *Sumner v. Biomet, Inc.*, No. 7:08–CV–98 2010 WL 4736320, at *4 (M.D.

23    Ga. Nov. 16, 2010) (expert opinion excluded under *Daubert* which had not been subjected to peer

24    review and publication and had not been tested or validated).

25    Moreover, Dr. Srinivasan's surveys should be excluded under *Daubert*  because he chose to

26    depart from an accepted methodology of conjoint analysis using price, and invented his own "price

27    discount" method solely for the purposes of this litigation.   As the Seventh Circuit explained in

28

1   *Braun v. Lorillard Inc.*, 84 F.3d 230 (7th Cir. 1996):

2       Nowhere in *Daubert* did the Court suggest that failure to adhere to the customary
3       methods for conducting a particular kind of scientific inquiry is *irrelevant* to the
        admissibility of a scientist's testimony.  On the contrary, the Court made clear that it is
4       relevant. 113 S. Ct. at 279-97.  A judge or jury is not equipped to evaluate scientific
5       innovations.  If, therefore, an expert proposes to depart from the generally accepted
        methodology of his field and embark upon a sea of scientific uncertainty, the court may
6       appropriately, insist that he ground his departure in demonstrable and scrupulous
        adherence to the scientist's creed of meticulous and objective inquiry.  To forsake the
7       accepted methods without even inquiring *why* they are the accepted methods-in this case,
        why specialists in testing human tissues for asbestos fibers have never used the familiar
8       high temperature ashing method-and without even knowing *what* the accepted methods
        are, strikes us, as it struck Judge Manning, as irresponsible.

9   *Id.* at 235 (emphasis added); *see also United States v. H&R Block, Inc.*, 833 F.Supp.2d 36, 67

10  (D.D.C. 2011) (rejecting expert's use of pricing simulator based on conjoint analysis because of

11  "critical flaw in design" by omitting prices for certain options).

12      In this case, there is a particular risk that a jury would lend credibility to Dr. Srinivasan's

13  untested and flawed price discount method merely because of Dr. Srinivasan's experience and

14  qualifications.  That is indeed the very situation where *Daubert* and Rule 702 come into play.  *See*

15  *Sumner*, 2010 WL 4736320 at *6.

16          **D.       The Survey Results Are Demonstrably Unreliable**

17      The faulty and unaccepted methodology using price discounts led to massive errors,

18  confusion, and illogical answers from the surveys.  This rampant confusion is apparent from the data

19  shown in Dr. Srinivasan's charts from Phase 1, and the confusion was confirmed by the subsequent

20  testing of the Phase 2 data by Sony's expert Robert Klein.

21      In Phase 1 of his surveys, Dr. Srinivasan asked respondents to rank the selected features

22  and discount amounts in terms of importance.  From these rankings, Dr. Srinivasan developed a

23  numerical value for each feature and discount amount.  Dr. Srinivasan's data shows that for BD

24  players, on average the respondents evaluated the $5 discount at 4.78, but valued the $10 discount

25  at 4.28 — a *lower* value.  (Kennedy Decl. Exh. 12; Exh. 9, Srinivasan Dep. 183:15-184:25)  For

26  the PS3, on average, respondents valued a $10 discount at 4.78, but valued a $20 discount to only

27  at 4.22.  (*Id.* Exh. 13 at 2; Exh. 9, Srinivasan Dep. 121-124.)  Incredibly, respondents valued a $5

28

1    discount at 4.61 — meaning that they valued a $5 discount *higher* than a $20 discount.  (*Id.*

2    Exh. 13, at 2, Exh. 9, Srinivasan Dep. 124-125.)   It is clear from Dr. Srinivasan's own Phase 1

3    data that respondents were massively confused by the survey and valued a lower discount to be

4    worth more.

5           Unlike Dr. Srinivasan, Sony's expert Mr. Klein did the analysis to test the reliability of the

6    price discount methodology for Phase 2.   Mr. Klein analyzed the Phase 2 data using the same

7    analysis software that Dr. Srinivasan had used to value autoplay, except Mr. Klein did not

8    constrain the values so a higher discount had to work more than a lower discount.  By removing

9    the artificial constraint imposed by Dr. Srinivasan, Mr. Klein was able to uncover any respondents

10   whose answers provided an illogical higher value to a lower price discount.  Mr. Klein provided a

11   chart (Klein Decl. Exh. 3) showing the values placed on the discounts by each respondent, and he

12   calculated the number of respondents who provided such negative responses for the price

13   discount:

14          [I]n each of the Srinivasan surveys, approximately half the respondents violated the
            assumption that a greater discount is preferable to a lesser discount
15

16                  Blu-ray
                            24% prefer $0 to $10 discount
17                          25% prefer $0 to $5 discount
                            36% prefer $5 to $10 discount
18                          50% with some price preference inconsistency
                    DVD
19                          20% prefer $0 to $5 discount
                            25% prefer $0 to $3 discount
20                          38% prefer $3 to $5 discount
                            52% with some price preference inconsistency
21                  PS3
                            23% prefer $0 to $20
22                          25% prefer $0 to $10
                            31% prefer $10 to $20
23                          46% with some price preference inconsistency
24

25          The results shown in the above table were obtained by using the .ATT and .CHO files
            provided with the Srinivasan Reports and performing the same calculations (using the
26          Reboot alternative only) as were performed for the Srinivasan Reports, but without
            constraining the price variable to "make sense."
27

28   (Klein Decl. ¶ 7)  Mr. Klein also calculated the number of respondents whose preference for the

1   larger discount was not statistically significantly different from their preference for no discount at

2   all or for a lesser discount.  When one adds such respondents to those who preferred the lower

3   discount, about 75% of all respondents for each Phase 2 study did not show a statistically

4   significant preference for a higher discount.  (*Id.* ¶ 8.)

5        The fundamental problem with the price discount approach is most clearly illustrated by

6   the many respondents who were presented  a choice set with two identical alternatives having only

7   different discounts — yet still *chose the lower discount*.  These fundamentally wrong choices were

8   made by 26-29% of the respondents who had such choice tasks:  20 of 76 (26%) for DVD; 25 of

9   90 (28%) for BD; and 26 of 90 (29%) for PS3.    (*Id.* ¶ 10; Klein Decl. Exhs. 4-6.)  The magnitude

10  of this fundamental confusion with the price discount method entirely undermines the

11  methodology of the surveys and their results.

12       These problems indicate that the respondents either were not holding the other features of

13  the products constant or did not understand that the "price discount" was a discount from the retail

14  price.  As Mr. Klein concluded:

15       I believe that there are several possible interpretations as to why the survey method failed
         and is unreliable.  In evaluating the choices presented, respondents may not have obeyed
16       the instruction to assume that all other aspects of the devices were the same.  Or, they
         may have mistaken the price discount for a price surcharge.  Whichever the explanation,
17       when half of the respondents are providing obviously faulty answers, the questionnaire
         and any conclusions that flow from it are unreliable.
18

19  (Klein Decl. ¶ 12.)

20       When deposed about these inconsistencies, Dr. Srinivasan accepted that Mr. Klein had

21  taken the Phase 2 raw data and had used the same software to analyze the data — but without

22  constraining price so the answers showing a negative value for the price discount would be

23  uncovered.  (Kennedy Decl. Exh. 9, Srinivasan Dep. 276-77, 280-82.)  Dr. Srinivasan agreed that

24  Mr. Klein's analysis used the software "to provide unconstrained results" that are "the estimates of

25  what the respondents' price discount parameters are."  (*Id.* at 281:19-24.)  Dr. Srinivasan did not

26  dispute that 50% of respondents provided negative values to the price discount as computed by

27  Mr. Klein. (*Id.* at 287-89.)  Tellingly, Dr. Srinivasan admitted that he had not done "a statistical

28

analysis to try to understand the degree to which respondents in [his] Phase 2 had provided statistically significant negative values to the price discount." (*Id.* at 291:18-292:5; 277-8.) Indeed, he conceded that the "results that [he] obtained from Phase 2 depend on [his] applying a price constraint." (*Id.* at 300:23-301:2.)

Dr. Srinivasan tried to explain away these illogical outcomes with the "price discount" method as resulting from "sampling error" or "sample size." He also contended that these errors in the treatment of the discount were not "statistically significant" for particular respondents. (*Id.* at 124-25, 183-84, 291.) These assertions do not rebut the proven unreliability of his "price discount" method. Sony does not rely on these responses to prove as a statistically significant matter that these respondents actually believe that a $5 discount is worth more than a $10 discount. Rather, the pervasiveness of such responses demonstrates that the "price discount" method fundamentally confused many respondents, such that the underlying data is entirely unreliable.

### E. Strong Recent Precedent Rejects As Unreliable Conjoint Survey Results Containing Comparable Illogical Responses

In *Oracle America, Inc. v. Google Inc.*, No. C10-03561, 2012 WL 850705 (N.D. Cal. Mar. 13, 2010), the court considered a *Daubert* challenge to a conjoint analysis to test the importance to consumers of seven smartphone features. *Id.* at *9. The conjoint analysis was excluded because the results as to price proved to be irrational and thus unreliable:

> In response to this concern, Oracle explains that it is not necessary in a conjoint analysis to test every distinguishing feature that may matter to consumers because study participants are told to hold all other features constant (Shugan Decl. ¶ 25, 28). That may be a true theory. But here, the conjoint study's own irrational results shows that study participants did not hold all other, non-tested features constant. Specifically, the results show that one quarter of all participants preferred (9%), or were statistically indifferent between (16%), a smartphone costing $200 to a theoretically identical smartphone costing $100 (Zimmer Decl. Ex F at 114, Shugan Decl. ¶ 39; Shugan Reply Rep. 19). The likely explanation for this irrational result is that survey respondents were not holding non-specified features constant and instead placing implicit attributes on features such as price.

*Id.* at *11 (emphasis added). Indeed, the court explained that the survey expert had "created this problem for himself" by testing a limited number of features. *Id.* Here also, Dr. Srinivasan made the same mistake by confining his test to only six features of each product — where each product

actually has many dozens of features including at least 40 features recognized by Dr. Srinivasan, many of which are more important to consumers than the ones chosen by Dr. Srinivasan for testing in Phase 2.

### F.   The Survey Methodology Is Rendered Unreliable By Overvaluing The Few Tested Features

In Phase 2, respondents were provided choices for the autoplay/reboot feature, and six other features for each of DVD, BD, and PS3.   Dr. Srinivasan was aware that each of these products had at least 40 identifiable attributes.   (Kennedy Decl. Exh. 9; Srinivasan Dep. 44-45.) Yet each respondent in Phase 2 was shown only autoplay and three other features.   The results demonstrate that this method is inherently unreliable for determining a real world value for autoplay without rebooting, because the respondents assumed that the identified features are the major features of the hypothetical product.   By not informing respondents of any other features of the products, the survey led respondents to elevate the value assigned to the few tested features. Respondents cannot be expected to remember the many other unlisted features his or her product might have.   Indeed, Dr. Srinivasan himself could recall only a few features of the BD player that he had used for a number of years.   (*Id.* at 233-39.)   The results of Phase 2 of the survey demonstrate how the selection of such few features caused respondents to greatly overvalue the autoplay feature and the few other features that were tested.

By analyzing the raw data from Phase 2 and the same analysis program used by Dr. Srinivasan, Mr. Klein was able to determine the respondents' measured "willingness to pay" for the six other features of the DVD, BD and PS3 tested in Phase 2.     As shown below, the respondents gave to the other six features the following "willingness to pay" values:

**DVD**

| | |
|---|---|
| Multiple inputs and outputs | $12.82 |
| Instant skip reply | $11.71 |
| Additional warranty | $ 6.74 |
| Progressive scan | $ 9.20 |
| Adjustable picture settings | $ 5.77 |
| Surround sound | $ 8.92 |
| **Total Willingness to pay for 6 features** | **$55.16** |

**BD Player**

| | |
|---|---|
| Ability to play video from computer | $26.79 |
| Adjustable picture settings | $18.24 |
| Camera memory slot | $16.89 |
| Video noise reduction | $20.59 |
| Surround sound | $31.22 |
| Instant skip/replay | $19.40 |
| **Total Willingness to pay for 6 features** | **$133.11** |

**PS3**

| | |
|---|---|
| Ability to play from computer | $31.02 |
| Built-in wifi | $57.51 |
| Multiple inputs and outputs | $47.20 |
| Internet apps | $67.45 |
| Surround sound | $42.52 |
| Camera memory slot | $27.12 |
| **Total Willingness to pay for 6 features** | **$272.83** |

(Klein Decl. ¶¶ 13-14, Exh. 7.)  Remarkably these totals approach the <u>entire average retail price</u> Dr. Srinivasan found for Sony's products, namely 80% of $68.66 for Sony's DVD; 65% of $203.32 for Sony's BD; and 91% of $299 for PS3.  (*See* Exh. 8A-C, Srinivasan Reports at 8.)  This result alone is absurd and demonstrates that the Phase 2 "value for autoplay was overstated and unreliable.

     Moreover, using a conservative assumption that the 12 additional features that were identified in Phase 1 for each of the products have values comparable to the 6 features selected for Phase 2, the aggregate values of just 18 features would amount to <u>nearly twice the retail value</u> of each product.  Even, these totals would not include the values of the other 22 features (including the *Sony* brand name) that Dr. Srinivasan identified, but did not test in either Phase 1 or Phase 2.  This massive overvaluing of tested features demonstrates that Dr. Srinivasan's method of testing only autoplay and six features in Phase 2 was fundamentally unreliable and grossly inflated the value of autoplay.

     Dr. Srinivasan agreed that his Phase 2 data could be used to provide individual values for the six other tested features:

Q. . . . And for Phase 2, you're telling me that the only part that you would be comfortable in giving values is for the six other features?

. . .

THE WITNESS:  That is right.  One at a time, not in combination.

(Kennedy Decl. Exh. 9, Srinivasan Dep. 322:9-16.)  He understood that Mr. Klein had used the data from his survey to measure the value of the other features on a price constrained basis.  (*Id.* at 307:11-308:10.)

Dr. Srinivasan's response to this apparent problem was to argue that his method required that each dollar value be "truncated" at the amount of the discount in the survey.  Thus, the features in the DVD survey would be no greater than $5; features in the BD survey would be no greater than $10; and features in the PS3 survey would be no greater than $20.  (*Id.* at 311:4-19.) Every tested feature gets cut except for autoplay.  Even if the truncations are applied to each tested feature, the six features for DVD would amount to $30 or 44% of the total price, the six features for BD would amount to $60 or 45% of the total price, and the six features for BD would amount to $120 or 44% of the total price alleged by Dr. Srinivasan.  Even with these constraints, the overall "value" from the survey for 6 out of 40 product features compared to the overall price of the products is incomprehensibly high.

This is an absurd result and demonstrates the unreliability of the survey for determining the value consumers would give the auto play feature.  If the values respondents gave all other features have to be greatly reduced, a scientific treatment of the survey data would also reduce auto play by a similar amount.  But Dr. Srinivasan did not reduce the autoplay value.  Thus, the value for autoplay measured by the surveys is unreliable and should be excluded.

G.    **The Survey Results Should Be Excluded Because Dr. Srinivasan <u>Failed To Test The Closest Alternatives To AutoPlay</u>**

To be relevant to a reasonable royalty, evidence must measure the value of the invention against the defendant's best available alternative.  As the Federal Circuit stated in *Grain Processing Corp. v. American Maize-Products, Co.* 185 F.3d 1341 (Fed. Cir. 1999):

[O]nly by comparing the patented invention to its next-best available alternative(s) – regardless of whether the alternative(s) were actually produced and sold during the infringement – can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right.

*Id.* at 1351.  A proper calculation of damages requires "sound economic and factual predicates." *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).  Thus, in *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571-72 (Fed. Cir. 1996), the Federal Circuit directed the district court on remand to consider the impact of a noninfringing alternative the defendant could have employed to the reasonable royalty.  *See also Fresenius Med.l Care Holdings, Inc. v. Baxter Int'l, Inc.* No. C03-0431, 2006 WL 1646113 at *1 (N.D. Cal. June 12, 2006) (a key part of the reasonable royalty determination under *Georgia-Pacific* is whether the accused infringer had acceptable noninfringing alternatives available to it at the time of the hypothetical negotiation.)

In 1997, Sony had available two alternatives to the alleged claimed autoplay feature, neither of which was tested by the Srinivasan surveys:  (a)  a "play" button to start the play of a disc, and (b) rebooting the operating system before automatically starting the play of a disc.  Both of these alternatives were set forth and analyzed in the responsive expert report by John Byrd. (*See* Kennedy Decl. Exh. 14, Byrd Report. at 38-56.)  Instead of testing these closer alternatives, Dr. Srinivasan tested only a "cold reboot," measuring the time for the product to be completely turned off and then on, or a "file name" option that is not commercially needed and has never been considered or suggested by Sony.  (Kennedy Decl. Exh. 9, Srinivasan Dep. at 35-36.)

First, the Srinivasan surveys do not at all deal with the play button alternative.  No respondent was asked for an amount he or she would pay to have the product automatically play the inserted disc instead of having to simply press a play button to start the disc playing.  The survey data collected by Dr. Srinivasan cannot be used to determine the value of such a minor inconvenience as pressing a play button.  Second, the Srinivasan surveys did not test the alternative of reloading the operating system (which Sony's expert John Byrd had found would only add a delay from less than 2 seconds to about 5.6 seconds).  (Kennedy Decl. Exh. 14, Byrd Report at 38.)  Instead of presenting commercially available alternatives, the respondents were presented delay alternatives ranging from 25 to 45 seconds based on the unreliable tests performed by Dr. Wolfe as discussed below. (Kennedy Decl. Exh. 9, Srinivasan Dep. 85-87, 108-09; Exh. 14, Byrd Report at 38.)  While a hypothetical 40-second reboot improvement may have some value to

respondents, one could not say that the improvement of a few seconds has any perceived value.

By failing to test for the closest noninfringing alternatives, Dr. Srinivasan's opinion should be excluded because he has not considered all of the relevant facts. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000):

> If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate. *See Kumho Tire Co.*, 526 U.S. at 15, 119 S.Ct. 1167; *Joiner*, 522 U.S. at 146, 118 S.Ct. 512. Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case. *See Kumho Tire Co.*, 526 U.S. at 154, 119 S.Ct. 1167; *Joiner*, 522 U.S. at 146, 118 S.Ct. 512.

*Id.* at 1056. *See also Atlantic Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1167-68 (10th Cir. 2000) (excluding expert testimony on market value that did not consider sales data from all relevant markets).

In response, TVI will no doubt argue that these fundamental failings go to the weight of the testimony and can be dealt with on cross-examination. But the purpose of Rule 702 is to ensure that an expert has used reliable and appropriate methodology and has considered the relevant facts *before* the expert provides testimony to the jury. Otherwise, there is the risk that the jury will accept the testimony simply because it comes from a credentialed expert.

## IV. MOTION TO PRECLUDE OR LIMIT TESTIMONY BY MICHAEL WAGNER, TVI'S DAMAGES EXPERT

Mr. Wagner used the dashboard created from the Srinivasan survey to develop a "baseline" royalty rate of $1.19 per DVD unit, $3.71 per BD unit, and $2.29 per PS3 unit. He purportedly reviewed the evidence based on the *Georgia-Pacific* factors, finding them all to be neutral, except for factor 10 on two products and factor 13 for all products. Using a method that he could not explain at his deposition, Mr. Wagner ultimately adjusted the baseline royalties to $0.85 per DVD unit, $2.75 per BD unit, and $1.30 per PS3 unit.

### A. Mr. Wagner's Opinion Should Be Excluded Along With The Srinivasan Surveys

Mr. Wagner's damages opinion and analysis admittedly "depends clearly on the surveys done and the results of the surveys done by Mr. Srinivasan." (Kennedy Decl. Exh. 15, Wagner

Dep. 56:10-15.)  For example, Mr. Wagner attributed the great difference between the royalty of $.85 for every DVD player and $2.75 for every BD player solely to the values found by the Srinivasan surveys.  (*Id.* at 43-45.)  When the surveys are removed from Mr. Wagner's damages opinions, he has no basis left from which to calculate damages.

### B. Mr. Wagner Failed To Consider The Effect <u>Of Increasing Sony's Prices On Decreasing The Volume Of Sales</u>

Mr. Wagner's computation should also be excluded because he did not account for the basic principle of economics that the price increases that Sony would need to apply to cover his royalties would lead to a decrease in unit sales.  Mr. Wagner admitted that he had not done a price elasticity analysis for any of the DVD, BD, or PS3 products to analyze the extent to which Sony's sales of its products would decrease if it were forced to increase its sales price to take into account the reasonable royalty damages.  (*Id.* at 83-84; 320-21.)  Mr. Wagner accepts the fundamental principle of economics that when one increases the price of a product, it normally leads to a decrease in sales, (*Id.* at 84), but he did not account for this effect. Mr. Wagner tried to justify his error by referring to Dr. Srinivasan's illogical contention that Sony could increase the price of its DVD players, BD players and PS3 from $2.33 to $7.62 and not lose a single unit sale of its products.  (Kennedy Decl. Exh. 8, Srinivasan Reports. at 18.)

A reliable damages methodology must measure and account for the effect of an increased price on decreasing sales volume.  In *Crystal Semiconductor Corp. v. Tritech Microelectronics International, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001), the Federal Circuit rejected testimony of a damages expert on lost profits for patent infringement because he failed to account for the effect that the higher price would have in reducing the likely number of lost sales.  The court commented on this economic principle:

> All markets must respect the law of demand.  *See* Paul A. Samuelson, *Economics* 53-55 (11th ed. 1980).  According to the law of demand, consumers will almost always purchase fewer units of a product at a higher price than at a lower price, possibly substituting other products.  *Id.* at 55.

*Id.* at 1359.  The damages expert was required to take account of the effect of the higher prices in the lost profits calculations:

1   Furthermore, Crystal did not present any evidence of how a hypothetical increase in
2   price would have affected Crystal's profits due to lost sales.  Lost sales and price erosion
    damages are inextricably linked.

3   *Id.* at 1360.  As a result of the failure to consider the effect of the higher price, the district court set

4   aside a jury award of lost profits on the ground that it lacked adequate record support, and the

5   Federal Circuit affirmed this determination.  *Id.* at 1361.

6   Because the increases in prices of Sony's products would have decreased its unit sales,

7   Mr. Wagner's damages number should have been decreased.  His failure to account for this effect

8   renders his entire computation unreliable.

9   **C.   Mr. Wagner's Methodology Using**
10  **Retail Prices Conflicts With The Patent Law**

11  For his damages royalty, Mr. Wagner used the dollar values from the Srinivasan surveys

12  that measured the <u>retail price</u> value of autoplay as determined by the alleged amount that

13  consumers would pay for that feature.   The selection of the retail price was intentional by

14  Mr. Wagner.  He understood that Srinivasan surveys measured the value to purchasers at retail for

15  the autoplay feature, and that Sony is not paid the retail price, but its wholesale price.   He

16  understood that typically a retailer for electronics will mark the product up by approximately

17  100%.  (Kennedy Decl. Exh. 15, Wagner Dep. at 74-76.)  Mr. Wagner also recognized that the

18  claim in this case is only against Sony, not the retailers.   (*Id.* at 78-79.) Although his entire

19  damages analysis depends on using the retail price, Mr. Wagner could not cite a single case in

20  which a court held it proper to use the value of a feature at retail to compute a reasonable royalty

21  to be paid by an alleged infringer who is a wholesaler for the product.  (*Id.* at 80-81.)

22  The patent statute itself speaks to the issue.  35 U.S.C. § 284 provides that, upon a finding

23  for the claimant, the court shall award damages "adequate to compensate for the infringement, but

24  in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ."

25  The statute makes clear that the royalty is to be based on the use of the invention by the infringer,

26  and Sony uses the invention in its products sold at wholesale.  Sony is not responsible for the use

27  made of the invention by any retailers.  It would be improper for Mr. Wagner to be able to present

28  a damages analysis which, as he recognized, virtually doubles the royalty by computing a royalty

1   that might be appropriate for retailers, not Sony.

2       Expert opinions contrary to controlling  law should be excluded under *Daubert*.  In *Apple,*

3   *Inc. v. Samsung Electronics Co.,* No. 11-cv-01846, 2012 WL 2571332 (N.D. Cal. June 30, 2011),

4   the court excluded as unreliable an apportionment of damages by Mr. Wagner which was contrary

5   to law:

6       Because Mr. Wagner's apportionment of damages with respect to Apple's design patent
    infringement claims is contrary to law, it is unreliable under FRE 702 and *Daubert* and

7   unduly prejudicial under FRE 403, Apple's motion to exclude Mr. Wagner's testimony
    apportioning damages  with  respect  to  Apple's  design  patent  claims  is  therefore

8   GRANTED.

9   *Id.* at *6.

10       **D.**    **Mr. Wagner's Royalty Values From 2011/2012**

11           **<u>Conflict With The Hypothetical Negotiation Date</u>**

12       The Federal Circuit has repeatedly pointed out that damages experts must consider

13   circumstances as they existed at the time of the hypothetical negotiation for purposes of

14   computing damages.  In *Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir.

15   2012), the Federal Circuit noted:

16       We have explained that "[t]he correct determination of [the hypothetical negotiation]
    date is essential for properly assessing damages."  *Integra Lifesciences I, Ltd. v. Merck*

17   *KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003) . . .

18       In sum, "[a] reasonable royalty  determination for purposes of making a damages
    evaluation must relate to the time infringement occurred, and not be an after-the-fact

19   assessment."  *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir.
    2002) (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir.

20   1983) . . .

21       Our holding is consistent with the purpose of the hypothetical negotiation framework,
    which seeks to discern the value of the patented technology to the parties in the

22   marketplace when infringement began.

23   *Id.* at 75-76.  Based on the expert's use of the incorrect hypothetical negotiation date, the court

24   granted a new trial on damages.  Contrary to those principles of a reliable damages analysis,

25   Mr. Wagner based his computations almost exclusively on the alleged value to consumers of an

26   autoplay feature from surveys taken in 2012.

27       The date of the hypothetical negotiation is March 1997.  (Kennedy Decl. Exh. 15, Wagner

28

1  Dep. at 30.)  Mr. Wagner had available the January 16, 1997 agreement between TVI and ███

2  ████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ████████████████████████ .  (*Id.* at 110-13; Exh. 18 at 10, TVI-███ Agreement)  But no

5  license, including the ████████ , influenced Mr. Wagner's reasonable royalty measurement.  (*Id.*

6  at 131, 149-50.)

7        Instead, Mr. Wagner based his royalty rates almost exclusively on the Srinivasan surveys.

8  These surveys measured the value to customers of the autoplay feature in October 2011 (Phase 1)

9  and February 2012 (Phase 2) — *15 years after the hypothetical negotiation*.  (Kennedy Decl.

10  Exh. 9, Srinivasan Dep. 131.)  The technology of DVD players has changed greatly over these 15

11  years.  BD players and gaming systems such as PS3 were introduced and have changed over this

12  time.  With these changes, the "value" of a feature such as autoplay in comparison to rebooting has

13  also changed greatly.

14        The reasonable royalty should be measured at the time of hypothetical negotiation when

15  Sony would have the ability to walk away from the negotiation and institute its noninfringing

16  alternative of a start or play button. *See LaserDynamics*, 694 F.3d at 76 (as part of the royalty, one

17  must "seek to pin down how the prospective infringement might have been avoided via an

18  out-of-court business solution.")  By failing to consider evidence relevant to the differences in

19  value from 1997 through 2012, Mr. Wagner has not "reliably applied the principles and methods

20  [of a damages analysis] to the facts of the case," and his testimony should be excluded under

21  Fed. R. Evid. 702.

22      **E.**    **Mr. Wagner's Testimony Is Not The**
              **Product Of A Reliable Method Because**

23                <u>**He Could Not Articulate The Method He Used**</u>

24        Strongly supporting the conclusion that Mr. Wagner's methodology is not repeatable or

25  testable comes from his inability to even explain what he had done to arrive at his opinions.  For

26  example, for the DVD players, he started with $1.19 taken directly from the Srinivasan surveys,

27  evaluated the *Georgia-Pacific* factors, all of which were neutral except for factor 13, and arrived

28

at $0.85.   When asked to explain his thinking, Mr. Wagner was able to provide nothing but generalities:

> THE WITNESS:  Well, it's — again, it's the totality of the experience.  It's hard to explain the totality of the experience and give you an answer that you want in your question.  But the major things that influence me on DVDs was that I wanted to give credit to Sony because of their — the quality of the company, the quality of their brand, the quality of their other inventions and the devices that led to a larger royalty base and their success in the marketplace.
>
> But by the same token I realized and recognized that this patent being licensed is a valid, enforceable and infringed patent, which significantly increases its value, which would want to tend me to award the full $1.19.  And it's just a combination of those — balancing those two interests.  I do want to arrive at a number that's either to the nickel or to the dime because I just think that's reasonable.  And then just based on my judgment I came up with $0.85 for the DVD.

(Kennedy Decl. Exh. 15, Wagner Dep. 237:7-238:1.)  His explanation for his analytical process of going from the $3.80 from the Srinivasan surveys for the BD players to his opinion of $2.75 was no more informative:

> THE WITNESS: It's exactly the same reasoning I had for the DVD, but there's one additional factor here, and that's what we've discussed already in GP Factor No. 10 which would indicate again an increase or maybe the maximum amount of this value.
>
> BY MR. KENNEDY:  Q.  Did you look at how much of an increase in the percentage you got for the Blu-ray discs versus the DVD?  I don't know if I'm explaining that correctly.
>
> A.  You are, but I did not do that analysis.  It is not how I arrived at my opinion and I have not done that calculation.

(*Id.* at 240:1-13.)

Neither the court nor Sony can test Mr. Wagner's methodology because he cannot explain what he did.  As noted in *General Electric v. Joiner*, 522 U.S. 136 (1997):

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a District Court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and opinion proffered.

*Id.* at 146.  An important factor in assessing the reliability of expert testimony is "whether the expert's methodology has been tested and is capable of being tested."  *Daubert*, 509 U.S. at 595. Because Mr. Wagner cannot explain the method he used to apply evidence under the *Georgia-Pacific* factors, his opinions fail the *Daubert* test to determine reliability.

1      A similar unexplained use of the *Georgia-Pacific* factors by a damages expert was found

2   to be "speculative" in *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31-32 (Fed. Cir.

3   2012). The Federal Circuit criticized the expert because he "did not explain how much each factor

4   affected the rate," and also found that "while mathematical precision is not required, some

5   explanation of both why and generally to what extent the particular factor impacts the royalty

6   calculation is needed." *Id.* at 31.   Mr. Wagner's inability to explain how he used *Georgia-Pacific*

7   factors renders his opinions speculative and inadmissible.

8   **V.      MOTION TO PRECLUDE OR LIMIT TESTIMONY
            BY ANDREW WOLFE, TVI'S LIABILITY EXPERT**

9        **A.      Dr. Wolfe's Testing of Reboot Times**

10      Dr. Wolfe, TVI's expert on infringement and validity, conducted tests to measure the

11   playback time of Sony's accused products in comparison to his version of a "rebooting" non-

12   infringing alternative. (Kennedy Decl. Exh. 17, Wolfe Opening Report at ¶ 102.)   Dr. Wolfe

13   claims to have tested Sony's accused DVD, BD, and PS3 products by taking two timing

14   measurements: (1) the time it would take for content from a disc to be displayed after it has been

15   "inserted (disc drawer closed or disc pulled in)" or "baseline playback time", and (2) the time

16   "from device power on until the first disc-based content was displayed on the video screen" or

17   "reboot playback time," which is characterized by Dr. Wolfe as the "hypothetical next-best non-

18   infringing alternative." (*Id.*)

19      Dr. Wolfe could not remember important details of his testing methodology on all of the

20   accused products.  Although he testified that he videotaped his tests, TVI did not produce any such

21   videotapes to Sony despite its obligation to do so.  A fact finder cannot assess the reliability of Dr.

22   Wolfe's tests and the resulting time measurements without some underlying evidence for the Court

23   and Sony to see what Dr. Wolfe actually did.   His test results are apparently critical to TVI's

24   damages case because Mr. Wagner relied upon Dr. Wolfe's test results to "input" them into

25   Srinivasan's dashboard to arrive at his baseline royalty numbers. (Kennedy Decl. Exh. 15, Wagner

26   Dep. 91-92.)  Thus, if Dr. Wolfe's test results are unreliable so too are Mr. Wagner's proposed

27   royalty calculations which rely upon them.

28

## B.   Dr. Wolfe's Testing Was Unreliable and Unscientific

Dr. Wolfe did not rely upon any accepted test. Rather, he created timing tests solely for this litigation.   For comparison, expert testimony "based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions expresse[d] were 'derived by the scientific method.'"   *Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).   Dr. Wolfe's tests were not derived from scientific methods.   Expert testimony must be supported by objective, verifiable evidence that rests on scientifically valid principles, such as peer review and publication in a reputable scientific journal. *Id.* at 1317-18. Dr. Wolfe has not pointed to any peer review or publication to support that his tests rest on scientifically valid principles.

At a minimum, Dr. Wolfe is required to explain the process by which he reached his conclusions and identify some type of objective source demonstrating his adherence to the scientific method.  *Id.* at 1318-19; *see also Domingo v. T.K.*, 289 F.3d 600, 605-06 (9th Cir. 2002). Dr. Wolfe has failed to do so.  In fact, when asked at his deposition to explain details about how he conducted the tests to determine the playback time for his alleged noninfringing alternative, he could not do so.  (Kennedy Decl. Exh. 16, Wolfe Dep.).  Although Dr. Wolfe attempted to characterize the test details that he could not remember as "not substantial" or "slight differences," those details are highly significant and required for Sony to assess the reliability of the unique tests that he performed.

In particular, when asked whether he used the same test approach for each of the six accused Sony products that he tested (two models of DVD players, three models of BD players, and one model PS3 console), Dr. Wolfe testified that he did not recall if there were differences. He acknowledged that some models required him to push a button in order "to get a particular device to continue", but he could not remember which of the DVD or BD players required that action. (*Id.* at 514:10 -515:9.)  He also could not consistently recall whether he started the machine with the disc in it or whether he inserted the disc after power up.  He advised that he may have tested the products both ways but was not certain.  (*Id.* at 515:11-516:10.) Dr. Wolfe also did not

know the amount of time for the PS3 console to accept a disc after it was powered up. (*Id.* at 516:21-517:18).  To make matters worse, Dr. Wolfe (and TVI) did not produce the videos that he said he made of his tests, and which he admitted were required for him reliably to record and perform the tests without becoming too distracted.  (*Id.* at 512:7-12 ("It was very hard to actually be able to record these numbers unless you captured video because it's too distracting.").)  When he was asked whether his videotaped tests included time and date stamps or whether he produced the videotapes for Sony to review his tests, he testified that he did not know. (*Id.* at 512:7-513:10; Exh. 17, Wolfe Opening Report at ¶ 102.)

Dr. Wolfe's timing test methodology fails each of the five checklist factors established by *Daubert*:  (1) his technique is a subjective approach that was created solely for this litigation and thus cannot reasonably be assessed for reliability; (2) his custom technique has not been subject to peer review or publication; (3) the potential rate of error is high, particularly since he cannot recall various details of his tests or whether each of the six accused products were tested in the same way; (4) no standards or controls exist for his test approach; and (5) his technique has not been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593-594.

TVI's refusal to produce any of the alleged videotapes of the test results for Sony to evaluate further renders Dr. Wolfe's custom tests entirely unreliable.  If he admittedly could not recall important details about his tests and the videotapes confirming his tests were not produced as required during expert discovery, there can be no doubt that his timing tests must be excluded along with Mr. Wagner's reliance upon them.  The missing videotapes are particularly important here in view of Dr. Wolfe's testimony that they were needed for him to properly perform his tests.

## VI.  **CONCLUSION**

Based on the foregoing, we respectfully submit that the Court should grant Sony's motion and enter the proposed Order as follows:

1.       excluding the surveys by Dr. Srinivasan on the ground that they employed an unreliable methodology, the results have greatly overstated the value of the autoplay feature, and the surveys failed to test the correct alternatives:

FINAL REDACTED Def Daubert_s motion re_ testin 25
25

2.      excluding Mr. Wagner's opinions because (a) he relies on the Srinivasan surveys and time delays measured in unreliable tests performed by Dr. Wolfe, (b) he has not taken into account the decrease in volume sales from the increase in Sony's prices, (c) he uses the retail prices for the value of autoplay, (d) he relies on "values" from 2011/2012 surveys, and (e) he could not articulate the method he used to apply evidence from the *Georgia-Pacific* factors, and

3.      excluding the testimony of Dr. Wolfe on testing of Sony's product for the rebooting option on the ground that he did not follow a scientific and reliable methodology.

DATED:  January 7, 2013

LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP

By:      /s/*Charles P. Kennedy*
      Gregory S. Gewirtz
      Jonathan A. David
      Charles P. Kennedy
      Fahd K. Majiduddin

Attorneys for Defendants
Sony Corporation; Sony Computer Entertainment Inc.;
Sony Computer Entertainment America LLC;
Sony Corporation of America; and
Sony Electronics Inc.