FILED

MAR 11 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TV INTERACTIVE DATA
CORPORATION

    Plaintiff

    v.

SONY CORPORATION, et al.

    Defendants

Case No.:3:10-cv-00475-JCS

**ORDER RE DAUBERT
MOTIONS.**

**Dkt. Nos. 546, 548.**

## I.    INTRODUCTION

Before the Court are Motions in Limine re *Daubert* filed by Plaintiff TV Interactive Data Corporation ("TVI"), and Defendants Sony Corporation, Sony Corporation of America, Sony Electronics, Inc., Sony Computer Entertainment, Inc., and Sony Computer Entertainment America LLC (collectively "Sony"). TVI and Sony both contend that certain testimony from the opposing party's experts must be excluded because the information is unreliable and thus inadmissible under Rule 702 and *Daubert*. The Motions came on for hearing February 22, 2013. For the reasons explained below, TVI's Partial *Daubert* Motion is GRANTED in part and DENIED in part, and Sony's *Daubert* Motion is DENIED.[1]

## II.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence permits expert testimony if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The expert may provide testimony if "(1) the testimony is based on sufficient facts or data; (2) the testimony

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1   is the product of reliable principles and methods; and (3) the expert has reliably applied the

2   principles and methods to the facts of the case." *Id.* In *Daubert v. Merrell Dow Pharmaceuticals*,

3   the Supreme Court held that the Rule 702 analysis "entails a preliminary assessment of whether

4   the reasoning or methodology underlying the testimony is scientifically valid and of whether that

5   reasoning or methodology can be applied to the facts in issue." 509 U.S. 579, 593-94 (1993).

6   Thus, district courts "are charged with a 'gatekeeping role,' the objective of which is to ensure that

7   expert testimony admitted into evidence is both reliable and relevant." *Sundance, Inc. v. DeMonte*

8   *Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008).

9       In *Daubert*, the Court suggested four non-exhaustive guiding factors to make this

10  determination: (1) whether the expert's methodology has been tested or is capable of being tested;

11  (2) whether the technique has been subjected to peer review and publication; (3) the known and

12  potential error rate of the methodology; and (4) whether the technique has been generally accepted

13  in the proper scientific community. *Daubert*, 509 U.S. at 593-95. The Court also emphasized that

14  the focus of this inquiry, "of course, must be solely on principles and methodology, not on the

15  conclusions that they generate." *Id.* at 595. When an expert's principles and methodology are

16  sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the

17  degree of relevancy or accuracy may go to the testimony's weight, not its admissibility. *Primiano*

18  *v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010).

19  **III.   TVI'S DAUBERT MOTION**

20      **A.   Mr. Byrd**

21      TVI contends the Court should exclude the opinion of Sony expert Mr. John Byrd, who has

22  proposed what Sony considers to be the next-best noninfringing alternatives to TVI's patented

23  technology. *See* Declaration of Patrick M. Arenz in Support of TVI's Partial *Daubert* Motion

24  ("Arenz Decl."), Ex.1 (Responsive Expert Report of John Byrd on Noninfringement). In the event

25  TVI prevails on its infringement claims at trial, Mr. Byrd's proposed alternatives will be relevant

26  to the assessment of a reasonably royalty. *See Grain Processing Corp. v. American Maize-*

27  *Product Co.*, 185 F.3d 1341 (Fed. Cir. 1989). TVI argues, however, that both Mr. Byrd's

28  noninfringing alternatives must be excluded because they are based on speculation and are thus

2

1   unreliable. TVI also contends that one of Mr. Byrd's noninfringing alternatives–the "press any

2   button" alternative–must also be excluded because it still infringes TVI's patents.

3   **1.    The "Press Any Button" Alternative[2]**

4   Mr. Byrd explains the "press any button" alternative in his expert report:

5       In the Option 1 redesign method, once a compatible disc insertion
        has been detected, the user would see (and optionally hear) a prompt
6       on the screen requesting them to press a button to play the movie or
        other content. The device would then pause to wait for the user to
7       press any button before the content on the disc starts playing.

8   Arenz Decl. Ex. 1 ¶ 167.

9   TVI contends the "press any button" alternative infringes TVI's patents because it is

10  contrary to the established claim construction of the term "automatically." TVI notes that Judge

11  White construed this claim in TVI's previous case against Microsoft–which involved the same

12  patents as in this case–when he wrote that the term 'automatically':

13      [D]oes not eliminate all user input, it only eliminates user input of a
        file name. Therefore, there is still a possibility of user input
14      reserved by the patentee during prosecution. The prosecution
        history of the patent serves to clarify what the patentee meant by
15      "automatically" and "without any additional user input." The Court
        adopts the definition of automatically used in the specification as
16      clarified by the prosecution history as: **without user input of a file
        name.**
17

18  Arenz Decl. Ex. 7 at 21 (Judge White's Claim Construction Order) (emphasis in original). TVI

19  also notes that in this case, Sony stipulated to Judge White's construction of this term in a joint

20  submission before Judge Fogel. *See* Arenz Decl. Ex. 8 at 2-3 (On November 9, 2010, the parties

21  stipulated that the construction of the term "automatically" was "without user input of a file

22  name"). Additionally, TVI contends this construction became part of the prosecution history of

23  the patents when Microsoft represented to the United States Patent and Trademark Office–when

24  seeking re-examination of the patents after Judge White's construction–that "[u]nder the Court's

25  construction, a substantial new question of patentability is created[.]" Declaration of Sarah E.

26

27      [2] This issue of whether Mr. Byrd's "press any button" alternative still infringes upon TVI's
28  patents is also discussed in TVI's Motion in Limine No. 4 to Exclude Evidence Based on
    Improper Claim Construction. *See* Dkt. No. 599.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Huddleston in Support of TVI's Reply Memorandum in Support of Its Partial Daubert Motion, Ex.

2  A (applying Judge White's construction that "'automatically' means 'without user input of a file

3  name'").

4      Sony does not dispute that it stipulated to Judge White's construction of the term

5  "automatically." Nor does Sony dispute that the "press any button" alternative does not require

6  the user to input a file name. *See* Arenz Decl. Ex. 2 (Deposition of Mr. Byrd) at 410 ("In my

7  redesign the user would not be required to input a file name in this specific redesign").[3]

8  Nevertheless, Sony contends the "press any button" alternative does not infringe TVI's patents

9  because "TVI has clearly and unequivocally disclaimed coverage of a system with a button to

10  activate the start of a disc." Sony Memorandum in Opposition to TVI's *Daubert* Motions ("Sony

11  Opp.") at 7:1-2. Sony argues that during the *Markman* hearing in this case, TVI's counsel was

12  very clear that use of a system in which the play of the disc was activated by pressing a button is

13  not an infringing product.

14      Sony points to representations from TVI's counsel during the *Markman* hearing to show

15  how TVI purportedly disclaimed Judge White's construction of the term "automatically" to mean

16  "without user input of a file name." Excerpted in the proper context, TVI's counsel made the

17  following representations while explaining the prior art:

18      The patent explains that, for example, to use a CD-ROM based
        multimedia book, the user must do the following on an IBM PC host
19      device, you have to start the Windows operating environment.
        Second, insert the CD-ROM into the drive. And then third, find the
20      appropriate icon and double click on the icon. If you've used a Mac,
        that's a very common approach where it pops in a dialog box with
21      the contents of the disk. But you have to navigate what's on there
        and decide which item you're going to click on. Sometimes people
22      label the files, click my first install, but there's some complexity
        there.
23

24  Declaration of Fahd K. Majiduddin In Support of Defendant's Opposition to TVI's Partial

25  *Daubert* Motion ("Majiduddin Decl."), Ex. 2 (Transcript of *Markman* Proceedings before Judge

26  ───────────────

27      [3] Sony's counsel argued for the first time at the motion hearing that Mr. Byrd's "press any
        button" alternative in fact does require the user to input the filename. Aside from the fact Sony's
28      counsel was unable to cite any supporting evidence for this argument, it is rejected because it was
        not included in Sony's opposition brief.

1    Fogel) at 13:6-18. TVI's counsel also explained that TVI's patents entailed the following

2    improvements:

3         And so here we are told that *automatic startup of an application on*
          *insertion of a storage media* allows even preschool children to use
4         applications encoded on a storage media without adult supervision,
          therefore using interactive media in accordance with this invention
5         is made as simple as playing a video cassette recorder or a VCR
          tape, and even preschool children can read interactive media without
6         adult supervision.

7    *Id.* at 22:14-22 (emphasis in Sony's Opposition). Sony also argues that TVI's PowerPoint from

8    the *Markman* hearing makes the disclaimer most clearly because Slide 11 states that the invention

9    allows applications "to start up automatically without any additional user input." Majiduddin

10   Decl. Ex. 3 at 4. Sony contends the foregoing representations show that TVI's counsel "clearly

11   and unequivocally disclaimed coverage of a system with a button to activate the start of a disc."

12   Sony Opp. at 7:1-2.

13        The Court disagrees. TVI's counsel did not make any disclaimer regarding the

14   construction of the term "automatically," much less a "clear and unequivocal" disclaimer as Sony

15   contends here. On November 9, 2010, the parties stipulated to use Judge White's construction of

16   the term "automatically." *See* Arenz Decl. Ex. 8 at 2-3. On February 22, 2011, when TVI's

17   counsel explained the prior art and patented technology before Judge Fogel during the *Markman*

18   hearing, construction of the term "automatically" was simply not in dispute. Moreover, TVI's

19   counsel did not say what Sony would like the Court to believe. While the excerpts above suggest

20   the patented technology enables users to start up automatically without any additional user input,

21   these statements do not say that the patented technology eliminates all user input such that

22   pressing any button will avoid infringement. Such a construction was expressly rejected by Judge

23   White. Arenz Decl. Ex. 7 at 21 (Judge White stated that the term 'automatically' "does not

24   eliminate all user input, it only eliminates user input of a file name."). In light of the parties'

25   stipulation to Judge White's construction, there should be no further dispute on this matter. All

26   testimony regarding the "press any button" alternative is therefore excluded.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**2. The "Operating System Reload" Alternative**

TVI sets forth several other reasons why the Court should exclude Mr. Byrd's testimony regarding both proposed noninfringing alternatives. Because the Court will exclude the first alternative, the analysis in this section is limited to Mr. Byrd's second "operating system reload" alternative. *See* Arenz Decl. Ex. 1 ¶¶ 187-218. There is no dispute that Mr. Byrd's second proposed noninfringing alternative was not actually in existence at the relevant time period in 1997—the period in which a hypothetical negotiation between TVI and Sony for a licensing agreement would have taken place. *See* Majiduddin Decl. Ex. 5 at 14. Thus, "the burden shifts to [Sony] to show that a substitute nonetheless was 'available' during this period...." *Conceptus, Inc. v. Hologic, Inc.*, 771 F.Supp.2d 1164, 1179 (N.D. Cal. 2010) (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1331 (Fed. Cir. 2009)).

Whether a purported noninfringing alternative was "available" requires an assessment of whether Sony had the "necessary materials, equipment, know-how, and experience to make an alternative product during the relevant time frame." *Conceptus*, 771 F.Supp.2d at 1179 (citing *Grain Processing*, 185 F.3d at 1353). "Mere speculation or conclusory assertions will not suffice to overcome the inference" that the noninfringing alternative was not available at that time. *Grain Processing*, 185 F.3d at 1353. "Thus, the trial court must proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement." *Id.* "Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits; substitutes only theoretically possible will not." *Id.* (citing *Minco Inc. v. Combustion Eng'g, Inc.,* 95 F.3d 1109, 1119 (Fed. Cir. 1996)).

TVI contends Sony has not shown the noninfringing alternative would have been "available" because Mr. Byrd's expert analysis is laden with fundamental flaws and speculation. TVI puts forth several specific arguments pertaining to the inadequacy of Mr. Byrd's analysis. For the following reasons, the Court finds that each of TVI's arguments go to the weight of Mr. Byrd's testimony, not its admissibility.

TVI first argues Mr. Byrd's cost estimates are unreliable because Mr. Byrd relied on his own expertise rather than obtaining information from Sony regarding engineer salary rates or

6

United States District Court
Northern District of California

United States District Court
Northern District of California

1    overhead costs. TVI also notes that Mr. Byrd failed to apply an exchange rate despite the fact

2    Sony's Japanese engineers are generally paid in Japanese Yen. However, the fact Mr. Byrd relied

3    on his own expertise to assess the cost and time required to implement the alternative, as opposed

4    to retrieving data from Sony, does not render Mr. Byrd's methodology unreliable. TVI does not

5    challenge Mr. Byrd's expertise, and TVI may cross-examine Mr. Byrd on his source of his data at

6    trial. This goes to the weight of Mr. Byrd's testimony.

7         Next, TVI argues the redesigns could not have been "available" because they would have

8    required modification of source code to which Sony did not have access. At the time of Mr.

9    Byrd's deposition, Mr. Byrd was not aware that Sony did not have access to the source code of

10   various accused products because of restrictions imposed by third parties. Mr. Byrd stated in his

11   deposition, however, that the two alternatives "don't require access to all the source code at all

12   times in order to implement them," and that "Sony had enough information in its possession at the

13   time these devices were released certainly to do these redesigns." Majiduddin Decl. Ex. 1

14   (Deposition of Mr. Byrd) at 320:11-15, 324:3-6. TVI challenges these statements as conclusory

15   and devoid of any support, and may TVI may make such challenges on cross-examination. This

16   goes to the jury's assessment Mr. Byrd's credibility on whether the alternative was "available"

17   when the source code was not. The lack of source code, however, does not render Mr. Byrd's

18   methodology unreliable so as to exclude his opinion on a *Daubert* motion.

19        TVI also contends Mr. Byrd's cost and time estimations are unreliable, as Mr. Byrd only

20   did an analysis for a single model in each product category (DVD-S700, BDP-S1, and the 2006

21   PlayStation3). In response, Sony contends that TVI misconstrues the scope of an acceptable

22   noninfringing alternative because after implementing the initial design for one product in a class,

23   Sony would not have to redesign the later versions since they would have been designed with the

24   alternative from the start. Again, the Court finds this matter appropriate for consideration by the

25   jury. Both parties are entitled to present their opinions on how the alternatives would have been

26   implemented, and the jury will accord each side's testimony the weight it is due.

27        Finally, TVI challenges Mr. Byrd's failure to analyze the acceptability of the noninfringing

28   alternative to consumers. Mr. Byrd stated at his deposition that he had not analyzed whether the

1  proposed alternatives would be acceptable with respect to consumers or the marketplace. Arenz

2  Decl. Ex. 2 at 417. Although this is an important element pertaining to whether the alternatives

3  were "available," this is not a basis to exclude Mr. Byrd's alternatives. Sony states that it will

4  introduce other evidence on this issue. TVI has not cited any case in which an expert's opinion

5  was excluded for this reason alone. The jury can hear evidence on whether these proposed

6  alternatives would have been acceptable to consumers, and the jury can resolve this dispute.

7  **B.  Mr. Hoffman**

8  Sony retained Mr. Creighton Hoffman to opine on damages and to rebut TVI's damages

9  expert's opinion. In the event the jury finds TVI's patents are valid and infringed, TVI will be

10  awarded damages "adequate to compensate for the infringement, but in no event less than a

11  reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. To

12  calculate a reasonably royalty rate, Mr. Hoffman analyzed a hypothetical negotiation based on

13  fifteen *Georgia-Pacific* factors. *See* Arenz Decl. Ex. 12 (Expert Report of Creighton G.

14  Hoffman); *see also Lucent Technologies Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir.

15  2009). TVI challenges several portions of Mr. Hoffman's hypothetical negotiation analysis as

16  incomplete and unreliable under Rule 702 and *Daubert*. The Court will assess each of TVI's

17  challenges separately. As noted below, several portions of Mr. Hoffman's opinion must be

18  excluded from evidence.

19  **1.  Reliance on Mr. Byrd's Non-Infringing Alternatives**

20  TVI first challenges Mr. Hoffman's reliance on Mr. Byrd's noninfringing alternatives

21  which TVI contends should be excluded as unreliable. Mr. Byrd is precluded from presenting an

22  expert opinion on his first "press any button" alternative, but his opinion pertaining to the

23  "operating system reload" alternative is admissible. Thus, TVI's motion to exclude this evidence

24  is only granted to the extent Mr. Hoffman relies on Mr. Byrd's "press any button" alternative.

25  It is not exactly clear where Mr. Hoffman relies on Mr. Byrd's "press any button"

26  alternative in his expert report. During Mr. Hoffman's *Georgia-Pacific* analysis, he states that

27  "[t]he cost of implementing one of these non-infringing alternatives (disabling autoplay) has been

28  estimated to be approximately $25,000 to $419,000. This amounts to less than $0.01 per accused

8

unit sold by Sony from March 1997 through the life of the patents-in-suit." Arenz Decl. Ex. 12 at 29. It is not clear whether this statement refers to just one of Mr. Byrd's proposed noninfringing alternatives, or to both. In order to be admissible, this estimate may not be based, in whole or in part, on the "press any button" alternative. If Mr. Hoffman's estimate is not based on the excluded evidence, it will be admitted. The witness must lay a proper foundation in this regard.

TVI also contends that Mr. Hoffman relies on Mr. Byrd's noninfringing alternatives when he critiques Professor Srinivasan's assessment of reasonable damages because, according to Mr. Hoffman, the survey fails to compare TVI's patented technology to the best noninfringing alternatives. However, a review of Mr. Hoffman's critique on this matter does not reveal a single reference to the "press any button" alternative, which the Court would exclude. *See* Arenz Decl. Ex. 12 at 33. Nor does Mr. Hoffman's critique expressly mention the "operating system reload" alternative, which the Court would not exclude. *See id.* Rather, Mr. Hoffman merely states that Professor Srinivasan failed to consider "[m]any other more simple and user friendly noninfringing alternatives [which] were available." Arenz Decl. Ex. 12 at 33. There will be at least one such alternative in evidence. Therefore, this testimony will not be excluded under *Daubert*.

## 2. Sony's Licenses

TVI next contends that Mr. Hoffman's reference to the Sony licenses must be excluded from testimony because by Mr. Hoffman's own admission, the Sony licenses are not comparable. The Federal Circuit requires that "use of past patent licenses under [*Georgia-Pacific*] factors 1 and 2 ... account for differences in the technologies and economic circumstances of the contracting parties." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) (citing *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319–20 (Fed. Cir. 2010) ("[C]omparisons of past licenses to the infringement must account for 'the technological and economic differences' between them") (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870–73 (Fed. Cir. 2010) (per curiam) (reversing the trial court's assessment of damages because similar to the district court in *Lucent Technologies*, it "made no effort to link certain licenses to the infringed patent"))). Mr. Hoffman references the Sony licenses in connection with his analysis of *Georgia-Pacific* Factor 2, which considers "[t]he rates paid by the licensee for the use of other

9

1    patents comparable to the patent in suit." *Lucent Technologies*, 580 F.3d at 1325 (quoting

2    *Georgia-Pacific Corp.* v. U.S. Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970)).

3          Mr. Hoffman wrote the following regarding *Georgia-Pacific* Factor 2 in his expert report:

> *Georgia-Pacific Factor 2 – The rates paid by the licensee for the use of other patents comparable to the patents-in-suit.*
>
> I have reviewed the patent and technology license agreement produced by Sony in this matter. These licenses are summarized on Exhibit G. Although these agreements are *not for technologies directly comparable* to those described in the patents-in-suit, they indicate that Sony has agreed to pay running royalties ranging from $0.01 to $0.25 per unit.

9    Majiduddin Decl. Ex. 5 at 18 (emphasis added). Thus, Mr. Hoffman admitted that the Sony

10    licenses are for technologies that are not comparable to the technology of the patents-in-suit.

11    Therefore, the Court will exclude Mr. Hoffman from referring to the royalty rates associated with

12    the Sony licenses.

13          Sony argues that Mr. Hoffman should be permitted to opine on the Sony licenses because

14    Mr. Hoffman only uses the Sony licenses for the limited purpose of noting that they "support" his

15    royalty rate and do not support TVI's expert Mr. Wagner's royalty rate. This argument is without

16    merit. The purpose of the *Georgia-Pacific* factors is to "support" an expert's proposed royalty

17    rate, and the Federal Circuit has clearly prohibited the use of noncomparable licenses to do so.

18    *See id.* Moreover, Mr. Hoffman used the Sony licenses in the context of Factor 2, which expressly

19    requires the "use of other patents *comparable* to the patent in suit." *Lucent Technologies*, 580

20    F.3d at 1325 (emphasis added).

21          The Court is mindful that the Federal Circuit recently stated that "[t]he degree of

22    comparability of [other] license agreements …[is a] … factual issue[] best addressed by cross-

23    examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Communications*, Inc.,

24    694 F.3d 1312, 1333 (Fed. Cir. 2012). This statement, however, did not overrule the Federal

25    Circuit's well-established precedent requiring some degree of comparability between licenses used

26    in the *Georgia-Pacific* analysis for the jury to weigh. Here, Mr. Hoffman expressly stated that the

27    Sony licenses "are not for technologies directly comparable" and offered no further testimony on

28    the matter. Majiduddin Decl. Ex. 5 at 18. Moreover, six days after the Federal Circuit issued its

United States District Court
Northern District of California

1  decision in *ActiveVideo*, the Federal Circuit criticized a district court's denial of a *Daubert* motion

2  because that "ruling erroneously permitted continued reliance on this evidence where

3  comparability between it and a hypothetical license to the [infringed patent] was absent."

4  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 80 (Fed. Cir. 2012).[4]

5  ### 3. Industry Patent Pools

6  In his expert report, Mr. Hoffman bases his royalty rate of $0.07 per unit in part on

7  "[i]ndustry 'patent pools' for the hundreds of patents necessary to implement the DVD and BD

8  standards [which] include royalty rates ranging from $2.50 to $9.00 per player." Majiduddin Ex. 5

9  at 29. Before Mr. Hoffman notes that the royalty rates from these patent pools support his

10  calculation of a $0.07 reasonable royalty rate, he explains:

11
12
13
14
> There are several industry patent pools and licensing organizations
> that provide manufacturers of DVD and BD players rights to the
> patents necessary to manufacture DVD and BD players and discs.
> The following discussion of relevant patent pools provides a general
> overview of the industry royalty rates in the DVD and BD disc
> player markets.

15  *Id.* at 24. Mr. Hoffman continues to give an overview of the patent pools, including leaders and

16  licensors in the pools, the general technology involved, and the royalty rates associated with each

17  patent pool. *See id.* at 23-27. This overview is included in Mr. Hoffman's analysis of *Georgia-*

18  *Pacific* Factor 12, which considers "[t]he portion of the profit or of the selling price that may be

19  customary in the particular business or in comparable businesses to allow for the use of the

20  invention or analogous inventions." *Georgia-Pacific*, 318 F. Supp. at 1120.

21  TVI contends that Mr. Hoffman's testimony on the patent pools must be excluded for the

22  similar reason as the Sony licenses: because Mr. Hoffman fails to explain the technological or

23

24  ⁴ Sony also argues Mr. Hoffman should be able to reference the Sony licenses because TVI
expert Mr. Wagner will also reference the Sony licenses in his *Georgia-Pacific* Factor 2 analysis.

25  In the same regard, and in the context of the next argument pertaining to industry patent pools,
Sony argues that because Mr. Wagner also reviews the royalty rates associated with these patent

26  pools, Mr. Hoffman should be permitted to opine on the same matter. However, the Court finds
TVI's distinction on these points persuasive. Mr. Wagner found the Sony licenses and the patent

27  pools were not comparable and therefore considered Factors 2 and 12 to be "neutral." Unlike Mr.
Wagner, Mr. Hoffman expressly referred to the royalty rates associated with the Sony licenses and

28  patent pools to support his calculation of the reasonable royalty rate. Such testimony will not be
permitted.

United States District Court
Northern District of California

economic comparability between any one of the patents in the patent pools and license that would have been reached had the hypothetical negotiation taken place. TVI shows that other courts have excluded evidence pertaining to patent pools when the expert fails to explain how they are technologically or economically comparable to the hypothetical license. TVI Motion at 17-18 (citing *Dataquill Ltd. v. High Tech Computer Corp.*, No. 08-0543, 2010 U.S. Dis. LEXIS 53164, 2012 WL 1284381, *24-25 (S.D. Cal. April 16, 2012) (excluding an expert's opinion regarding a patent pool and noting that it "is a worldwide license for hundreds of patents covering an entire standard, and, therefore, is much larger in scope than the license that would have been reached at the hypothetical negotiation."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 06-0348, 2011 U.S. Dist. LEXIS 42590, 2011 WL 7563818, *11 (E.D. Texas Jan. 7, 2011) ("Particularly where a license covers a portfolio of patents or includes other intellectual property or services, Plaintiff must present evidence sufficient to allow the jury to weigh the economic value of the patented feature against the economic value of the features and services covered by the license agreement.")). The Court finds these well-reasoned principles persuasive, and will exclude Mr. Hoffman's testimony on the royalty rates associated with the patent pools as supporting the calculation of royalty rates in this case.

Sony contends Mr. Hoffman's information on the patent pools should not be excluded because Mr. Hoffman did not "derive" his proposed $0.07 reasonably royalty rate from the range of royalties associated with the patent pools, but merely used the patent pool rates to insure that his royalty rate was reasonable in comparison. This argument is without merit. Mr. Hoffman expressly "based" his conclusion that TVI and Sony would have negotiated a $0.07 per unit royalty rate in part on industry patent pools with "running royalties ranging from $2.50 to $9.00 per player." Majiduddin Decl. Ex. 5 at 29. Moreover, Mr. Hoffman uses this information in his analysis of *Georgia-Pacific* Factor 12, which also expressly requires some degree of comparability between the businesses. *See Georgia-Pacific*, 318 F. Supp. at 1120 (Factor 12 considers "[t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."). Mr. Hoffman failed to show any degree of comparability. Therefore, he may not refer to the royalty

12

1  rates for the patent pools.

2  Nevertheless, Mr. Hoffman's consideration of the patent pools in *Georgia-Pacific* Factor

3  13 does not suffer from the same fatal flaws. *Georgia-Pacific* Factor 13 considers the "portion of

4  the realizable profit that should be credited to the invention as distinguished from non-patented

5  elements, the manufacturing process, business risks, or significant features or improvements added

6  by the infringer." *Georgia-Pacific*, 318 F.Supp. at 1120. Within his Factor 13 analysis, Mr.

7  Hoffman describes Sony's "substantial intellectual property holdings" including Sony's own

8  patents and the patent pools to which it is a licensor. Majiduddin Decl. Ex. 5 at 27. Mr. Hoffman

9  notes that "[t]hese patented and proprietary technologies have contributed significantly to the

10  commercial success and profitability of Sony's accused products." *Id.* This opinion does not

11  improperly refer to royalty rates associated with noncomparable patent pools. There is no mention

12  of the royalty rates at all. Therefore, so long as the royalty rates are not admitted into evidence,

13  the Court finds Mr. Hoffman's opinion proper in this regard.

14  ### 4. The Microsoft Royalty Agreement

15  TVI also argues that Mr. Hoffman should not be permitted to testify about an effective

16  $0.02 royalty rate he calculated from the lump-sum settlement and licensing agreement between

17  TVI and Microsoft. In his expert report, Mr. Hoffman notes that Microsoft and TVI entered into

18  an agreement wherein Microsoft agreed to pay TVI ▓▓▓▓ for its alleged infringing sales of

19  ▓▓▓▓ PC units between January 29, 1997 and June 30, 2005. Arenz Dec. Ex. 12 at 16.

20  Mr. Hoffman notes this payment included a license for past sales, as well as future sales made

21  during the nine additional years of life remaining on TVI's patents. *Id.* Mr. Hoffman does not

22  state in his expert report that this lump-sum agreement translates to a $0.02 effective rate. *See id.*

23  At his deposition, however, Mr. Hoffman was asked: "At the hypothetical negotiations,

24  were the parties aware that Microsoft would later license the TVI's patents?" Arenz Decl. Ex. 13

25  at 59:14-16. Mr. Hoffman first responded that this question was "wholly irrelevant," but

26  eventually stated that "Microsoft settled out something like two cents a copy was the effective

27  rate." Arenz Decl. Ex. 13 at 58:18-19, 59:23-25. When asked how he reached that conclusion,

28  Mr. Hoffman explained:

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> What happened was Mr. Wagner has told us how many units were involved and he's got that in his report and we've got the dollar value, and that was as of a certain date. And the patent still had another nine years to go, and you divide these units into the dollar, you get about five cents, and Microsoft sales, everyone would have expected—truth is, they have, you know, increased since then. So I think a reasonable number through the end of time would be somewhere in the two cent range.

*Id.* at 60:12-23. In Sony's Opposition to TVI's *Daubert* motion, Sony states that Mr. Hoffman took Microsoft's sales, doubled them to account for the fact that the paid up license also would cover Microsoft's sales for an additional nine years, and divided the ▮▮▮▮ payment by these sales. Sony Opp. at 30.

TVI contends that Mr. Hoffman's testimony on the $0.02 effective rate which he calculated from the lump sum agreement between TVI and Microsoft should be excluded for two reasons: first, because Mr. Hoffman failed to disclose this effective rate in his expert report, and second, because the opinion is legally deficient for Mr. Hoffman's failure to account for "significant" and "fundamental" differences between lump-sum licenses and running royalty licenses. *See Lucent Technologies*, 580 F.3d at 1325-36, 1329-30. In response, Sony asserts that all evidence pertaining to the settlement between TVI and Microsoft should be excluded in its entirety.[5] Sony contends that Mr. Hoffman's calculation of an effective royalty rate was merely in rebuttal to TVI's expert Mr. Wagner's reference to the ▮▮▮▮ lump-sum settlement agreement without any effort to convert that lump-sum into a per unit payment.

TVI's prior settlement agreements are not admissible for the purpose of calculating a reasonable royalty rate. Mr. Hoffman is therefore excluded from opining on any effective royalty rate calculated from the lump-sum agreement between TVI and Microsoft. In addition, as the $0.02 effective rate was not disclosed in his expert report, Mr. Hoffman is precluded from testifying to this matter at trial.

### 5. Critique of Dr. Srinivasan's Conjoint Analysis

TVI's final challenge is to the portion of Mr. Hoffman's opinion which critiques Professor

---

[5] In Sony's Motion in Limine No. 1, Sony moves to exclude all evidence and arguments pertaining to TVI's settlement agreements in which other companies agreed to license TVI's patents. The Court has granted this motion.

United States District Court
Northern District of California

1　　Srinivasan's conjoint analysis. As described in below in the discussion of Sony's *Daubert* motion,

2　　Professor Srinivasan is an expert in the area of marketing research known as "conjoint analysis,"

3　　and has written twenty-four peer-reviewed research papers on the topic. According to Professor

4　　Srinivasan, conjoint analysis quantifies customer preferences for certain attributes in a product,

5　　and has enabled Professor Srinivasan to estimate the "market's willingness to pay" for TVI's

6　　patented technology as an incremental benefit in Sony's accused products. *See* Declaration of

7　　Charles P. Kennedy in Support of Sony's *Daubert* Motion ("Kennedy Decl."), Ex. 8A at 4.

8　　　　A section of Mr. Hoffman's expert report (Opinion III) critiques Professor Srinivasan's

9　　conjoint analysis. *See* Arenz Decl. Ex. 12 at 38-41. In particular, Mr. Hoffman offers his expert

10　　opinion that (a) Professor Srinivasan's methodology was inappropriate given the large number of

11　　features of the products which were not tested; (b) the results were nonsensical in the manner that

12　　the respondents interpreted the price discounts used in the surveys; (c) the reboot times were

13　　vastly overstated in comparison to reboot times determined by TVI's own expert; and (d) the price

14　　discount levels were not appropriately chosen. *See id.*

15　　　　TVI argues that Mr. Hoffman should not be allowed to opine on Professor Srinivasan's

16　　conjoint survey analysis because Mr. Hoffman admitted at his deposition that he is not an expert in

17　　conjoint analysis:

18　　　　　　　Q: – are you an expert in conjoint analysis
　　　　　　　　A: No, no, not at all, never held myself out to that
19　　　　　　　Q: You're only – you're not going to tell the ladies and gentlemen
　　　　　　　　of the jury, for example, that you're an expert in conjoint analysis?
20　　　　　　　A: No, no. I don't think I've got that in my report anyway.
　　　　　　　　Q: You're not going to tell the court you're an expert in conjoint
21　　　　　　　analysis?
　　　　　　　　A: No, no....

22　　Arenz Decl. Ex. 13 at 109:15-25, 110:1-5. TVI contends that because Rule 702 only permits

23　　expert testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience,

24　　training, or education," Mr. Hoffman's opinion on the conjoint analysis should be excluded.

25　　Fed.R.Evid. 702. In response, Sony argues that Mr. Hoffman offers proper testimony in his area

26　　of expertise because he testifies to such matters as whether Professor Srinivasan's surveys are

27　　appropriate for determining a reasonable rate.

28

1    The Court finds that Mr. Hoffman's opinion is proper in this regard. Mr. Hoffman is an

2    expert in the area of damages determined through the *Georgia-Pacific* analysis. His critiques of

3    Professor Srinvasan's surveys are in the context of his expertise. Therefore, the Court will not

4    exclude his opinion under *Daubert*.

5    **IV.     SONY'S DAUBERT MOTION**

6            **A.      Professor Srinivasan**

7            Sony first argues that the entirety of TVI expert Professor Srinivasan's conjoint surveys

8    should be excluded from evidence as they are unreliable in the face of *Daubert*. Professor

9    Srinivasan has served as a tenured and emeritus professor at the Stanford Graduate School of

10   Business for the last thirty-nine years. Declaration of Professor V. Seenu Srinivasan ("Srin.

11   Decl.") ¶ 2. He has authored over one-hundred articles in peer-reviewed journals, including

12   twenty-three on conjoint analysis. *Id.* In 1978, Professor Srinivasan coined the term "conjoint

13   analysis" in a peer-reviewed article that he co-authored with his professor. *Id.*

14           Professor Srinivasan describes conjoint analysis as a type of survey or market research,

15   which, at the most general level, conceptualizes products as bundles of attributes, treating price as

16   an attribute. *Id.* ¶ 3. Conjoint analysis uses customer surveys to determine "values" for each

17   attribute. By choosing among multiple bundles of attributes, survey participants make implicit

18   tradeoffs one would make in real-world purchasing decisions. *Id.* "For example, conjoint analysis

19   offers respondents hypothetical products in several combinations, some of which might contain

20   feature 1 (but not feature 2), and some of which might contain feature 2 (but not feature 1)." *Id.*

21   Professor Srinivasan explains that by comparing respondents' choices when presented with

22   different features, one can estimate the quantitative values of specific features. *Id.* According to

23   Professor Srinivasan, studies have validated that this implicit tradeoff is more reliable than asking

24   consumers directly what they would pay for a specific feature. *Id.*

25           In his particular study for this case, Professor Srinivasan estimated the "market's

26   willingness to pay" ("MWTP") for TVI's patented technology as an incremental benefit in Sony's

27   accused products. Srin. Decl. Exs. 1-3 at 3. Professor Srinivasan conducted three surveys to

28   measure the MWTP for the benefit of using the autoplay feature (which he termed "next disc

16

playback") in a DVD player, Blu-ray player, and a PlayStation 3 console. *Id.* at 3-4. The surveys incorporate two noninfringing alternatives to autoplay identified by Dr. Wolfe in his expert report for TVI: (1) a reboot option (measured by the increased time it takes to restart and play the next disc), and (2) a filename option (the device displays a virtual keyboard on the screen and instructs the user to type in a file name to play the next disc). *Id.* at 3; *see also* Arenz Decl. Ex. 7 (Opening Expert Report of Dr. Andrew Wolf) ¶ 97. The MWTP is the amount by which Sony would be able to increase the price of its accused products yet suffer no reduction in the number of units sold if Sony were to use autoplay rather one of Professor Srinivasan's two proposed noninfringing alternatives. Srin. Decl. Exs. 1-3 at 4.

To conduct his conjoint analysis, Professor Srinivasan used a mathematical formula to determine the MWTP for the autoplay feature in each of the three accused products. *Id.* at 5. He did this by using a particular type of conjoint analysis called Choice-Based Conjoint Analysis, in which survey respondents chose among various options of combinations of the product attributes. Professor Srinivasan recognized that a challenge to his study was that each of the accused products had various attributes (18 in Blu-ray, 20 in DVD, and 18 in PS3). *Id.* The accepted methodology for conjoint analysis is to limit the number of attributes to six or fewer. If survey respondents were asked to evaluate 18 – 20 attributes, Professor Srinivasan states there would been an information overload on the respondent, leading to poor quality data. *Id.* To remedy this problem, Professor Srinivasan conducted his conjoint analysis in two phases.

In Phase 1 of his study, Professor Srinivasan asked respondents to prioritize 18 attributes of each accused product to come up with a list of six attributes that have similar values as the autoplay feature. *Id.* at 6. Professor Srinivasan asserts that Phase 1 also allowed him to determine a price discount that approximately has the same or smaller value as the autoplay, which led to a conservative bias of the MWTP. *Id.*

In Phase 2 of his study, Professor Srinivasan determined the estimate values which the survey respondents attached to autoplay as compared to the two noninfringing alternatives. *Id.* The six comparable attributes chosen from Phase 1 were broken into set A and set B, each of three attributes. The survey respondents were then presented with hypothetical products with five total

17

1  attributes (the attribute of interest (autoplay); three other attributes of similar value; and a price

2  discount of $0, $3, $5, $10 or $20), and were asked to assume that all other attributes were the

3  same across the four options in each choice set. *Id.* at 5. Professor Srinivasan tested autoplay

4  against his two noninfringing alternatives. *Id.* at 6. Each survey respondent saw fifteen

5  randomized choice sets. *Id.* at 6, 14.

6      Professor Srinivasan then analyzed the data using industry-standard software according to

7  peer-reviewed research and presented his conclusions in a "Dashboard" exhibit. *Id.* at 6. The

8  Dashboard is dynamic in that it shows the MWTP for autoplay over reboot on a second-by-second

9  basis. For example, considering the values of 20 seconds for autoplay and 75 seconds for reboot

10  (a 55 second difference), the MWTP for autoplay is $9.86 for Blu-ray players. *Id.* at 6. If the

11  difference between autoplay and reboot is faster or slower, then the MWTP adjusts accordingly.

12  Professor Srinivasan's results are shown below considering the MWTP over the two noninfringing

13  alternatives, for each of the three products (Blu-ray player, DVD and PS3). The estimated MWTP

14  results below account for the margin of error due to sample size at a 95% confidence interval:

15  **AUTOPLAY v. REBOOT**

| Product Type | MWTP |
| --- | --- |
| Blu-Ray | $7.61 |
| DVD | $2.33 |
| PS3 | $5.73 |

20  **AUTOPLAY v. FILENAME**

| Product Type | MWTP |
| --- | --- |
| Blu-ray | $10 |
| DVD | $5 |
| PS3 | $10 |

26  Srin. Decl. Exs. 1-3 at 6, 16-17. The estimated MWTP was used as a baseline by TVI's other

27  expert Mr. Wagner in his calculation of a reasonable royalty rate. *See* Declaration of Michael J.

28  Wagner Ex. 1 at 37.

18

1          Sony moves to exclude the entirety of Professor Srinivasan's conjoint surveys on the basis

2    that they are fundamentally flawed and unreliable, and therefore should be excluded under

3    *Daubert*. The Court notes from the outset, however, that Sony's criticism of the survey designs is

4    more appropriate for consideration by a jury, rather than the Court on a *Daubert* motion. The

5    Ninth Circuit has stated that "[u]nlike novel scientific theories, a jury should be able to determine

6    whether asserted technical deficiencies undermine a survey's probative value." *Southland Sod*

7    *Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997). *See also Click Billards, Inc. v.*

8    *Sixshooters Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ("[I]ssues of methodology, survey design,

9    reliability, the experience and reputation of the expert, critique of conclusions, and the like go to

10   the weight of the survey rather than its admissibility."). Such reasoning has also been applied to

11   deny a *Daubert* motion seeking to exclude a conjoint analysis from evidence. *See Microsoft Corp.*

12   *v. Motorola Mobility, Inc.*, No. 10-1823, 2012 U.S. Dist. LEXIS 152244, at *32 (W.D. Wash. Oct.

13   22, 2012) (criticisms of a conjoint analysis went "to issues of methodology, survey design,

14   reliability, and critique of conclusions, and therefore go to the weight of the survey rather than

15   admissibility") (internal quotes omitted)).

### 1.    Price Discounts

17         Sony first criticizes Professor Srinivasan's choice to use price discounts—as opposed to

18   price itself—as one of the attribute variables in Phase 2 of his study. Sony argues that Professor

19   Srinivasan's "price discount methodology" has not been accepted in the relevant scientific

20   community, a consideration which weighs heavily in the *Daubert* analysis. In response, TVI

21   argues that this argument underscores Sony's fundamental misunderstanding of the conjoint

22   analysis.

23         The Court agrees with TVI. Professor Srinivasan did not create a novel "price discount

24   method" solely for this litigation. Rather, price discount was just one of the variables in the

25   conjoint analysis, which *is* accepted by the relevant community.[6] Professor Srinivasan explains:

26

27         _____

      [6] TVI points to a handful of cases to demonstrate that conjoint analysis is increasingly used
28   in litigation. *See, e.g.*, Arenz Decl. Ex. 8 (transcript of proceedings for *Apple v. Samsung*, Case
     No. 11-1846, Aug. 10, 2012).

19

United States District Court
Northern District of California

1

> In conjoint studies, some aspect of price is almost always included as an attribute of the product. However, the particular way price is operationalized varies across studies depending upon the objective of the study. A very common use of conjoint analysis is in deciding a new product's feature specifications and in setting the price. In these situations, conjoint researchers include the product price itself as an attribute to predict customer choice under alternative product specifications and prices. But that is not to say that product price is the only way of incorporating price in conjoint analysis.

Srin. Decl. ¶ 4. Professor Srinivasan provides a handful of examples in which price was incorporated in ways other than product price, such as a discount card or as a percentage of the price of the base product. *Id.* ¶ 5.

Professor Srinivasan also explains why using price discounts was better than using price in this particular case. *Id.* ¶ 8. Here, the objective was to measure the MWTP of a single feature of a product, such as Blu-ray which has prices ranging from about $140 to $210. If Professor Srinivasan had used price, there would have been three levels of prices for the Blu-ray ($140, $170 and $210), and survey respondents would have been comparing a single feature (autoplay v. reboot) against price differentials of $30, $40 or $70. Professor Srinivasan states that the measuring interval would have been much greater than the likely value for the feature of interest and could have created a non-conservative bias. *Id.*

Sony also argues that the choice to use price discounts made the results of his survey illogical, and demonstrate that Professor Srinivasan's survey method was unreliable. Sony expert Mr. Klein re-analyzed the data from Professor Srinivasan's surveys using the same survey software. Unlike Professor Srinivasan, however, Mr. Klein did not constrain the utility of the price variable. "Constrained estimates for price, by definition, constrains the results so that a lower discount has no greater value than a higher discount." Srin Decl. ¶ 17. According to Professor Srinivasan, literature on conjoint analysis shows that constraining estimations of desirable features produces better predictive results.[7] *Id.* Mr. Klein agrees that when there are

---

[7] Professor Srinivasan notes that Mr. Klein's company's cofounder, Dr. John Hauser of M.I.T., used constrained estimations in his expert report for *Apple v. Samsung*. Srin. Decl. ¶ 17.

20

United States District Court
Northern District of California

1   only a few variables, constraining the price variable may improve estimates, but believes it was

2   not useful in this case where the surveys entailed several variables.   Klein Decl. ¶ 11.

3       By re-analyzing Professor Srinivasan's data and not constraining the price variable, Mr.

4   Klein infers that approximately one-half of the survey respondents violated the rational

5   assumption that consumers prefer a larger discount to a smaller discount:

6        Blu-ray:     24% prefer $0 to $10 discount
7                       25% prefer $0 to $5 discount
                    36% prefer $5 to $10 discount
8                       50% with some price preference inconsistency

9        DVD:      20% prefer $0 to $5 discount
                    25% prefer $0 to $3 discount
10                      38% prefer $3 to $5 discount
                    52% with some price inconsistency
11

12       PS3:       23% prefer $0 to $20
                    25% prefer $0 to $10
13                      31% prefer $10 to $20.
                    46% with some price preference inconsistency
14

15  Klein Decl. ¶ 7. Mr. Klein attributes this illogic to the possibility that survey respondents

16  misunderstood the price discount for a price surcharge, or did not follow Professor Srinivasan's

17  instructions to hold all the non-tested attributes constant.  *Id.* ¶ 12.

18      In response, Professor Srinivasan criticizes Mr. Klein's failure to prove that any of his

19  results are statistically significant.  Srin. Decl. ¶¶ 10-16.  Professor Srinivasan notes that testing for

20  statistically significancy is an "elementary" principle in survey analysis, and without having

21  conducted such a test, Mr. Klein cannot know whether the perceived inconsistencies are true.[8]  *Id.*

22  ¶ 8. To rebut Mr. Klein's findings, Professor Srinivasan oversaw a test for statistical significance

23  at a 95% confidence level, and arrived at the following results:

24       Blu-ray:     1.7% prefer $0 to $5 discount     (compare Mr. Klein's 25%)

25

---

26      [8] Professor Srinivasan also notes that Mr. Klein did perform a statistical significance test to
see whether the respondents preference for higher discounts are significantly different from their
27  preference for no discount at all.  Therefore, Professor Srinivasan believes that Mr. Klein either
chose not to perform the same statistical significance test for his primary numbers, or he obtained
28  the same results as Professor Srinivasan that the inconsistencies are immaterial to the validity of
the surveys. *Id.* ¶ 16.

|   | 2.7% prefer \$0 to \$10 discount | (compare Mr. Klein's 24%) |
|---|---|---|
|   | 2.7% prefer \$5 to \$10 discount | (compare Mr. Klein's 36%) |
|   | 9.5% with some inconsistency | (compare Mr. Klein's 50%) |
| DVD: | 3.0% prefer \$0 to \$3 discount | (compare Mr. Klein's 25%) |
|   | 4.0% prefer \$0 to \$5 discount | (compare Mr. Klein's 20%) |
|   | 2.0% prefer \$3 to \$5 discount | (compare Mr. Klein's 38%) |
|   | 9.5% with some inconsistency | (compare Mr. Klein's 52%) |
| PS3: | 6.8% prefer \$0 to \$20 | (compare Mr. Klein's 23%) |
|   | 5.1% prefer \$0 to \$10 | (compare Mr. Klein's 25%) |
|   | 3.7% prefer \$10 to \$20 | (compare Mr. Klein's 31%) |
|   | 13.9% with some inconsistency | (compare Mr. Klein's 46%) |

*Id.* ¶ 12. These results demonstrate that a statistically insignificant number of respondents valued lower discounts over greater discounts. As Professor Srinivasan explained, the 95% confidence level means that even if every one of the respondents' true preferences are consistent with economic rationality, we would incorrectly identify approximately five percent of the respondents as violating economic rationality. *Id.* ¶ 14. Consequently, in interpreting the results above, the amount in excess of 5% is a more accurate indication of the prevalence of true economic irrationality. An examination of the table above therefore indicates that the prevalence of true economic irrationality is less than 5% in 11 out of the 12 cells in the table above. Because only in the PS3 case did approximately 9% of respondents violate the rational economic assumption (13.9% - 5% = 8.9%), Professor Srinivasan concludes that there is very little prevalence of true economic irrationality. *Id.* Based on Professor Srinivasan's findings, there is certainly not enough evidence to render the method unreliable under *Daubert*.

Mr. Klein also claims in his expert report that he determined the extent to which respondents who were presented with two choices (out of a total of four) in which all the features were identical except the price discount illogically selected the alternative with the smaller discount. Klein Decl. ¶ 10. Mr. Klein's results purportedly show that 26% chose the lower discount for DVDs, 28% chose the lower discount for Blu-ray, and 29% chose the lower discount for PS3. *Id.* and Exs. 4-6 thereto. In response, Professor Srinivasan points out that this data is taken from 82 choice sets out of a total of 14,535, which is one-half of one percent of the total number of choice. Srin Decl. ¶ 20. Again, this small sample of illogical choices is not significant,

22

1    and cannot bar introduction of the surveys under *Daubert*. Even considering this small portion of

2    the survey results to be material, Professor Srinivasan notes that Mr. Klein ignored the very

3    rational possibility that these survey respondents may have simply not paid attention to the price

4    discount, considering it to be a much less important factor than the other tested product attributes.

5    *Id.* ¶ 19.

6    Professor Srinivasan also accuses Mr. Klein and Sony of merely speculating that any price

7    inconsistencies arise from his choice to use the price discount, as opposed to product price. *Id.* ¶

8    18. Professor Srinivasan states that such price inconsistencies often arise in conjoint analysis, and

9    this is true regardless of whether the product price or a price discount is used. *Id.* Moreover,

10   Professor Srinivasan conducted what he calls a "robustness check" in response to Mr. Klein's

11   critique of his report. *See id.* ¶ 21. According to Professor Srinivasan, the Dashboard results

12   provide an opportunity exclude lower quality data and tested at a 95% level, thereby excluding

13   respondents who exhibit great error in their responses distort the MWTP results. When examining

14   only the higher-quality data, the MTWP numbers for the reboot option decrease on average by two

15   cents, demonstrating that his original MTWP calculations were sound. *Id.*

16   In the face of Professor Srinivasan's convincing rebuttal evidence, Sony cannot genuinely

17   argue that his use of price discounts rendered the surveys unreliable. Mr. Klein failed to test

18   whether the results of his own re-analysis of Professor Srinivasan's survey were statistically

19   significant. Without the help of Mr. Klein's re-analysis of the survey data, Sony has no basis to

20   assert that survey respondents were confused by Professor Srinivasan's use of a price discount as

21   opposed to price. Sony's motion to exclude the Srinivasan surveys on this basis is therefore

22   denied.

23                    **2.    Testing Few Product Features**

24   Sony also argues that Professor Srinivasan's surveys are unreliable because he only tested

25   a portion of all the attributes of each product. As noted above, Professor Srinivasan asked

26   respondents to rank 18 – 20 product attributes in Phase 1 of his study. In Phase 2, he only used the

27   five attributes respondents chose in Phase 1 to have the closest value to autoplay. Sony contends

28   that the exclusion of the majority of product attributes from Phase 2 led respondents to overvalue

                                                    23

1 | each of the product attributes that were tested.

2 |     In response, TVI claims this argument disregards long-standing peer-reviewed literature

3 | that using six or fewer variables leads to better predictive results because survey respondents are

4 | not overwhelmed by too much data. *See* Srin. Decl. Ex. 1-3 at 5-6. TVI quotes Mr. Klein's

5 | partner, Professor Hauser, in a declaration for his work in the *Apple v. Samsung* case in which he

6 | wrote that "from a scientific perspective, it is unnecessary to include all features of a product when

7 | designing a conjoint study. Such a requirement is not consistent with the academic literature or

8 | commercial use of conjoint studies." Arenz Decl. Ex. 13 ¶ 7. Sony does not respond to this point.

9 |     Once again, Sony uses Mr. Klein's re-analysis of Professor Srinivasan's survey data to

10 | attempt to discredit Professor Srinivasan's findings by showing how testing only a portion of the

11 | product features encouraged respondents to overvalue the product features which were tested.

12 | Using the data from Phase 2 of the survey and employing the same software used by Professor

13 | Srinivasan, Mr. Klein measured the MWTP for the six other features tested in Phase 2. Klein Dec.

14 | ¶ 14 and Ex. 7 thereto. Mr. Klein shows the MWTP for each of the six other tested features for

15 | the Blu-ray player:

| Feature | MWTP |
|---|---|
| Ability to play video from computer | $26.79 |
| Adjustable picture settings | $18.24 |
| Camera memory slot | $16.89 |
| Video noise reduction | $20.59 |
| Surround sound | $31.22 |
| Instant skip/replay | $19.40 |
| **Total value of six features:** | **$133.11** |

21 | *Id.* ¶ 15. Mr. Klein opines that such MWTP results are "absurd" because $133.11 is the total value

22 | for only six of the 18 possible features chosen for inclusion in the study, and a fully-featured Blu-

23 | ray player can cost as little as $150.[9] *Id.* Mr. Klein states that the MWTP as measured by the

24 | Srinivasan studies therefore bears no relationship to the market realities of what consumers

25 | actually pay as represented by retail prices. *Id.*

26 |

27 |     [9] In this same regard, Mr. Klein noted that survey respondents valued the six features of

28 | the DVD player at $55.16, which is 80% of Sony's $68.66 retail price, and valued the six features of the PS3 player at $272.83, which is 91% of Sony's $299 retail price. Klein Decl. ¶ 16.

In response to this analysis, Professor Srinivasan accuses Mr. Klein of violating "a very basic principle in conjoint analysis that the analyst should not 'extrapolate.'" Srin. Decl. ¶ 22 ("Any reasonable data analyst, and certainly a conjoint expert should know that extrapolation is to be avoided."). Professor Srinivasan explains:

> The price discounts varied from \$0 to \$5 in the case of DVD players, \$0 to \$10 in the case of Blu-ray player, and \$0 to \$20 in the case of PS3 player. Consequently, the respondent never compared two choice options that varied more than \$5, \$10, and \$20 in the cases of DVD, Blu-ray, and PS3 players, respectively.

*Id.* Professor Srinivasan gives an example of the results for autoplay v. filename for Blu-ray players, where the MTWP value exceeded \$10 but Professor Srinivasan nevertheless entered \$10 for the MWTP. *Id.* ¶ 23. Professor Srinivasan states that "[m]aking projections beyond these values is considered "extrapolation," and that "Mr. Klein's refusal to apply this basic tenet of conjoint analysis makes his opinions regarding values of individual features that exceed the dollar ranges above for the respective product categories ... completely wrong." *Id.* In response to this, Sony notes that even avoiding such extrapolation, six features of the PS3 would still amount to \$120, which is more than a reasonable portion of the retail price.

The foregoing dispute is a classic example of the "battle of the experts" for the jury to decide. While the Court is skeptical of Mr. Klein's violation of what Professor Srinivasan calls a basic principle in conjoint analysis to avoid extrapolation, the Court recognizes the oddity in finding such a high valuation of each individual product feature. Nevertheless, the literature on conjoint analysis condones testing six or fewer variables to produce results with a better predictive value, and the Court will not exclude the Srinvasan surveys for failing to depart from this accepted methodology.

The Court is aware that Judge Alsup recently excluded a conjoint analysis on a *Daubert* motion for its illogical results, noting that testing only a portion of the total number of features may have caused the problem. *See Oracle America, Inc. v. Google, Inc.*, No. 10-3561-WHA, 2012 WL 850705, *9-13 (N.D. Cal. Mar. 13, 2010). However, in that study, the expert tested seven features in the analysis, three of which were covered by the patented technology, and four of which were not. *Id.* at *10. Judge Alsup remarked that the expert offered no principle basis for

25

1    selecting the four non-patented features for inclusion in the analysis. In contrast, Professor

2    Srinivasan conducted his conjoint analysis in two phases, and the objective of Phase 1 entailed a

3    principled basis for choosing the five features which would be tested alongside autoplay in Phase

4    2—their similar values relative to the other features.

### 3. Failure to Test the Closest Noninfringing Alternatives

6    Finally, Sony contends that Professor Srinivasan's surveys should be excluded for failure

7    to compare the value of the autoplay feature next to what Sony considers to be the best two

8    noninfringing alternatives. As discussed above, Sony's "press any button" alternative is excluded

9    from evidence because it still infringes TVI's patents. Moreover, because Sony's other proposed

10   noninfringing alternative—the operating system reload alternative—was not in existence at the

11   time the hypothetical negotiation would have taken place, Sony bears the burden of proving before

12   the jury that this alternative was "available." *Conceptus*, 771 F.Supp.2d at 1179 (citing *Grain

13   Processing*, 185 F.3d at 1353) (whether a purported noninfringing alternative was "available"

14   requires an assessment of whether Sony had the "necessary materials, equipment, know-how, and

15   experience to make an alternative product during the relevant time frame."). Sony has not yet met

16   its burden of proving "availability" because this is a fact issue for the jury to decide. The Court

17   will not exclude an expert report based on Sony's assumption which may be disproven at trial.

### B. Mr. Wagner

19   TVI hired Mr. Wagner to offer an expert opinion on a reasonable royalty rate owed to TVI

20   in the event TVI prevails on its infringement claims. Sony moves to exclude Mr. Wagner's expert

21   opinion on five grounds—the first and last of which the Court quickly rejects. The Court will not

22   exclude Professor Srinivasan's conjoint analysis, thus Mr. Wagner's use of Professor Srinivasan's

23   calculation of the MWTP as a baseline for his royalty rates is admissible. The Court will also not

24   exclude Mr. Wagner's opinion because he considered qualitative factors—the essence of Sony's

25   final argument. Mr. Wagner based his assessment of a reasonable royalty on several underlying

26   considerations and performed the analysis required by *Georgia-Pacific*. *See* Declaration of

27   Michael J. Wagner ("Wagner Decl.") Ex. 1. The Court will now address Sony's more interesting

28   arguments.

26

1

### 1. Price Elasticity

2      Sony contends Mr. Wagner's opinion should be excluded from evidence because of his

3   purported failure to account for price elasticity—the amount by which Sony's sales would decrease

4   as a result of the increase in price associated with Mr. Wagner's reasonable royalties. Sony cites

5   *Crystal Semiconductor Corp. v. Tritech Microelectronics International, Inc.*, where a district court

6   set aside a jury award for lost profits based on a price erosion theory because it lacked adequate

7   record support, and the Federal Circuit affirmed this determination. 246 F.3d 1336, 1361 (Fed.

8   Cir. 2001). The Federal Circuit noted several deficiencies of the patent-holder's expert's report,

9   including the fact the expert "did not present any evidence of how a hypothetical increase in price

10   would have affected Crystal's profits due to lost sales." *Id.* at 1360. The court thought this

11   problematic because "[l]ost sales and price erosion damages are inextricably linked." *Id.*

12      TVI persuasively distinguishes *Crystal Semiconductor* from the instant case. That case

13   arose in the context of price erosion damages, a theory which is not at issue in this case and which

14   differs from an expert's calculation of a reasonable royalty. To be entitled to damages on a price

15   erosion theory, the patent holder must "show that 'but for' infringement, it would have sold its

16   product at a higher price." *Id*. at 1357. The Federal Circuit has noted that "in a credible economic

17   analysis, the patentee cannot show entitlement to a higher price divorced from the effect of that

18   higher price on the demand for the product." *Id.* Therefore, "the patentee's price erosion theory

19   must account for the nature, or definition, of the market, ... and the effect of the hypothetically

20   increased price on the likely number of sales at that price in that market." *Id.* Thus, *Crystal*

21   *Seminconductor* requires a price elasticity analysis when a patent holder seeks to collect damages

22   on a price erosion theory.

23      Mr. Wagner's rebuttal evidence persuades the Court that the reasoning in *Crystal*

24   *Semiconductor* cannot simply extend to calculations of a reasonably royalty. To collect price

25   erosion damages, a patent-holder must show that the infringing conduct affected retail prices. *See*

26   *Crystal Semiconductor*, 246 F.3d at 1357 (to recover price erosion damages, a patent-holder must

27   show that "'but-for infringement, it would have sold its product at higher prices"). One cannot

28   assume, however, that a royalty will always affect retail prices because a supplier of goods does

United States District Court
Northern District of California

not always burden its consumers by passing additional costs downstream. Without a showing that the hypothetical retail prices would have affected Sony's retail prices, the reasoning in *Crystal Semiconductors* is wholly inapplicable to this case.

According to Mr. Wagner, his proposed royalty for the Playstation3 would have resulted in a total added cost of ▮▮▮▮ to Sony based on the sales information that Sony has provided. Wagner Decl. ¶ 5. Sony's total cost of goods sold for Playstation3 is ▮▮▮▮ (not including any sales, general, or administrative costs). *Id.* The ▮▮▮▮ royalty expense would only be an increase of two-tenths of one percent of the total costs. *Id.* According to Mr. Wagner, "Sony has already agreed not to charge over ▮▮▮▮ dollars of costs of goods sold to their customers." *Id.* In that case, the ▮▮▮▮ would be absorbed as a portion of the costs Sony already chooses not to pass onto its customers. *See id.*

## 2. Retail vs. Wholesale Prices

Sony next argues that Mr. Wagner's opinion must be excluded for his calculation of a reasonably royalty using retail prices instead of whole sale prices. Upon a finding of infringement this Court must award damages "adequate to compensate for the infringement, but in no event less than a reasonably royalty for *use made of the invention* by the infringer ...." 35 U.S.C. § 284 (emphasis added). Sony contends that as a wholesaler, Sony's "use made of the invention" must be measured by wholesale prices as opposed to retail prices, which Mr. Wagner recognizes is usually double in relation to the wholesale price.

Sony does not cite any case in support of this argument. TVI contends that nothing in § 284 or Federal Circuit precedent requires the use of wholesale prices to calculate a reasonable royalty to be paid by a wholesaler. TVI notes that Mr. Wagner is required to "carefully tie proof of damages to the claimed invention's footprint in the market place," *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010), and contends Mr. Wagner has done just that by considering the value of TVI's patented technology to consumers in the context of the *Georgia-Pacific* factors. TVI also argues that Sony's argument makes no sense in a real-world application. TVI asserts that because it may recover on the theory of indirect infringement through its retailers' or end-consumers' infringing use, Mr. Wagner's consideration of the value to end consumers is

28

1    appropriate. In the same regard, TVI argues that under the theory of patent exhaustion,

2    downstream infringers (retailers and end-consumers) effectively receive a license to use TVI's

3    patented technology and thus consideration of retail prices is appropriate.

4         The Court will not exclude Mr. Wagner's opinion from evidence on this basis. While

5    Sony puts forth an interesting argument, Sony lacks any precedential support for the argument that

6    a hypothetically-calculated reasonable royalty must be tied to wholesale prices as opposed to retail

7    prices. Sony has failed to prove that Mr. Wagner's use of retail prices renders his opinion

8    unreliable under *Daubert*. If Mr. Wagner's use of retail prices rendered his calculation of a

9    reasonable royalty inaccurate, that goes to the weight of his testimony rather than admissibility.

10                    **3.    Royalty Values from 2011/2012**

11        Sony's final argument is that Mr. Wagner improperly used Professor Srinivasan's MWTP

12   as a baseline for his royalty rates because Professor Srinivasan's surveys were taken in 2011 and

13   2012, fifteen years after the date of the hypothetical negotiation in 1997. Sony cites *Laser*

14   *Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012), where the Federal Circuit

15   stated that "[a] reasonably royalty determination for purposes of making a damages evaluation

16   must relate to the time infringement occurred, and not be an after-the-fact assessment." *Id.* at 75

17   (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002)). In *Laser*

18   *Dynamics*, the Federal Circuit reversed the district court for requiring the parties to set their

19   hypothetical negotiation at the time the lawsuit was filed as opposed to when infringement began.

20   *Id.* Here, Mr. Wagner calculated a reasonable royalty using a hypothetical negotiation date in

21   1998, which is the date Sony began selling the accused products. Wagner Decl. Ex. 1 at 31.

22        Sony's challenge to Mr. Wagner's opinion is therefore more subtle than the issue presented

23   in *Laser Dynamics*. Sony contends that even though Mr. Wagner agrees a reasonable royalty rate

24   should correspond to the hypothetical negotiation in 1997-1998, Mr. Wagner's consideration of

25   surveys from 2011-2012 render his calculations unreliable. More specifically, Sony argues that

26   consumers value autoplay in relation to reboot more than they did fifteen years ago. In response,

27   TVI argues that because DVD prices have decreased since they were first introduced, survey

28   respondents likely placed less importance on price than they would have done in 1997.

United States District Court
Northern District of California

1          Sony may be correct in its assessment that consumers value autoplay more today than they

2   did fifteen years ago, but this is an issue for the jury to decide. It simply does not follow that Mr.

3   Wagner's consideration of the Srinivasan surveys from 2011-2011 render his calculations

4   unreliable in the face of *Daubert*. Rather, the lapse in time goes to the weight of Mr. Wagner's

5   testimony. In the same regard, Mr. Wagner's failure to consider the 1997 licensing agreement

6   negotiated between TVI and Intel for the same technology bears on the weight of his testimony,

7   but does not merit total exclusion. Accordingly, the Court will not exclude Mr. Wagner's opinion

8   on this basis.

9          ## C.   Dr. Wolfe

10          Dr. Wolfe was hired by TVI as an expert on the best noninfringing alternatives. Arenz

11   Decl. Ex. 7 (Opening Expert Report of Dr. Andrew Wolfe). As mentioned in the discussion of

12   Professor Srinivasan's surveys, Dr. Wolfe's expert report suggests that the two next-best

13   noninfringing alternatives are the filename and the reboot alternatives. *Id.* ¶ 97. In filename

14   alternative, a user inputs a filename in order to begin playback of content from a disc. In the

15   reboot alternative, a user reboots between disc insertions. According to Dr. Wolfe, "[t]his would

16   cause the user interface, both on the video display and the device front panel, to disappear for at

17   least some period of time. It would also cause an additional delay in playing the new disc." *Id.*

18          Dr. Wolfe conducted a series of experiences to quantify the impact of the delay incurred as

19   a result of using the reboot noninfringing alternative. *Id.* ¶ 98. Dr. Wolfe took two time-estimates

20   to document the time it would take for content from a disc to be displayed on the screen using both

21   autoplay and the reboot noninfringing alternative. Dr. Wolfe captured the playback of each disc

22   on HD video and then extracted the playback time by reviewing the time codes for each recording

23   to the nearest $1/30^{th}$ of a second. *Id.* ¶ 100. Dr. Wolfe displayed his time measurements on two

24   charts in of his opening expert report. *See id.* at 47, 49.

25          Sony challenges Dr. Wolfe's time measurements on grounds that his "tests were not

26   derived from scientific methods." Sony Daubert Motion at 23. Sony asserts that "Dr. Wolfe has

27   not pointed to any peer review or publication to support that his tests rest on scientifically valid

28   principles." *Id.* Sony criticizes Dr. Wolfe's failure at his deposition to explain the details about

1  how he conducted his tests, and failure to include the tape-recordings of Dr. Wolfe's time

2  measurements in his expert report as required by Rule 26 of the Federal Rules of Civil Procedure.

3  *Id.*

4  Sony's contentions are meritless. Dr. Wolfe more than adequately explained each step of

5  the process in his expert report. Sony makes much of the fact that such time-measurements have

6  not been "peer-reviewed" and tested for accuracy. However, with respect to measurement of time

7  by tape-recordings, no such peer-review is necessary. The Court will therefore not exclude Dr.

8  Wolfe's expert opinion.

9  Furthermore, the fact that Dr. Wolfe tape-recorded his tests does not mean he violated the

10  Federal Rules of Civil Procedure by not including these recordings in his expert report. Pursuant

11  to Rule 26, Dr. Wolfe was required to disclose in his opening report "(i) a complete statement of

12  all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data

13  considered by the witness in forming them." Fed.R.Civ.P. 26(a)(2)(B). He did so. Sony learned

14  of the videotapes at deposition but neither sought them, moved to compel, nor moved to

15  supplement its expert opinions. This motion came too late.

16  **V.    CONCLUSION**

17  For the reasons stated above, Sony's *Daubert* Motion is DENIED and TVI's Partial

18  *Daubert* Motion is GRANTED in part and DENIED in part as set forth above.

19  IT IS SO ORDERED.

20  Dated: March 1, 2013

22  

23  Joseph C. Spero
    United States Magistrate Judge

31